IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

APPEAL NO.  22-11884

_____

UNITED STATES OF AMERICA
Plaintiff-Appellee,

v.

SAMUEL CHRISTOPHER TEMPLEMAN
Defendant-Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
(Jacksonville Division, Case No.3:21-cr-19-MMH-PDB)

_____

APPELLANT'S APPENDIX ON APPEAL

_____

A. Fitzgerald Hall
Federal Defender, MDFL

Stephen J. Langs, Esq.
Assistant Federal Defender
Appellate Division
Florida Bar No. 0137227
201 South Orange Avenue, Suite 300
Orlando, Florida 32801
Phone (407) 648-6338
Fax (407) 648-6765
Stephen_Langs@fd.org
Counsel for Appellant Templeman

No. 22-11884

*United States of America v. Samuel Christopher Templeman*

INDEX OF APPENDIX[1]

| Docket/Tab No. | Document |
| --- | --- |
| A | Criminal Docket Sheet |
| 1 | Indictment |
| 59 | Plea Agreement |
| 98 | Sentencing Minutes, 5/17/2022 |
| 99 | Second Amended Sentencing Memorandum |
| 100 | Judgment |
| 115 | Transcript - Change of Plea 6/21/2021 |
| 119 | Transcript - Sentencing 5/17/2022 |
| Cert | Certificate of Service |

---

[1] The presentence report and statement of reasons will be filed separately under seal.

APPEAL, CLOSED, CUSTODY, SL_DOC, TRLSET

# U.S. District Court
# Middle District of Florida (Jacksonville)
# CRIMINAL DOCKET FOR CASE #: 3:21-cr-00019-MMH-PDB All Defendants

Case title: USA v. Templeman et al

Date Filed: 02/25/2021

Date Terminated: 05/18/2022

---

Assigned to: Judge Marcia Morales Howard
Referred to: Magistrate Judge Patricia D. Barksdale

Appeals court case number: 22-11884-F USCA

### Defendant (1)

**Samuel Christopher Templeman**
*CUSTODY*
*TERMINATED: 05/18/2022*

represented by **Conrad Kahn**
Federal Public Defender's Office
201 S Orange Ave., Ste 300
Orlando, FL 32801-3417
407/648-6338
Email: Conrad_Kahn@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maurice C. Grant , II**
Federal Public Defender Florida Middle
200 W. Forsyth Street
Ste 1240
Jacksonville, FL 32202
904-232-3039
Fax: 904-232-1937
Email: maurice_grant@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Stephen J. Langs**
Federal Public Defender's Office
201 S Orange Ave., Ste 300
Orlando, FL 32801-3417
407/648-6338 Ext 133
Fax: 407/648-6095
Email: stephen_langs@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Pending Counts**                                        **Disposition**

18:1594.F FORFEITURE
(1)

Imprisonment: 160 months; Supervised Release: 120 months; Special Assessment: $100.00.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

18:1591.F SEX TRAFFICKING OF CHILDREN OR BY FORCE, FRAUD OR COERCION
(2)

**Disposition**

Dismissed on the motion of the Assistant U.S. Attorney and pursuant to the Plea Agreement.

**Highest Offense Level (Terminated)**

Felony

**Complaints**

None

**Disposition**

---

Assigned to: Judge Marcia Morales Howard
Referred to: Magistrate Judge Patricia D. Barksdale

**Defendant (2)**

**Deborah Lynn Templeman**
*CUSTODY*
*TERMINATED: 05/18/2022*

represented by **Andrew Michael Bonderud**
The Bonderud Law Firm, PA
301 W. Bay Street #1433
Jacksonville, FL 32202
904/438-8082
Fax: 904/800-1482
Email: bonderudlaw@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Pending Counts**

18:2252A.F ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO
(3)

**Disposition**

Imprisonment: 72 months; Supervised Release: 120 months; Special Assessment: $100.00.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

18:1594.F FORFEITURE
(1)

**Disposition**

Dismissed on the motion of the Assistant U.S. Attorney and pursuant to the Plea

Agreement.

**Highest Offense Level (Terminated)**

Felony

**Complaints**                                    **Disposition**

None

---

**Plaintiff**

**USA**                              represented by   **Laura Cofer Taylor**
                                                      US Attorney's Office - FLM*
                                                      Suite 700
                                                      300 N Hogan St
                                                      Jacksonville, FL 32202
                                                      904-301-6249
                                                      Email: Laura.C.Taylor@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Retained*

                                                      **Kelly Karase**
                                                      US Attorney's Office - FLM
                                                      Suite 700
                                                      300 N Hogan St
                                                      Jacksonville, FL 32202
                                                      904/301-6301
                                                      Fax: 904/301-6310
                                                      Email: Kelly.Karase@usdoj.gov
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Mai Tran**
                                                      United States Attorney's Office
                                                      Suite 700
                                                      300 N. Hogan Street
                                                      Jacksonville, FL 32202
                                                      904-301-6300
                                                      Fax: 904-301-6310
                                                      Email: mai.tran2@usdoj.gov
                                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/25/2021 | 1 | INDICTMENT returned in open court as to Samuel Christopher Templeman (1) count(s) 1, 2, Deborah Lynn Templeman (2) count(s) 1, 3. (BGR) (Entered: 02/26/2021) |
| 02/25/2021 | 2 | MOTION for Arrest Warrant by USA as to Samuel Christopher Templeman. (BGR) (Entered: 02/26/2021) |
| 02/25/2021 | 3 | MOTION for Arrest Warrant by USA as to Deborah Lynn Templeman. (BGR) (Entered: 02/26/2021) |

| 02/25/2021 | 4 | **ORDER granting 2 Motion for Warrant as to Samuel Christopher Templeman (1). Signed by Magistrate Judge Monte C. Richardson on 2/25/2021. (BGR)** (Entered: 02/26/2021) |
|---|---|---|
| 02/25/2021 | 5 | **ORDER granting 3 Motion for Warrant as to Deborah Lynn Templeman (2). Signed by Magistrate Judge Monte C. Richardson on 2/25/2021. (BGR)** (Entered: 02/26/2021) |
| 03/01/2021 | 10 | **ORDER as to Samuel Christopher Templeman, Deborah Lynn Templeman: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Judge Timothy J. Corrigan on 12/1/2020. (BGR)** (Entered: 03/01/2021) |
| 03/16/2021 | | ARREST of Samuel Christopher Templeman and Deborah Lynn Templeman on 3/16/2021 (ASL) (Entered: 03/17/2021) |
| 03/16/2021 | 14 | MINUTE entry for in person proceedings held before Magistrate Judge Patricia D. Barksdale: Initial Appearance as to Samuel Christopher Templeman and Deborah Lynn Templeman held on 3/16/2021. (Digital) (ASL) (Entered: 03/17/2021) |
| 03/16/2021 | 15 | ORAL MOTION to appoint counsel by Samuel Christopher Templeman. (ASL) Motions referred to Magistrate Judge Patricia D. Barksdale. (Entered: 03/17/2021) |
| 03/16/2021 | 16 | ORAL MOTION to appoint counsel by Deborah Lynn Templeman. (ASL) Motions referred to Magistrate Judge Patricia D. Barksdale. (Entered: 03/17/2021) |
| 03/16/2021 | 17 | ORAL MOTION for detention by USA as to Samuel Christopher Templeman. (ASL) Motions referred to Magistrate Judge Patricia D. Barksdale. (Entered: 03/17/2021) |
| 03/16/2021 | 18 | ORAL MOTION for detention by USA as to Deborah Lynn Templeman. (ASL) Motions referred to Magistrate Judge Patricia D. Barksdale. (Entered: 03/17/2021) |
| 03/16/2021 | 19 | ORAL MOTION to continue the detention hearings by USA. (ASL) (Entered: 03/17/2021) |
| 03/16/2021 | 20 | **ORDER granting 15 Samuel Christopher Templeman's oral motion to appoint counsel and appointing the Federal Defender's Office to represent him in this case. Signed by Magistrate Judge Patricia D. Barksdale on 3/16/2021. (ASL)** (Entered: 03/17/2021) |
| 03/16/2021 | 21 | **ORDER granting 16 Deborah Lynn Templeman's oral motion to appoint counsel and appointing Andrew Bonderud, Esquire, to represent her in this case. Signed by Magistrate Judge Patricia D. Barksdale on 3/16/2021. (ASL)** (Entered: 03/17/2021) |
| 03/16/2021 | 22 | **ORDER OF TEMPORARY DETENTION granting 19 the United States' oral motion to continue the detention hearings and scheduling the detention hearings for 3/19/2021 at 12:15 PM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. Signed by Magistrate Judge Patricia D. Barksdale on 3/16/2021. (ASL)** (Entered: 03/17/2021) |
| 03/17/2021 | 11 | Arrest Warrant Returned Executed on 3/16/2021 as to Samuel Christopher Templeman. (BGR) (Entered: 03/17/2021) |
| 03/17/2021 | 12 | Arrest Warrant Returned Executed on 3/16/2021 as to Deborah Lynn Templeman. (BGR) (Entered: 03/17/2021) |

| 03/18/2021 | 24 | STL2 of particular or Forfeiture of Property as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Glober, Bonnie) (Modified on 3/18/2021, to edit text) (BGR). (Entered: 03/18/2021) |
| --- | --- | --- |
| 03/19/2021 | 25 | MINUTE entry for the in person arraignment and detention hearings held on 3/19/2021 before Magistrate Judge Patricia D. Barksdale: The defendants entered pleas of not guilty to each count against them in the indictment and moved to continue the detention hearing. Judge Barksdale granted the motion to continue and scheduled the detention hearing for 3/23/2021 at 1:30 p.m. (Digital) (ASL) (Entered: 03/22/2021) |
| 03/19/2021 | 26 | ORAL MOTION to continue the detention hearing by Samuel Christopher Templeman and Deborah Lynn Templeman. (ASL) (Entered: 03/22/2021) |
| 03/19/2021 | 27 | **ORDER OF TEMPORARY DETENTION granting 26 Samuel Christopher Templeman's and Deborah Lynn Templeman's oral motion to continue the detention hearing and scheduling the detention hearing for 3/23/2021 at 01:30 PM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. Signed by Magistrate Judge Patricia D. Barksdale on 3/19/2021. (ASL)** (Entered: 03/22/2021) |
| 03/19/2021 | 28 | NOTICE of acceptance of general discovery by Samuel Christopher Templeman (filed in open court). (ASL) (Entered: 03/22/2021) |
| 03/19/2021 | 29 | NOTICE of acceptance of general discovery by Deborah Lynn Templeman (filed in open court). (ASL) (Entered: 03/22/2021) |
| 03/19/2021 | 30 | **SCHEDULING ORDER as to Samuel Christopher Templeman and Deborah Lynn Templeman: A status conference is scheduled for 4/19/2021 at 03:00 PM in Jacksonville Courtroom 10B before Judge Marcia Morales Howard; the jury trial is scheduled for 5/3/2021 at 09:00 AM in Jacksonville Courtroom 10B before Judge Marcia Morales Howard; discovery, dispositive, and suppression motions are due by 4/19/2021. Signed by Deputy Clerk on 3/19/2021. (ASL)** (Entered: 03/22/2021) |
| 03/23/2021 | 31 | MOTION for Protective Order by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) Motions referred to Magistrate Judge Patricia D. Barksdale. (Entered: 03/23/2021) |
| 03/23/2021 | 33 | MINUTE entry for the in person detention hearing held on 3/23/2021 before Magistrate Judge Patricia D. Barksdale: The defendants waived their right to a detention hearing, reserving the right to reopen if circumstances change. (Digital) (ASL) (Entered: 03/24/2021) |
| 03/23/2021 | 34 | **ORDER OF DETENTION PENDING TRIAL as to Samuel Christopher Templeman. Signed by Magistrate Judge Patricia D. Barksdale on 3/23/2021. (ASL)** (Entered: 03/24/2021) |
| 03/23/2021 | 35 | **ORDER OF DETENTION PENDING TRIAL as to Deborah Lynn Templeman. Signed by Magistrate Judge Patricia D. Barksdale on 3/23/2021. (ASL)** (Entered: 03/24/2021) |
| 03/24/2021 | 32 | **PROTECTIVE ORDER granting 31 the United States' motion for protective order. Signed by Magistrate Judge Patricia D. Barksdale on 3/24/2021. (ASL)** (Entered: 03/24/2021) |
| 04/15/2021 | 36 | NOTICE: The status conference set for April 19, 2021, at 3:00 p.m. will be held telephonically. The Courtroom Deputy Clerk will separately provide counsel with the call-in information. (JW) (Entered: 04/15/2021) |
| 04/19/2021 | 37 | ORAL MOTION to Continue trial by Samuel Christopher Templeman, Deborah Lynn |

| 04/19/2021 | 38 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Samuel Christopher Templeman, Deborah Lynn Templeman held on 4/19/2021; granting 37 Oral Motion to Continue as to Samuel Christopher Templeman (1), Deborah Lynn Templeman (2). Status Conference set for 6/21/2021 at 03:00 PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 7/6/2021 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Court Reporter: Cindy Packevicz Jarriel (JW) (Entered: 04/20/2021) |
|---|---|---|
| 04/22/2021 | 39 | MOTION to Take Deposition by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) Motions referred to Magistrate Judge Patricia D. Barksdale. (Entered: 04/22/2021) |
| 04/28/2021 | 40 | **ORDER granting 39 the United States' motion to take deposition. Signed by Magistrate Judge Patricia D. Barksdale on 4/28/2021. (ASL)** (Entered: 04/28/2021) |
| 05/20/2021 | 41 | NOTICE *of Dates and Times of Deposition of the Material Witness* by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman (Taylor, Laura) (Entered: 05/20/2021) |
| 05/20/2021 | 42 | MOTION for Writ of Habeas Corpus ad testificandum by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) Motions referred to Magistrate Judge Patricia D. Barksdale. (Entered: 05/20/2021) |
| 05/20/2021 | 43 | MOTION for Writ of Habeas Corpus ad testificandum by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) Motions referred to Magistrate Judge Patricia D. Barksdale. (Entered: 05/20/2021) |
| 05/20/2021 | 44 | MOTION to Seal by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) (Entered: 05/20/2021) |
| 05/20/2021 | 45 | **ORDER granting 44 Motion to Seal as to Samuel Christopher Templeman (1), Deborah Lynn Templeman (2). Signed by Magistrate Judge Patricia D. Barksdale on 5/20/2021. (RH)** (Entered: 05/20/2021) |
| 05/20/2021 | | Sealed Documents S-46 and S-47 (RH) (Entered: 05/20/2021) |
| 05/28/2021 | 48 | Unopposed MOTION to Continue Deposition of the Material Witness by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) (Entered: 05/28/2021) |
| 05/28/2021 | 49 | MOTION for Miscellaneous Relief, specifically Dissolve Writs of Habeas Corpus Ad Testificandum by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) (Entered: 05/28/2021) |
| 05/28/2021 | 50 | **ORDER granting the United States' motions for 48 leave to reschedule the deposition of the person referred to in the indictment as "Minor Victim 1" and 49 to dissolve the writs associated with the deposition. Signed by Magistrate Judge Patricia D. Barksdale on 5/28/2021. (ASL)** (Entered: 05/28/2021) |
| 06/09/2021 | 51 | Unopposed MOTION to Continue Deposition of the Material Witness by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) (Entered: 06/09/2021) |
| 06/11/2021 | 52 | **ORDER granting 51 the United States' second motion to reschedule a deposition. Signed by Magistrate Judge Patricia D. Barksdale on 6/11/2021. (ASL)** (Entered: 06/11/2021) |

| | | |
|---|---|---|
| 06/15/2021 | 53 | NOTICE OF HEARING as to Samuel Christopher Templeman: A change of plea hearing is scheduled for 6/17/2021 at 10:00 AM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. (ASL) (Entered: 06/15/2021) |
| 06/16/2021 | 54 | NOTICE OF HEARING as to Deborah Lynn Templeman: A change of plea hearing is scheduled for 6/18/2021 at 01:30 PM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. (ASL) (Entered: 06/16/2021) |
| 06/16/2021 | 55 | NOTICE: The status conference set for June 21, 2021, at 3:00 p.m. will be held telephonically. The Courtroom Deputy Clerk will separately provide counsel with the call-in information. (JW) (Entered: 06/16/2021) |
| 06/17/2021 | 56 | NOTICE OF RESCHEDULING HEARING as to Deborah Lynn Templeman: The change of plea hearing previously scheduled for 6/18/2021 is rescheduled to 6/21/2021 at 02:00 PM in Jacksonville Courtroom 5B before Magistrate Judge Patricia D. Barksdale. (ASL) (Entered: 06/17/2021) |
| 06/17/2021 | 57 | MINUTE entry for the in person change-of-plea hearing held on 6/17/2021 before Magistrate Judge Patricia D. Barksdale: Samuel Christopher Templeman entered a plea of guilty to count one of the indictment. (Digital) (ASL) (Entered: 06/21/2021) |
| 06/17/2021 | 58 | CONSENT regarding entry of a plea of guilty by Samuel Christopher Templeman (filed in open court). (ASL) (Entered: 06/21/2021) |
| 06/17/2021 | 59 | PLEA AGREEMENT re: count one of the indictment as to Samuel Christopher Templeman (filed in open court; the original document has been returned to the AUSA). (ASL) (Entered: 06/21/2021) |
| 06/17/2021 | 60 | **REPORT AND RECOMMENDATION concerning plea of guilty re: count one of the indictment as to Samuel Christopher Templeman. The parties agreed to waive the 14-day objection period. Signed by Magistrate Judge Patricia D. Barksdale on 6/17/2021. (ASL)** (Entered: 06/21/2021) |
| 06/21/2021 | 62 | Minute Entry for Telephonic proceedings held before Judge Marcia Morales Howard: STATUS Conference as to Samuel Christopher Templeman, Deborah Lynn Templeman held on 6/21/2021. Court Reporter: Sharon A. Miller (JW) (Entered: 06/21/2021) |
| 06/21/2021 | 63 | Unopposed MOTION to Continue Deposition of the Material Witness by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) (Entered: 06/21/2021) |
| 06/21/2021 | 64 | MINUTE entry for the in person change-of-plea hearing held on 6/21/2021 before Magistrate Judge Patricia D. Barksdale: Deborah Lynn Templeman entered a plea of guilty to count three of the indictment. (Digital) (ASL) (Entered: 06/21/2021) |
| 06/21/2021 | 65 | CONSENT regarding entry of a plea of guilty by Deborah Lynn Templeman (filed in open court) (ASL) (Entered: 06/21/2021) |
| 06/21/2021 | 66 | PLEA AGREEMENT re: count three of the indictment as to Deborah Lynn Templeman (filed in open court; the original document has been returned to the AUSA). (ASL) (Entered: 06/21/2021) |
| 06/21/2021 | 67 | **REPORT AND RECOMMENDATION concerning plea of guilty re: count three of the indictment as to Deborah Lynn Templeman. The parties agreed to waive the 14-day objection period. Signed by Magistrate Judge Patricia D. Barksdale on 6/21/2021. (ASL)** (Entered: 06/21/2021) |
| 06/21/2021 | 68 | **ORDER granting 63 the United States' unopposed motion to continue for thirty days the June 24 and 25, 2021, deposition. Signed by Magistrate Judge Patricia D.** |

| | | Barksdale on June 21, 2021 (ASL) (Entered: 06/21/2021) |
|---|---|---|
| 07/20/2021 | 69 | ACCEPTANCE OF PLEA of guilty and adjudication of guilt re: Count One of the Indictment as to Samuel Christopher Templeman. Sentencing set for 10/29/2021 at 02:00PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Signed by Judge Marcia Morales Howard on 7/20/2021. (JW) (Entered: 07/20/2021) |
| 07/20/2021 | 70 | ACCEPTANCE OF PLEA of guilty and adjudication of guilt re: Count One of the Indictment as to Deborah Lynn Templeman. Sentencing set for 10/29/2021 at 02:00PM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Signed by Judge Marcia Morales Howard on 7/20/2021. (JW) (Entered: 07/20/2021) |
| 07/21/2021 | 71 | Unopposed MOTION to Cancel Deposition of the Material Witness by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) (Modified on 7/22/2021, to edit text) (BGR). (Entered: 07/21/2021) |
| 07/23/2021 | 72 | **ORDER granting 71 the United States' unopposed motion to cancel the July 26 and 27, 2021, deposition of "Minor Victim 1." Signed by Magistrate Judge Patricia D. Barksdale on July 22, 2021. (ASL)** (Entered: 07/23/2021) |
| 08/10/2021 | 73 | NOTICE OF ATTORNEY APPEARANCE Mai Tran appearing for USA. (Tran, Mai) (Entered: 08/10/2021) |
| 09/21/2021 | 74 | Unopposed MOTION for Forfeiture of a Preliminary Order by USA as to Samuel Christopher Templeman. (Tran, Mai) (Entered: 09/21/2021) |
| 09/21/2021 | 75 | Unopposed MOTION for Forfeiture of a Preliminary Order by USA as to Deborah Lynn Templeman. (Tran, Mai) (Entered: 09/21/2021) |
| 09/23/2021 | 76 | RULE 32(e)(2) INITIAL PRESENTENCE INVESTIGATION REPORT as to Samuel Christopher Templeman. E-copies made available to selected parties.(JIS) (Entered: 09/23/2021) |
| 10/22/2021 | 78 | Unopposed Joint MOTION to Continue Sentencing by Samuel Christopher Templeman as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Grant, Maurice) (Modified on 10/25/2021, to edit text) (BGR). (Entered: 10/22/2021) |
| 10/22/2021 | 79 | **ORDER granting 78 Motion to Continue as to Samuel Christopher Templeman (1), Deborah Lynn Templeman (2). Sentencing continued to January 10, 2022, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 10/22/2021. (JW)** (Entered: 10/22/2021) |
| 12/09/2021 | 80 | NOTICE OF RESCHEDULING HEARING: The sentencing hearing previously scheduled for January 10, 2022, at 1:30 p.m. is rescheduled as to Samuel Christopher Templeman and Deborah Lynn Templeman. New hearing date and time:Sentencing as to both Defendants set for January 31, 2022, at 9:30 a.m. in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. (JW) (Entered: 12/09/2021) |
| 01/18/2022 | 81 | Second MOTION to Continue Sentencing *Unopposed* by Samuel Christopher Templeman. (Grant, Maurice) (Entered: 01/18/2022) |
| 01/19/2022 | 82 | **ORDER granting 81 Motion to Continue Sentencing. The sentencing in this matter as to both Defendants is continued to March 17, 2022, at 9:30 a.m. Signed by Judge Marcia Morales Howard on 1/19/2022. (JW)** (Entered: 01/19/2022) |
| 01/26/2022 | 83 | MOTION to Continue Sentencing by USA as to Samuel Christopher Templeman, Deborah Lynn Templeman. (Taylor, Laura) (Entered: 01/26/2022) |
| 01/27/2022 | 84 | **ORDER granting 83 Motion to Continue as to Samuel Christopher Templeman (1), Deborah Lynn Templeman (2). Sentencing as to both Defendants continued to April** |

| | | |
|---|---|---|
| | | , 2022, at 1:30 p.m. Signed by Judge Marcia Morales Howard on 1/27/2022. (JW) (Entered: 01/27/2022) |
| 02/07/2022 | 85 | NOTICE OF ATTORNEY APPEARANCE Kelly Karase appearing for USA. (Karase, Kelly) (Entered: 02/07/2022) |
| 03/23/2022 | 86 | Third MOTION to Continue Sentencing *Unopposed* by Samuel Christopher Templeman. (Grant, Maurice) (Entered: 03/23/2022) |
| 03/24/2022 | 87 | **ORDER granting 86 Motion to Continue. The sentencing as to both Defendants is continued to May 17, 2022, at 9:30 a.m. Signed by Judge Marcia Morales Howard on 3/24/2022. (JW)** (Entered: 03/24/2022) |
| 04/13/2022 | 88 | **PRELIMINARY ORDER OF FORFEITURE (granting 74 Motion for Forfeiture of Property as to Samuel Christopher Templeman (1)). Signed by Judge Marcia Morales Howard on 4/13/2022. (JW)** (Entered: 04/13/2022) |
| 04/13/2022 | 89 | **PRELIMINARY ORDER OF FORFEITURE (granting 75 Motion for Forfeiture of Property as to Deborah Lynn Templeman (2)). Signed by Judge Marcia Morales Howard on 4/13/2022. (JW)** (Entered: 04/13/2022) |
| 05/06/2022 | 90 | RULE 32(g) FINAL PRESENTENCE INVESTIGATION REPORT as to Samuel Christopher Templeman. E-copies made available to selected parties.(MF) (Entered: 05/06/2022) |
| 05/13/2022 | 94 | SENTENCING MEMORANDUM by Samuel Christopher Templeman (Attachments: # 1 Exhibit Letters of Support)(Grant, Maurice) (Entered: 05/13/2022) |
| 05/13/2022 | 95 | SENTENCING MEMORANDUM by Deborah Lynn Templeman (Bonderud, Andrew) (Entered: 05/13/2022) |
| 05/15/2022 | 96 | AMENDED SENTENCING MEMORANDUM as to Samuel Christopher Templeman. Amendment to 94 Sentencing Memorandum (Attachments: # 1 Exhibit Letters of Support)(Grant, Maurice) (Modified on 5/16/2022, to edit text) (BGR). (Entered: 05/15/2022) |
| 05/16/2022 | 97 | PROOF OF PUBLICATION as to Samuel Christopher Templeman, Deborah Lynn Templeman newspaper: Official Government Internet Site (www.forfeiture.gov) dates of publication: 30 consecutive days from April 15, 2022 through May 14, 2022. (Tran, Mai) (Entered: 05/16/2022) |
| 05/17/2022 | 98 | Minute Entry for In Person proceedings held before Judge Marcia Morales Howard: SENTENCING held on 5/17/2022 for Samuel Christopher Templeman (1), Count(s) 1, Imprisonment: 160 months; Supervised Release: 120 months; Special Assessment: $100.00.; Count(s) 2, Dismissed on the motion of the Assistant U.S. Attorney and pursuant to the Plea Agreement. Defendant is remanded to the custody of the U.S. Marshal.; Deborah Lynn Templeman (2), Count(s) 1, Dismissed on the motion of the Assistant U.S. Attorney and pursuant to the Plea Agreement.; Count(s) 3, Imprisonment: 72 months; Supervised Release: 120 months; Special Assessment: $100.00. Defendant is remanded to the custody of the U.S. Marshal. Court Reporter: Katharine Healey (BGR) (Entered: 05/18/2022) |
| 05/17/2022 | 99 | SECOND AMENDED SENTENCING MEMORANDUM as to Samuel Christopher Templeman (Attachments: # 1 Exhibit Letters of Support)(BGR) (Entered: 05/18/2022) |
| 05/18/2022 | 100 | **JUDGMENT as to Samuel Christopher Templeman (1), Count(s) 1, Imprisonment: 160 months; Supervised Release: 120 months; Special Assessment: $100.00.; Count(s) 2, Dismissed on the motion of the Assistant U.S. Attorney and pursuant to** |

| | | the Plea Agreement. Signed by Judge Marcia Morales Howard on 5/18/2022. (BGR) (Entered: 05/18/2022) |
|---|---|---|
| 05/18/2022 | [101](#) | STATEMENT OF REASONS as to Samuel Christopher Templeman. E-copies made available to selected parties. (BGR) (Entered: 05/18/2022) |
| 05/18/2022 | [102](#) | **JUDGMENT as to Deborah Lynn Templeman (2), Count(s) 1, Dismissed on the motion of the Assistant U.S. Attorney and pursuant to the Plea Agreement.; Count(s) 3, Imprisonment: 72 months; Supervised Release: 120 months; Special Assessment: $100.00. Signed by Judge Marcia Morales Howard on 5/18/2022. (BGR)** (Entered: 05/18/2022) |
| 05/24/2022 | [104](#) | SENTENCING MEMORANDUM by Deborah Lynn Templeman (Bonderud, Andrew) (Entered: 05/24/2022) |
| 06/01/2022 | [105](#) | NOTICE OF APPEAL by Samuel Christopher Templeman re [100](#) Judgment,. Filing fee not paid (Grant, Maurice) (Entered: 06/01/2022) |
| 06/03/2022 | [106](#) | TRANSMITTAL of initial appeal package as to Samuel Christopher Templeman to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re [105](#) Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (Attachments: # [1](#) Notice of appeal, # [2](#) Judgment)(SJW) (Entered: 06/03/2022) |
| 06/08/2022 | | USCA Case Number as to Samuel Christopher Templeman. USCA Number: 22-11884-F for [105](#) Notice of Appeal filed by Samuel Christopher Templeman. (SJW) (Entered: 06/08/2022) |
| 06/15/2022 | [107](#) | MOTION for Final Order of Forfeiture by USA as to Samuel Christopher Templeman. (Tran, Mai) (Modified on 6/16/2022, to edit text) (BGR). (Entered: 06/15/2022) |
| 06/15/2022 | [108](#) | MOTION for Final Order of Forfeiture by USA as to Deborah Lynn Templeman. (Tran, Mai) (Modified on 6/16/2022, to edit text.) (BGR). (Entered: 06/15/2022) |
| 06/15/2022 | [109](#) | NOTICE OF ATTORNEY APPEARANCE: Stephen J. Langs appearing for Samuel Christopher Templeman *for Appellate Purposes Only* (Kahn, Conrad) (Modified on 6/16/2022, to edit text) (BGR). (Entered: 06/15/2022) |
| 06/15/2022 | [110](#) | NOTICE OF ATTORNEY APPEARANCE: Stephen J. Langs appearing for Samuel Christopher Templeman *for Appellate Purposes Only* (Langs, Stephen) (Modified on 6/16/2022, DUPLICATE ENTRY see [109](#) Notice.) (BGR). (Entered: 06/15/2022) |
| 06/16/2022 | [111](#) | **FINAL ORDER OF FORFEITURE (granting [107](#) Motion for Forfeiture of Property as to Samuel Christopher Templeman (1)). Signed by Judge Marcia Morales Howard on 6/16/2022. (JW)** (Entered: 06/16/2022) |
| 06/16/2022 | [112](#) | **FINAL ORDER OF FORFEITURE (granting [108](#) Motion for Forfeiture of Property as to Deborah Lynn Templeman (2)). Signed by Judge Marcia Morales Howard on 6/16/2022. (JW)** (Entered: 06/16/2022) |
| 06/16/2022 | [113](#) | TRANSCRIPT information form filed by Samuel Christopher Templeman for proceedings held on 6/17/21, 6/21/21, 5/17/22 before Judge Morales Howard, Judge Patricia Barksdale re [105](#) Notice of Appeal. USCA number: 22-11884. (Langs, Stephen) (Entered: 06/16/2022) |
| 06/17/2022 | [114](#) | COURT REPORTER ACKNOWLEDGMENT by Katharine M. Healey, RMR, CRR, FPR-C re [105](#) Notice of Appeal as to Samuel Christopher Templeman. Estimated transcript filing date: 07-16-22. USCA number: 22-11884. (KMH) (Entered: 06/17/2022) |

| 07/12/2022 | 115 | TRANSCRIPT of Digitally Recorded Change of Plea hearing as to Samuel Christopher Templeman held on 06/17/2021 before Judge Patricia D. Barksdale. Court Reporter/Transcriber Katharine M. Healey, RMR, CRR, FPR-C, Telephone number (904)301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/2/2022 Redacted Transcript Deadline set for 8/12/2022 Release of Transcript Restriction set for 10/11/2022. (KMH) (Entered: 07/12/2022) |
|---|---|---|
| 07/12/2022 | 116 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Samuel Christopher Templeman. Court Reporter: Katharine Healey (KMH) (Entered: 07/12/2022) |
| 07/12/2022 | 117 | TRANSCRIPT of Digitally Recorded Change of Plea hearing as to Deborah Lynn Templeman held on 06/21/21 before Judge Patricia D. Barksdale. Court Reporter/Transcriber Katharine M. Healey, RMR, CRR, FPR-C, Telephone number (904) 301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/2/2022 Redacted Transcript Deadline set for 8/12/2022 Release of Transcript Restriction set for 10/11/2022. (KMH) (Entered: 07/12/2022) |
| 07/12/2022 | 118 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Deborah Lynn Templeman. Court Reporter: Katharine Healey (KMH) (Entered: 07/12/2022) |
| 07/12/2022 | 119 | TRANSCRIPT of sentencing hearing as to Samuel Christopher Templeman, Deborah Lynn Templeman held on 05/17/22 before Judge Marcia Morales Howard. Court Reporter/Transcriber Katharine M. Healey, RMR, CRR, FPR-C, Telephone number (904) 301-6843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/2/2022 Redacted Transcript Deadline set for 8/12/2022 Release of Transcript Restriction set for 10/11/2022. (KMH) (Entered: 07/12/2022) |
| 07/12/2022 | 120 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Samuel Christopher Templeman, Deborah Lynn Templeman. Court Reporter: Katharine Healey (KMH) (Entered: 07/12/2022) |

| | | |
|---|---|---|
| | | NOTIFICATION that transcript has been filed by Katharine M. Healey, RMR, CRR, FPR-C re: 105 Notice of Appeal as to Samuel Christopher Templeman, Deborah Lynn Templeman USCA number: 22-11884 (KMH) (Entered: 07/12/2022) |
| 08/01/2022 | 122 | TRANSCRIPT of Digitally Recorded Change of Plea hearing as to *Deborah* Templeman held on 06/21/2021 before Judge Patricia D. Barksdale. Court Reporter/Transcriber Katharine M. Healey, RMR, CRR, FPR-C, Telephone number 9043016843. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/22/2022 Redacted Transcript Deadline set for 9/1/2022 Release of Transcript Restriction set for 10/31/2022. (KMH) (Entered: 08/01/2022) |
| 08/01/2022 | 123 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Samuel Christopher Templeman. Court Reporter: Katharine Healey (KMH) (Entered: 08/01/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/06/2022 14:48:06 | | |
| **PACER Login:** | Stevelangs | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cr-00019-MMH-PDB |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FILED IN OPEN COURT
2.25.2021

CLERK U S DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES OF AMERICA

v.

CASE NO. 3:21-cr-19-MMH-PDB
18 U.S.C. § 1594(c)
18 U.S.C. § 1591
18 U.S.C. § 2252(a)(4)(B)

SAMUEL CHRISTOPHER TEMPLEMAN
DEBORAH LYNN TEMPLEMAN

## INDICTMENT

The Grand Jury charges:

## COUNT ONE

Beginning at least by an unknown date in or around November 2019,

and continuing through on or about December 11, 2019, in the Middle

District of Florida, and elsewhere, the defendants,

SAMUEL CHRISTOPHER TEMPLEMAN
and
DEBORAH LYNN TEMPLEMAN,

did knowingly combine, conspire, confederate, and agree with each other and

with others who are known and unknown to the grand jury to knowingly

recruit, entice, harbor, transport, provide, obtain, maintain, patronize and

solicit, by any means, a girl referred to as Minor Victim 1, and benefit

financially, and receive anything of value from participation in a venture

which recruited, enticed, harbored, transported, provided, obtained,

maintained, patronized, and solicited, by any means, Minor Victim 1, in and

affecting interstate and foreign commerce, knowing and in reckless disregard

of the fact that Minor Victim 1 was under the age of 18 years and would be

caused to engage in a commercial sex act, in violation of 18 U.S.C. § 1591(a)

and (b)(2).

It was part of the conspiracy that the defendants would perform acts

and make statements to hide and conceal and cause to be hidden and

concealed the purpose of the conspiracy and the acts committed in furtherance

thereof.

All in violation of 18 U.S.C. § 1594(c).

## COUNT TWO

Beginning at least by an unknown date in or around November 2019,

and continuing through on or about December 11, 2019, in the Middle

District of Florida, and elsewhere, the defendant,

SAMUEL CHRISTOPHER TEMPLEMAN,

in and affecting interstate and foreign commerce, did knowingly recruit,

entice, harbor, transport, provide, obtain, maintain, and solicit a girl referred

to as Minor Victim 1, and benefit financially, and receive anything of value

from participation in a venture which recruited, enticed, harbored,

transported, provided, obtained, maintained, and solicited, by an means,

Minor Victim 1, and aid and abet the same, while knowing and in reckless disregard of the fact that Minor Victim 1 had not attained the age of 18 years, and having had the reasonable opportunity to observe Minor Victim 1, and knowing that Minor Victim 1 would be caused to engage in a commercial sex act.

All in violation of 18 U.S.C. § 1591(a) and (b)(2) and 18 U.S.C. § 2.

### COUNT THREE

On or about December 7, 2019, in the Middle District of Florida, and elsewhere, the defendant,

DEBORAH LYNN TEMPLEMAN,

did knowingly possess a matter, that is, a Samsung Model SM-A102U cellular telephone, which contained a visual depiction, that is, the visual depiction in the computer file titled 20191024_231812.mp4, that had been produced using materials that had been shipped and transported in and affecting interstate and foreign commerce, when the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct and the visual depiction was of such conduct.

In violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2).

## FORFEITURE

1.      The allegations contained in Counts One through Three are incorporated by reference for the purpose of alleging forfeiture, pursuant to the provisions of 18 U.S.C. §§ 1594 and 2253.

2.      Upon conviction of a conspiracy of the violation of 18 U.S.C. § 1591(a), in violation of 18 U.S.C. § 1594(c), the defendants, SAMUEL CHRISTOPHER TEMPLEMAN and DEBORAH LYNN TEMPLEMAN, shall forfeit to the United States, pursuant to 18 U.S.C. § 1594,

        a.  any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of the violation(s); and

        b.  any property, real or personal, which constitutes or is derived from proceeds traceable to the violation(s).

3.      Upon conviction of a violation of 18 U.S.C. § 1591(a), the defendant, SAMUEL CHRISTOPHER TEMPLEMAN, shall forfeit to the United States, pursuant to 18 U.S.C. § 1594:

        a.  any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of the violation(s); and

        b.  any property, real or personal, which constitutes or is derived from proceeds traceable to the violation(s).

4.      Upon conviction of a violation of 18 U.S.C. § 2252(a)(4)(B), the defendant, DEBORAH LYNN TEMPLEMAN, shall forfeit to the United States, pursuant to 18 U.S.C. § 2253:

4

a.  Any visual depiction described in 18 U.S.C. §§ 2251, 2251A, or 2252, 2252A, 2252B, or 2260 of chapter 110 of Title 18, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped, or received in violation of chapter 110;

b.  Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and

c.  Any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property.

5.     If any of the property described above, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant

to 18 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), and as

incorporated by 18 U.S.C. § 2253(b).

A TRUE BILL,

Foreperson

MARIA CHAPA LOPEZ
United States Attorney

By:

LAURA COFER TAYLOR
Assistant United States Attorney

By:

ERIN WOLFSON
Special Assistant United States Attorney

By:

KELLY KARASE
Assistant United States Attorney
Deputy Chief, Jacksonville Division

6

Case 3:21-cr-00019-MMH-PDB   Document 1   Filed 02/25/21   Page 7 of 7 PageID 7

FORM OBD-34
2/19/21 Revised

No.

# UNITED STATES DISTRICT COURT
### Middle District of Florida
### Jacksonville Division

THE UNITED STATES OF AMERICA

vs.

SAMUEL CHRISTOPHER TEMPLEMAN and DEBORAH LYNN TEMPLEMAN

## INDICTMENT

Violations: 18 U.S.C. § 1594(c), 18 U.S.C. § 1591, and 18 U.S.C. § 2252(a)(4)(B)

A true bill,

_Douglas Rieard Johnson_
Foreperson

Filed in open court this 25th day

of February, 2021

_____
Clerk

Bail $ _____

GPO 863 525

FILED IN OPEN COURT
JACKSONVILLE, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

6/17/21

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:21-cr-19-MMH-PDB

SAMUEL CHRISTOPHER TEMPLEMAN

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by KARIN

HOPPMANN, Acting United States Attorney for the Middle District of Florida, and

the defendant, SAMUEL CHRISTOPHER TEMPLEMAN, and the attorney for the

defendant, Maurice Grant, Esq., mutually agree as follows:

### A.   Particularized Terms

1.   Count(s) Pleading To

The defendant shall enter a plea of guilty to Count One of the

Indictment. Count One charges the defendant with conspiring to traffic a child for

commercial sex, in violation of 18 U.S.C. § 1594(c).

2.   Maximum Penalties

Count One carries a term of imprisonment of up to life, a fine of not

more than $250,000, or both imprisonment and a fine, a term of supervised release of

not less than five years up to life, and a mandatory special assessment of $100, said

special assessment to be due on the date of sentencing.

Defendant's Initials _SCT_                        AF Approval _MT_

Pursuant to 18 U.S.C. § 3583(k), if the defendant is required to register under the Sex Offender Registration and Notification Act and commits any criminal felony offense under Title 18, United States Code, Chapter 109A, 110 or 117, or Sections 1201 or 1591, the Court shall revoke the term of supervised release and require the defendant to serve a term of imprisonment of not less than 5 years and up to life. Any other violation of the terms and conditions of supervised release is punishable by a term of imprisonment of up to five years.

In addition, pursuant to 18 U.S.C. § 3014, the Court shall impose a $5,000 special assessment on any non-indigent defendant convicted of an offense in violation of certain enumerated statutes involving: (1) peonage, slavery, and trafficking in persons; (2) sexual abuse; (3) sexual exploitation and other abuse of children; (4) transportation for illegal sexual activity; or (5) human smuggling in violation of the Immigration and Nationality Act (exempting any individual involved in the smuggling of an alien who is the alien's spouse, parent, son or daughter).

The Court shall order the defendant to make restitution to any victim of the offense, as set forth below.

3.    Elements of the Offense(s)

The defendant acknowledges understanding the nature and elements of the offense(s) with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are:

First:    That the defendant knowingly conspired with another person to violate Title 18, United States Code, Section 1591(a) and (b)(2), that is, to recruit, entice, harbor, transport, obtain, maintain,

Defendant's Initials _SCi_                2

patronize, and solicit, by any means, the person named in the indictment, in and affecting interstate and foreign commerce, knowing and in reckless disregard of the fact that the person named in the indictment was under the age of 18 years and would be caused to engage in a commercial sex act;

Second:   That the defendant did so knowing the conspiratorial goal; and

Third:   That the defendant voluntarily assisted in accomplishing that goal.

4.   Counts Dismissed

At the time of sentencing, the remaining count against the defendant, Count Two, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5.   Mandatory Restitution to Victims of Offenses of Conviction

Pursuant to 18 U.S.C. §§ 3663(a)(1), 3663A(a), 3663A(b), and 3664, defendant agrees to make full restitution, if any, to the victim identified as Minor Victim 1 in the indictment. Defendant agrees that such restitution shall be made as to all counts charged, whether or not the defendant enters a plea of guilty to such counts and whether or not such counts are dismissed pursuant to this agreement. Further, the defendant agrees to pay restitution to Minor Victim 1 for the entire scope of the defendant's criminal conduct, including but not limited to all matters included as relevant conduct.

6.   Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward

Defendant's Initials   _SCT_                    3

adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a).  The

defendant understands that this recommendation or request is not binding on the

Court, and if not accepted by the Court, the defendant will not be allowed to

withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior

to operation of subsection (a) is level 16 or greater, and if the defendant complies

with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement,

including but not limited to, the timely submission of the financial affidavit

referenced in Paragraph B.5., the United States agrees to file a motion pursuant to

USSG §3E1.1(b) for a downward adjustment of one additional level.  The defendant

understands that the determination as to whether the defendant has qualified for a

downward adjustment of a third level for acceptance of responsibility rests solely

with the United States Attorney for the Middle District of Florida, and the defendant

agrees that the defendant cannot and will not challenge that determination, whether

by appeal, collateral attack, or otherwise.

7.    Sex Offender Registration and Notification

The defendant has been advised and understands, that under the Sex

Offender Registration and Notification Act, a federal law, the defendant must

register and keep the registration current in each of the following jurisdictions: the

location of the defendant's residence, the location of the defendant's employment;

and, if the defendant is a student, the location of the defendant's school.  Registration

will require that the defendant provide information that includes name, residence

Defendant's Initials _____     4

address, and the names and addresses of any places at which the defendant is or will be an employee or a student. The defendant understands that he must update his registrations not later than three business days after any change of name, residence, employment, or student status. The defendant understands that failure to comply with these obligations subjects the defendant to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine or imprisonment, or both.

8.   Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 1594(d), whether in the possession or control of the United States, the defendant or defendant's nominees.

The assets to be forfeited specifically include, but are not limited to, the following:

        a.   ZTE model Z899VL cellular telephone, serial number 32FB76122680;

        b.   iPhone model XR cellular telephone, serial number 356450103439078;

        c.   LG model LGK50 cellular telephone, serial number 359962102240361; and

        d.   Samsung model SM-A102U cellular telephone, serial number 356274100620948,

which assets were used in the conspiracy to traffic a child for commercial sex as

charged in Count One.  The defendant further consents to the filing of a motion by

the United States for immediate entry of a Preliminary Order of Forfeiture.

      The defendant agrees and consents to the forfeiture of these assets

pursuant to any federal criminal, civil judicial or administrative forfeiture action.

The defendant also agrees to waive all constitutional, statutory and procedural

challenges (including direct appeal, habeas corpus, or any other means) to any

forfeiture carried out in accordance with this Plea Agreement on any grounds,

including that the forfeiture described herein constitutes an excessive fine, was not

properly noticed in the charging instrument, addressed by the Court at the time of

the guilty plea, announced at sentencing, or incorporated into the judgment.

      The defendant admits and agrees that the conduct described in the

Factual Basis below provides a sufficient factual and statutory basis for the forfeiture

of the property sought by the government.  Pursuant to Rule 32.2(b)(4), the

defendant agrees that the preliminary order of forfeiture will satisfy the notice

requirement and will be final as to the defendant at the time it is entered. In the event

the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture

order may be incorporated into the written judgment at any time pursuant to Rule

36.

      The defendant agrees to take all steps necessary to identify and locate

all property subject to forfeiture and to transfer custody of such property to the

United States before the defendant's sentencing. The defendant agrees to be

Defendant's Initials _SCT_         6

interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.

The defendant agrees that the United States is not limited to forfeiture of the property specifically identified for forfeiture in this Plea Agreement. If the United States determines that property of the defendant identified for forfeiture

Defendant's Initials _SLT_                    7

cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above. The Defendant expressly consents to the forfeiture of any substitute assets sought by the Government. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be

Defendant's Initials _SCA_          8

binding upon defendant's heirs, successors and assigns until the agreed forfeiture,

including satisfaction of any preliminary order of forfeiture for proceeds.

**B.**   **Standard Terms and Conditions**

    1.   Restitution, Special Assessment and Fine

        The defendant understands and agrees that the Court, in addition to or

in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any

victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in

18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution

to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as

to all counts charged, whether or not the defendant enters a plea of guilty to such

counts, and whether or not such counts are dismissed pursuant to this agreement.

The defendant further understands that compliance with any restitution payment

plan imposed by the Court in no way precludes the United States from

simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C.

§ 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to

the Mandatory Victims Restitution Act, in order to ensure that the defendant's

restitution obligation is satisfied.

        On each count to which a plea of guilty is entered, the Court shall

impose a special assessment pursuant to 18 U.S.C. § 3013.  The special assessment is

due on the date of sentencing.  The defendant understands that this agreement

imposes no limitation as to fine.

Defendant's Initials _S O_           9

2.    Supervised Release

The defendant understands that the offense(s) to which the defendant is

pleading provide(s) for imposition of a term of supervised release upon release from

imprisonment, and that, if the defendant should violate the conditions of release, the

defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction,

a defendant who is not a United States citizen may be removed from the United

States, denied citizenship, and denied admission to the United States in the future.

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court

and the United States Probation Office all information concerning the background,

character, and conduct of the defendant, to provide relevant factual information,

including the totality of the defendant's criminal activities, if any, not limited to the

count(s) to which defendant pleads, to respond to comments made by the defendant

or defendant's counsel, and to correct any misstatements or inaccuracies.  The

United States further reserves its right to make any recommendations it deems

appropriate regarding the disposition of this case, subject to any limitations set forth

herein, if any.

5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii),

the defendant agrees to complete and submit to the United States Attorney's Office

Defendant's Initials _S&_          10

within 30 days of execution of this agreement an affidavit reflecting the defendant's

financial condition.  The defendant promises that his financial statement and

disclosures will be complete, accurate and truthful and will include all assets in

which he has any interest or over which the defendant exercises control, directly or

indirectly, including those held by a spouse, dependent, nominee or other third party.

The defendant further agrees to execute any documents requested by the United

States needed to obtain from any third parties any records of assets owned by the

defendant, directly or through a nominee, and, by the execution of this Plea

Agreement, consents to the release of the defendant's tax returns for the previous five

years.  The defendant similarly agrees and authorizes the United States Attorney's

Office to provide to, and obtain from, the United States Probation Office, the

financial affidavit, any of the defendant's federal, state, and local tax returns, bank

records and any other financial information concerning the defendant, for the

purpose of making any recommendations to the Court and for collecting any

assessments, fines, restitution, or forfeiture ordered by the Court.  The defendant

expressly authorizes the United States Attorney's Office to obtain current credit

reports in order to evaluate the defendant's ability to satisfy any financial obligation

imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor

bound by this agreement.  The Court may accept or reject the agreement, or defer a

decision until it has had an opportunity to consider the presentence report prepared

Defendant's Initials _____        11

by the United States Probation Office. The defendant understands and

acknowledges that, although the parties are permitted to make recommendations and

present arguments to the Court, the sentence will be determined solely by the Court,

with the assistance of the United States Probation Office. Defendant further

understands and acknowledges that any discussions between defendant or

defendant's attorney and the attorney or other agents for the government regarding

any recommendations by the government are not binding on the Court and that,

should any recommendations be rejected, defendant will not be permitted to

withdraw defendant's plea pursuant to this plea agreement. The government

expressly reserves the right to support and defend any decision that the Court may

make with regard to the defendant's sentence, whether or not such decision is

consistent with the government's recommendations contained herein.

7.   Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to

impose any sentence up to the statutory maximum and expressly waives the right to

appeal defendant's sentence on any ground, including the ground that the Court

erred in determining the applicable guidelines range pursuant to the United States

Sentencing Guidelines, except (a) the ground that the sentence exceeds the

defendant's applicable guidelines range as determined by the Court pursuant to the

United States Sentencing Guidelines; (b) the ground that the sentence exceeds the

statutory maximum penalty; or (c) the ground that the sentence violates the Eighth

Amendment to the Constitution; provided, however, that if the government exercises

Defendant's Initials _SCT_                12

its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete

Defendant's Initials _Sci_              13

satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

Defendant's Initials _Sc_      14

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.    Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _15th_ day of _June_ 2021.


                                            KARIN HOPPMANN
                                            Acting United States Attorney


_____        _____
SAMUEL CHRISTOPHER TEMPLEMAN   LAURA COFER TAYLOR
Defendant                       Assistant United States Attorney


_____        _____
MAURICE GRANT                   KELLY KARASE
Attorney for Defendant          Assistant United States Attorney
                                Deputy Chief, Jacksonville Division


Defendant's Initials _SCT_                    15

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                             CASE NO. 3:21-cr-19-MMH-PDB

SAMUEL CHRISTOPHER TEMPLEMAN

### PERSONALIZATION OF ELEMENTS

**As to Count One**:

1.     Beginning at least by some date in or around November 2019, and continuing through on or about December 11, 2019, did you knowingly conspire with another person, namely, Deborah Lynn Templeman, to violate Title 18, United States Code, Section 1591(a) and (b)(2)?

      a.     Specifically, did you agree with Deborah Lynn Templeman to recruit, entice, harbor, transport, obtain, maintain, patronize, and solicit, by any means, Minor Victim 1, the person referenced in Count One of the Indictment?

      b.     Did you do so knowing that Minor Victim 1 had not attained the age of 18 years and would be caused to engage in a commercial sex act?

      c.     Were your acts in or affecting interstate or foreign commerce, including through the use of the website www.skipthegames.com, which is based in Europe, and through the use of a Samsung Model SM-A102U cellular telephone, a facility of interstate commerce, which had been manufactured in Vietnam?

2.     Did you do so knowing the conspiratorial goal?

3.     Did you voluntarily assist in accomplishing that goal?

Defendant's Initials _SCT_          16

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                             CASE NO. 3:21-cr-19-MMH-PDB

SAMUEL CHRISTOPHER TEMPLEMAN

**FACTUAL BASIS**

At all pertinent times, Samuel Christopher TEMPLEMAN
("S. TEMPLEMAN") and Deborah Lynn TEMPLEMAN ("D. TEMPLEMAN")
knew that Minor Victim 1 was a child with a date of birth in February 2003.
S. TEMPLEMAN and D. TEMPLEMAN had custodial rights over Minor Victim 1
from the time of her birth until July 2019, when those custodial rights were
terminated.  Unless otherwise specified, the events described herein occurred in
Duval County, Florida, and St. Johns County, Florida, both within the Middle
District of Florida.

Beginning around early 2017, Minor Victim 1 began experimenting with hard
drugs.  Around August 2018, Minor Victim 1 began using heroin.  At that time,
S. TEMPLEMAN had a long-term addiction to opioid pills.  At some point after
Minor Victim 1 began using heroin, Minor Victim 1 observed that S. TEMPLEMAN
was "dope sick," meaning that he was suffering from withdrawal effects of opioid
drugs.  Minor Victim 1 offered heroin to S. TEMPLEMAN, which he accepted.
Thereafter, Minor Victim 1 and S. TEMPLEMAN began using heroin and cocaine

Defendant's Initials _Ser_           17

base together on a routine basis. During this time, Minor Victim 1 also began engaging in commercial sex "dates" at the direction of a pimp in exchange for drugs.

In July 2019, S. TEMPLEMAN and D. TEMPLEMAN's custodial rights to Minor Victim 1 were terminated, and Minor Victim 1 was placed into a foster care placement in Daytona, Volusia County, Florida, within the Middle District of Florida. By court order, S. TEMPLEMAN and D. TEMPLEMAN were not permitted contact with Minor Victim 1. Minor Victim 1 shortly thereafter absconded from the foster care placement and engaged in commercial sex in exchange for a ride back to Jacksonville.

Around late August 2019, D. TEMPLEMAN informed Minor Victim 1 that S. TEMPLEMAN had received a sum of money as a result of an inheritance. The amount that S. TEMPLEMAN received was approximately $26,000. Minor Victim 1 agreed to meet up with S. TEMPLEMAN and D. TEMPLEMAN, and the three stayed in a Jacksonville-area hotel for several days. On September 14, 2019, S. TEMPLEMAN and D. TEMPLEMAN used $5000 of the inheritance money to make a down payment on a 2011 Honda Accord. Around the middle of September 2019, Minor Victim 1 again made contact with S. TEMPLEMAN and D. TEMPLEMAN and asked to stay with them; S. TEMPLEMAN and D. TEMPLEMAN agreed.

Until approximately sometime in the middle of October 2019, S. TEMPLEMAN, D. TEMPLEMAN, and Minor Victim 1 used the inheritance money for expenses including cellular telephones, hotels, food, clothing, and drugs,

Defendant's Initials _____ 18

with approximately half of the inheritance money being used to purchase drugs for S.
TEMPLEMAN and Minor Victim 1.

During this time, D. TEMPLEMAN maintained regular employment with
Allstate Insurance, where she was paid approximately $1000 every two weeks.
S. TEMPLEMAN had no independent source of income. After spending all of the
inheritance money, the only legitimate source of income for S. TEMPLEMAN,
D. TEMPLEMAN, and Minor Victim 1 was D. TEMPLEMAN's bi-weekly salary.
D. TEMPLEMAN would cash her paychecks and provide a portion of the money to
S. TEMPLEMAN and Minor Victim 1, while D. TEMPLEMAN would use the
remainder to pay bills. The money from D. TEMPLEMAN's paychecks would be
depleted within 1-2 days of receipt, with S. TEMPLEMAN and Minor Victim 1
spending their portion primarily on drugs. During the remaining 12-13 days of every
two-week period, the only income for S. TEMPLEMAN, D. TEMPLEMAN, and
Minor Victim 1 was derived from Minor Victim 1 engaging in commercial sex acts
and occasional panhandling for gas money.

Until December 11, 2019, S. TEMPLEMAN, D. TEMPLEMAN, and Minor
Victim 1 would occasionally rent hotel rooms, sometimes stay at truck stops,
sometimes sleep in the 2011 Honda Accord, and sometimes sleep at Allstate
Insurance (D. TEMPLEMAN's place of employment). During weekdays when
D. TEMPLEMAN was working, S. TEMPLEMAN and Minor Victim 1 would drop
D. TEMPLEMAN off at work and then S. TEMPLEMAN would drive Minor
Victim 1 to various commercial sex "dates." The majority of the money Minor

Defendant's Initials _SCT_        19

Victim 1 made by engaging in commercial sex "dates" was spent on drugs for

S. TEMPLEMAN and Minor Victim 1, with some also spent on necessities such as

food and hotel rooms for S. TEMPLEMAN, D. TEMPLEMAN, and Minor

Victim 1. During times that D. TEMPLEMAN was not working, she would also

accompany S. TEMPLEMAN and Minor Victim 1 to Minor Victim 1's commercial

sex dates and at times drove Minor Victim 1 to commercial sex dates.

On December 11, 2019, detectives with the Jacksonville Sheriff's Office

traveled to D. TEMPLEMAN's place of employment (Allstate Insurance) in order to

attempt to recover Minor Victim 1. Detective Jessica Maynard was advised by

D. TEMPLEMAN's coworkers that D. TEMPLEMAN was on a break with

S. TEMPLEMAN and Minor Victim 1. Detective Maynard waited inside of Allstate

Insurance for D. TEMPLEMAN to return. Upon returning, D. TEMPLEMAN

advised Detective Maynard that S. TEMPLEMAN had dropped her off on a side

street and she had walked the rest of the way back to Allstate because

S. TEMPLEMAN and D. TEMPLEMAN did not want law enforcement to know

that they had custody of Minor Victim 1. D. TEMPLEMAN expressed that she

wanted Minor Victim 1 to get help, and that S. TEMPLEMAN and Minor Victim 1

would be returning to pick her up at Allstate at the end of the work day. Detective

Maynard remained at Allstate throughout the rest of D. TEMPLEMAN's work day,

which was supposed to end at 5pm. During the day, D. TEMPLEMAN related to

Detective Maynard that she was aware that S. TEMPLEMAN and Minor Victim 1

were addicted to drugs and that she would sometimes ride with them to buy drugs.

Defendant's Initials _____      20

D. TEMPLEMAN admitted to Detective Maynard that she knew Minor Victim 1 was engaging in prostitution and that she had taken Minor Victim 1 to "dates" both on her own and with S. TEMPLEMAN.

On December 11, 2019, while Detective Maynard was at D. TEMPLEMAN's office, S. TEMPLEMAN called D. TEMPLEMAN on the phone and the call was conducted via speakerphone such that Detective Maynard could hear their conversation.  During the phone call, S. TEMPLEMAN inquired whether D. TEMPLEMAN had obtained money from a loan that they had applied for during lunch.  After the phone call, D. TEMPLEMAN stated to Detective Maynard that she was the only one who worked and that her money was gone, mostly having been spent on drugs for S. TEMPLEMAN and Minor Victim 1.  D. TEMPLEMAN advised that the family has used the money Minor Victim 1 would make engaging in commercial sex to buy food, pay for hotels, pay bills, and other necessities.

On December 11, 2019, just prior to 5pm, S. TEMPLEMAN again called D. TEMPLEMAN at her office, and Detective Maynard was able to overhear their conversation.  S. TEMPLEMAN stated to D. TEMPLEMAN that he was going to take Minor Victim 1 to a "date" to get money before they came to pick up D. TEMPLEMAN.  At approximately 7pm, S. TEMPLEMAN and Minor Victim 1 arrived at Allstate to pick up D. TEMPLEMAN; Minor Victim 1 was recovered, and S. TEMPLEMAN was arrested.

After being arrested, on December 11, 2019, S. TEMPLEMAN was advised of his Miranda rights and, having been advised, agreed to be interviewed.

Defendant's Initials _____    21

S. TEMPLEMAN stated that he was aware that Minor Victim 1 engaged in commercial sex acts and had "started coming around" after finding out about his receipt of the inheritance money.  S. TEMPLEMAN explained that he knew that Minor Victim 1 was associating with a bad crowd and using drugs, and that if she were going to do that, S. TEMPLEMAN would rather Minor Victim 1 did it with him.  S. TEMPLEMAN acknowledged having taken Minor Victim 1 to a commercial sex date earlier that day and stated "I just kind of leave it in the Lord's hand" and that he hoped Minor Victim 1 knows what she's doing because "there's . . . a chance that she could not come back to my car."  S. TEMPLEMAN stated that Minor Victim 1 posted her own advertisements for commercial sex "dates," and that both he and D. TEMPLEMAN would take her to them.  S. TEMPLEMAN admitted that he, D. TEMPLEMAN, and Minor Victim 1 all lived off of the proceeds of Minor Victim 1's commercial sex "dates."  S. TEMPLEMAN stated that Minor Victim 1 would engage in car dates and that he would screen the customers, also referred to as "johns," to make sure they were safe.  S. TEMPLEMAN estimated having taken Minor Victim 1 to 20-30 commercial sex dates in total.  S. TEMPLEMAN stated that he would make sure that Minor Victim 1 always used condoms and that sometimes D. TEMPLEMAN would buy the condoms for Minor Victim 1.  S. TEMPLEMAN stated that he knew QV referred to a "quick visit" which means "she wants it quick," that Minor Victim 1 "doesn't do anal at all," but would engage in vaginal sex and "probably" oral sex.  S. TEMPLEMAN described

Defendant's Initials _SCV_                    22

the nicknames, ages, vehicles, and locations where Minor Victim 1 would meet some of her "regular" johns.

Multiple phones belonging to S. TEMPLEMAN, D. TEMPLEMAN, and Minor Victim 1 were reviewed, which revealed that each phone contained text message communications setting up commercial sex dates with johns. Additionally, Detective Maynard located multiple advertisements on www.skipthegames.com, which is a website based in Europe that is commonly used for arranging commercial sex dates, featuring advertisements of Minor Victim 1 for commercial sex. The www.skipthegames.com ads featured the phone numbers of the cellular telephones belonging to S. TEMPLEMAN, D. TEMPLEMAN, and Minor Victim 1, which had previously been purchased using inheritance money. One of the phones, which belonged to D. TEMPLEMAN, also contained multiple still images and a video constituting child sex abuse material depicting Minor Victim 1 engaging in masturbation and lascivious exhibition of her genital area. Minor Victim 1 had taken these images and video in order to send them to potential johns upon request. This cellular telephone was a Samsung Model SM-A102U cellular telephone, which is a facility of interstate commerce. A review of the Samsung Model SM-A102U cellular telephone revealed that it had been manufactured in Vietnam. D. TEMPLEMAN admitted to Detective Maynard that she was aware that child sex abuse material was contained on the Samsung Model SM-A102U cellular telephone and during a jail phone call after her arrest referenced having seen the child sex abuse material that was stored on her phone.

Defendant's Initials _SCT_                    23

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA                    CASE NO. 3:21-cr-19-MMH-PDB
v.
SAMUEL CHRISTOPHER TEMPLEMAN
DEBORAH LYNN TEMPLEMAN

Counsel for Government:                     Counsel for Defendants:
Laura Taylor                                Maurice Grant
Mai Tran                                    Andrew Bonderud

## HONORABLE MARCIA MORALES HOWARD
## UNITED STATES DISTRICT JUDGE

Courtroom Deputy: Jodi L. Wiles             Court Reporter: Katharine Healey
U.S. Probation: Joshua Blakely

## CLERK'S MINUTES

**PROCEEDINGS OF:   SENTENCING**

**Samuel Christopher Templeman:**

The Clerk of the Court is directed to remove from the docket Defendant's Sentencing Memorandum (Dkt. No. 94) and Defendant's Amended Sentencing Memorandum (Dkt. No. 96) due to the inclusion of the full name of the minor victim.  Defense counsel is directed to redact and refile the Sentencing Memorandum.

Plea previously accepted.

Defendant adjudged guilty on Count **One of the Indictment**

Defendant's Witnesses:   Valerie McClain, M.D.; Tonya Douglas

Imprisonment:  **ONE HUNDRED SIXTY (160) MONTHS**

The Court makes the following recommendations to the Bureau of Prisons:
- Incarceration at a facility located as close as possible to Jacksonville, Florida.
- Defendant receive mental health treatment.
- Defendant participate in the 500 hour, intensive residential substance abuse treatment program, as well as any other substance abuse treatment programs available.

Supervised Release:   **TEN (10) YEARS**

Special conditions of supervised release:
- Defendant shall participate as directed in a substance abuse treatment program.
- Defendant shall participate as directed in a mental health program specializing in sexual offender treatment and submit to polygraph testing.
- Defendant shall register with the state sexual offender registration agency in any state where he resides, visits, is employed, carries on a vocation, or is a student.  The probation officer shall provide state officials with all information required under Florida sexual predator and sexual offender notification and registration statutes.
- Defendant shall submit to a search of his person, residence, place of business, any storage units under his control, computer, or vehicle.
- Defendant shall cooperate in the collection of DNA as directed by the probation officer.

Special Assessment:   **$100.00**   to be paid immediately.

Count Two of the Indictment is dismissed on the motion of the Assistant U.S. Attorney and pursuant to the Plea Agreement.

Defendant advised of right to appeal and to counsel on appeal.

Defendant is remanded to the custody of the U.S. Marshal.

Defendant's Second Amended Sentencing Memorandum filed in open court.

**Deborah Lynn Templeman:**

Plea previously accepted.

Defendant adjudged guilty on Count **Three of the Indictment**

Imprisonment:  **SEVENTY-TWO (72) MONTHS**

The Court makes the following recommendations to the Bureau of Prisons:
- Incarceration at a facility located as close as possible to Jacksonville, Florida.
- Defendant receive mental health treatment.

Supervised Release:   **TEN (10) YEARS**

Special conditions of supervised release:

- Defendant shall participate as directed in a mental health program specializing in sexual offender treatment and submit to polygraph testing.
- Defendant shall register with the state sexual offender registration agency in any state where he resides, visits, is employed, carries on a vocation, or is a student.   The probation officer shall provide state officials with all information required under Florida sexual predator and sexual offender notification and registration statutes.
- Defendant is prohibited from possessing, subscribing to, or viewing, any images, videos, magazines, literature, or other materials depicting children in the nude and/or in sexually explicit positions.
- Defendant shall submit to a search of her person, residence, place of business, any storage units under her control, computer, or vehicle.
- Defendant shall cooperate in the collection of DNA as directed by the probation officer.

Special Assessment:   __**$100.00**__   to be paid immediately.

Count One of the Indictment is dismissed on the motion of the Assistant U.S. Attorney and pursuant to the Plea Agreement.

Defendant advised of right to appeal and to counsel on appeal.

Defendant is remanded to the custody of the U.S. Marshal.

Counsel for Defendant is directed to file a redacted Sentencing Memorandum.   The Clerk of the Court is directed to place the original, unredacted Sentencing Memorandum under seal.

Date: May 17, 2022
Time: 9:35 a.m. – 12:00 p.m.; 3:37 p.m. – 4:21 p.m.
Total: 3 Hours, 9 Minutes

**DEFENDANT'S UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

FILED IN OPEN COURT

5-17-22

CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

**UNITED STATES OF AMERICA**

**v.**                    **Case No.:   3:21-CR-19-MMH-PDB**

**SAMUEL CHRISTOPHER TEMPLEMAN**

---

**DEFENDANT'S SECOND AMENDED**
**SENTENCING MEMORANDUM**

Defendant, **SAMUEL CHRISTOPHER TEMPLEMAN**, entered a

plea of guilty to one count of conspiracy to traffic a child for commercial sex,

in violation of 18 U.S.C. §§ 1594(c), 1591(b)(2) and 1591(a). (Doc. Nos. 1 and

59). This court accepted the plea; and, the matter currently is set for sentencing

on May 17, 2022. (Doc. Nos. 69 and 87).

**Guideline Calculations**

The United States Probation Office (Probation) has prepared a

presentence investigation report. (PSR, Doc. No. 90). Probation has

determined that the base offense level for conspiracy to traffic a child for

commercial sex is 30. PSR ¶ 28. Additionally, Probation has identified four

separate enhancements. PSR ¶¶ 29, 30, 31 and 37. First, Probation has

determined that Defendant's familial relationship with the minor victim warrants a specific offense characteristics enhancement of 2 levels. PSR ¶ 29. Second, Probation has determined that a computer was used in the course of the conduct, resulting in a specific offense characteristics enhancement of 2 levels. PSR ¶ 30. The third enhancement that Probation determined stems from a finding that the offense involved the commission of a sex act, resulting in a specific offense characteristics enhancement of 2 levels. PSR ¶ 31. As a consequence of the three specific offense characteristics, Probation determined that the adjusted offense level subtotal is 36. PSR ¶ 36.

The fourth, and last, enhancement identified by Probation is a Chapter Four enhancement applicable to repeat offenders. PSR ¶ 37. Probation has determined the offense of conviction exhibited a pattern of prohibited sexual conduct, resulting in an enhancement of 5 levels. Therefore, with the inclusion of the pattern enhancement, Probation has determined that the adjusted offense level is 41. PSR ¶ 37. With acceptance of responsibility, pursuant to USSG §§ 3E1.1 (a) and (b), Probation has determined that the total offense level is 38. PSR ¶¶ 38 - 40.

On the matter of criminal history, Probation has concluded Mr. Templeman has one (1) criminal history point of scored criminal conduct. PSR ¶ 45. Therefore, Probation reports Mr. Templeman falls in criminal history category I. PSR ¶ 46. Based upon a total offense level of 38 and criminal history category of I, the guideline range of imprisonment is 235 months to 293 months. (PSR ¶ 86).

### Factors Under 18 U.S.C. § 3553(a) Relevant to Mr. Templeman

**1. The nature and circumstances of the offense and the history and characteristics of the defendant.**

*Nature and circumstances of the offense*

Mr. Templeman was the biological father of Minor Victim 1. Minor Victim 1was born to Mr. Templeman's wife, Deborah Templeman in February 2003. In December of 2019, Minor Victim 1 was 16 years old.

In July 2019, Minor Victim 1 was placed in foster care due to the inability of the Templemans to govern Minor Victim 1's conduct in an appropriate manner to prevent engagement in unlawful commercial sex acts. Minor Victim 1 was placed in foster care in Daytona Beach. However, shortly after placement, Minor Victim 1 absconded and returned to Jacksonville, securing travel in exchange for sex.

3

In September 2019, Minor Vitim 1 began staying with Mr. Templeman and his wife. Before then, Minor Victim 1 was staying with others and presumably engaged in commercial sex acts. After Minor Victim 1 came to stay, the three lived in hotels or out of a car. Ms. Templeman was the only one of the three working and drawing wages. The money Ms. Templeman earned was depleted rapidly because Mr. Templeman and Minor Victim 1, both addicted to controlled substances, spent money primarily on drugs.

On December 11, 2019, law enforcement officers, in search of Minor Victim 1, went to Ms. Templeman's place of employment. Shortly after the officers arrived at the business, Ms. Templeman returned from meeting with Mr. Templeman and Minor Victim 1. When questioned regarding the whereabouts of Minor Victim 1, Ms. Templeman stated that she was with Mr. Templeman and that they would be returning to pick her up at the end of the business day. One of the officers remained with Ms. Templeman through the balance of the workday. Later in the afternoon, near the end of the shift, Mr. Templeman called his wife. During the conversation, which was overheard by the officer, Mr. Templeman stated he was taking Minor Victim 1 to meet a "date" with the goal of getting money before coming to pick her up. Later that

4

evening, when Mr. Templeman and Minor Victim 1 came to pick up Me. Templeman, Mr. Templeman was arrested and Minor Victim 1secured.

Subsequent to arrest, Mr. Templeman was interviewed by law enforcement. During the course of the interview, Mr. Templeman acknowledged his awareness that Minor Victim 1 was engaged in commercial sex acts. Mr. Templeman admitted that he had driven her to rendezvous with men for commercial sex acts numerous times. Mr. Templeman also acknowledged that the money obtained by Minor Victim 1 was used to support their living. Mr. Templeman expressed concern that Minor Victim 1 would continue to engage in commercial sex activity without his awareness, increasing the level of anxiety for both he and his wife. He resigned himself to acquiesce in her activities to avoid further loss and alienation of Minor Victim 1 that could sever their family irreparably or result in harm to her in his absence.

### *History and characteristics of the defendant*

On the surface, Samuel Christopher Templeman was raised in an intact family with stability and normalcy. Mr. Templeman was the only child of the marriage; and, as such received the unwavering attention of his parents. Mr. Templeman's father was gainfully employed by the Duval County School

Board and actively participated in his son's social development, to include fishing and baseball.  Mr. Templeman's mother worked as a pre-school teacher at a local Christian academy.  According to Mr. Templeman, he experienced a good childhood without any form of domestic violence or abuse.  However, behind the closed doors, the family environment was deteriorating.

Mr. Templeman's parents quietly grappled with marital discourse, eventually drifting apart and resulting in a divorce.  Mr. Templeman's mother suffered from depression throughout the marriage.  When Mr. Templeman was six (6) years old, his mother left on two occasions to live with family in South Carolina to undergo antidepression treatment.  The traumatic impact of the separation was of such magnitude that Mr. Templeman's father allowed him to travel alone on a Greyhound bus to bring his mother home.  The plan worked. His mother returned.  However, his mother's battle with depression continued. The hidden cracks in the marriage began to widen.

When Mr. Templeman was 21 years old, after 28 years of marriage, his parents ended their marriage.  The divorce shook the foundation of Mr. Templeman's understanding of family.  His world fell apart.  While as a teen, Me. Templeman indulged in the consumption of alcohol, he disdained the use

6

of drugs of any type.  Shortly after the divorce, Mr. Templeman experimented with cocaine and cocaine base, later becoming a frequent user of the former. Usually, marijuana is viewed as the gateway drug to substance abuse; however, in Mr. Templeman's case, he did not experiment with marijuana until he was 24 years old.

In April of 1998, at the age of 23, Mr. Templeman married Deborah Templeman, his codefendant, who is three (3) years his senior.  In February of 2003, Deborah Templeman gave birth to a baby girl, MINOR VICTIM 1, the only child of their union, but her third child.  With the birth of MINOR VICTIM 1, Mr. Templeman set out to create and sustain a strong family unit, unlike that he came to experience.  For a number of years, Mr. Templeman was successful in guiding his family and providing for their financial needs.  However, in 2011, after six years of battling an opioid addiction stemming from a back injury sustained at work, Mr. Templeman lost his job with the Duval County School Board due to employment cutbacks.  Thus, began the downward spiral to depression and uncontrolled substance abuse.

From 2011 until the date of his arrest in December of 2019, Mr. Templeman struggled to maintain employment and sobriety.  Mr. Templeman's

struggles took an even greater downward turn following the sudden death of his father in 2018. As the depression deepened, Mr. Templeman fell deeper into the grasp of opioid addiction.

In the beginning, Mr. Templeman's primary source of opioids was prescription pills. However, between 2016 and 2017, at the age of 42, Mr. Templeman was exposed to heroin. In April of 2019, Mr. Templeman's opioid of choice was heroin, eventually becoming heroin with fentanyl mixture. As the grip of heroin/fentanyl tightened, Mr. Templeman sought treatment; but, following each program, he relapsed. On at least two occasions in the summer of 2019, Mr. Templeman reportedly attempted suicide by overdosing on various controlled substances. By December of 2019, Mr. Templeman was a shell of the man known to those who loved him driven only with the goal of maintaining the euphoria of heroin. *See* Attachment 1, Letters of Support.

## 2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense.

Mr. Templeman recognizes that enabling a minor to engage in commercial sex acts is among the highest criminal offenses imaginable. Mr. Templeman further understands the court has an obligation to impose a

sentence that emphasizes the importance of the laws concerning the exploitation of minors, the need for the laws to protect a vulnerable population from unlawful sex acts, and the promotion of respect for those laws in an effort to protect minors.

On the matter of just punishment, Mr. Templeman asks this court to be mindful of the poor choices he made as a father and a husband exacerbated by extended periods of major depression brought on by loss of his job and sudden death of his father. Without question, Mr. Templeman's actions were reprehensible and unlawful. Neither the means justified the end, nor the end justified the means. Nevertheless, Mr. Templeman acted out of fear of losing Minor Victim 1 to the streets, which could have left her in the hands of those who would mistreat or harm her in his absence.

3. **The need for the sentence imposed to afford adequate deterrence to criminal conduct.**

Mr. Templeman recognizes this court, in imposing a sentence that affords adequate deterrence of criminal conduct, must draw a balance between general and specific deterrence. With respect to general deterrence, Mr. Templeman accepts the court's need to send a resounding message to individual of a sufficient manner to dissuade conduct involving the exploitation

of minors in the commercial sex act community.  Mr. Templeman request this court look to the fact that whatever sentence this court imposes, he will forever be deterred from engaging in this form of criminal activity.  Therefore, in addressing the balance, Mr. Templeman asks this court not to weigh general deterrence to such a degree as to diminish the value of specific deterrence in this case.  Ultimately, the objective in the imposition of a sentence upon an individual is to impose a sentence sufficient but not greater than necessary to accomplish the goals of sentencing that individual.

### 4. The need for the sentence imposed to protect the public from further crimes of the defendant.

Mr. Templeman is 47 years of age with one point of scorable criminal history. PSR §§ 43 and 45.  Prior to his arrest on the offense of conviction, Mr. Templeman has had three encounters with law enforcement. PSR §§ 42 - 44.  Two of the encounters were for no valis driver's license. PSR §§ 42 and 44.  Granted, no one can predict the future action of another; however, the best gauge of future conduct is past conduct.  Based upon Mr. Templeman's past conduct, he would benefit from an intensive drug treatment program and mental health counselling while incarcerated.  With such drug and mental health treatment, Mr. Templeman is unlikely to engage in further criminal conduct.

## Conclusion

Mr. Templeman requests this court consider the above factors and fashion sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing.  Mr. Templeman suggests a term of imprisonment of 72 months is sufficient but not greater than necessary to satisfy the purpose of sentencing in this case.

Respectfully submitted,

A. FITZGERALD HALL, Esq.
FEDERAL PUBLIC DEFENDER

*s/ Maurice C. Grant, II*
Maurice C. Grant, II, Esq.
Assistant Federal Public Defender
Florida Bar No. 0791806
200 West Forsyth, Suite 1240
Jacksonville, Florida 32202
Telephone: (904) 232-3039
Fax: (904) 232-1937
E-mail: Maurice_Grant@fd.org

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this *17ᵗʰ* day of ***May 2022***, a true copy of the foregoing was served by ***electronic court filing system*** to Laura Taylor, Assistant United States Attorney, Office of the United States Attorney, 300 North Hogan, Suite 700, Jacksonville, Florida 32202, Kelly Karase, Assistant United States Attorney, Office of the United States Attorney, 300 North Hogan, Suite 700, Jacksonville, Florida 32202 and by e-mail to Josh Blakely, United States Probation Officer, United State Probation Office, 300 N. Hogan Street, Suite 600, Jacksonville, Florida 32202.

s/ Maurice C. Grant, II
Maurice C. Grant, II, Esq.

## Fwd: Letter of Support for Samuel Chris Templeman

Jean Pattee

To:

My name is Jean Pattee and I am Chris' mom. I have lived in Merritt Island since January of 2020. Before that I had lived in Jacksonville since 1970. I am 70 years old and work as a VPK teacher at East Coast Christian Academy.

From the beginning of Chris' life his Dad and I were very engaged in Chris' life. Chris' dad introduced him to fishing at the age of three, and this quickly became one of Chris' passions. Baseball became his second, and Chris played T-ball and Little League baseball through the senior league. His dad was one of the team coaches through most of this time.

Chris's childhood was basically normal and happy. However, when Chris was six years old I had a major depressive episode which greatly disrupted our family's lives. During the time I was dealing with this I went to stay with my extended family in South Carolina. I did not want Chris to see me in this condition. His father and his father's mother took care of Chris during this time. While there I was put on antidepressant medicine and went through some therapy. In approximately three months I felt well enough to return home.

Unfortunately my depression continued intermittently. In June I once again left Chris and his dad to stay with my relatives in South Carolina. This time, however, after a few weeks Chris told his dad he was going to South Carolina to bring his mom home. Because Chris' grandfather was a Greyhound bus driver he was able to arrange the trip and knew that bus driver would look after Chris. What has always amazed me though was his courage and determination, despite his age, "to bring his mom home" and making the trip alone. He did accomplish his goal and I returned home and continued to get help in Jacksonville for the ongoing depressive episodes. I only tell this story to highlight a traumatic event in Chris's life at a very young age.

Chris was an average student in school grade wise, and when I would get onto him about something like his grades, which he considered trivial, he told me more than once that unlike most of the kids in his high school at least he didn't do drugs. He was very proud of that fact because  drug use was rampant at his high school, pretty much like today. Another thing he was shocked about was when he found

out one of the best ball players on his team had become addicted to cocaine. Sadly, although Chris was disgusted with drug use at that point in his life, that aversion did not last.

After Chris graduated from high school in 1992 he continued to work at Gyro Wrap where he had worked since he was a junior. Chris' dad and I divorced several years later after 28 years of marriage. This was a major blow to Chris because he had grown up with an intact family, and even though he was now 21 years old, it had a pretty devastating effect on him. He began drinking a lot and hanging around with some guys that I thought were going to end all of them in jail. I think he may have begun experimenting with drugs at this point, but I am not sure.

He met Debbie soon after this and it was "love at first sight." They were married two years later in 1998, and ▮▮▮▮▮ was born five years later in 2003. Chris was then working for the Duval County School Board where his dad also worked. Debbie also had a good job at this time too. ▮▮▮▮▮ was around six when I discovered Chris was using pills although he continued to be a good dad and good provider. I have learned through the years that without the will to get help, addiction is a very progressive disease, and it usually expands to the use of harder drugs which has been the case in Chris' addiction. It has radically changed his perspective on things and has caused devastating consequences to himself and the rest of his family.

In spite of all of this I do believe Chris is capable of turning his life around as well as overcoming his drug addiction. I definitely believe he needs help to do this and that it will not happen without a lot of work on his part. I believe in the goodness in Chris' basic nature and that he has the desire to get better and to become a productive human being, and I love him unconditionally which I do think can make a difference.

Respectfully,
Jean Pattee *Jean S. Pattee*

▮▮▮▮▮▮▮▮▮

Merritt Island, FL 32952

▮▮▮▮▮▮▮▮

Louis Templeman

<span style="background:black">         </span>

Jacksonville, Florida 32218

July 7, 2021

The Honorable Judge Marcia Morales Howard
U.S. District Court, Middle District of Florida
Jacksonville Division
300 North Hogan Street
Jacksonville, FL 32202

Dear Judge Howard,

I am writing this letter in support of Christopher Samuel Templeman. I am his paternal uncle, age 71 and retired. And I have lived in Jacksonville near him for about fifty years. I have worked as a professional painter, Child Protection Investigator and a pastor. I performed the wedding for Chris and his wife, Debbie, about ten years ago.

When Chris was a child his friendliness and peaceful attitude made him welcome in any setting. He and his daddy, my brother Sam, were often together in numerous activities and family fellowships. He followed his father into organized baseball and saltwater fishing. He also followed his father into employment with the maintenance department of the Duval County School Board. During this period Chris became so enthralled by his drug habit and so entrapped by addiction that his slow, steady deterioration found no bottom.

By the time Chris developed his habits, his father had suffered a spinal injury at work which resulted in chronic pain and his health began its downward slide . When my brother died, two years ago, Chris's life fell apart. We all watched as Chris began to enter a darker world. He became completely isolated, anti-social and secretive, his main focus becoming the satisfaction of his next score. That is not the Chris I knew. My nephew had a personality makeover and lifestyle destruction as a result of his drug addiction.

However, he will become sober in prison. His mind will find an opportunity at some point to clean out after decades of drug use. This great interruption will become the start of his recovery. Chris Templeman will return to his senses and find ample time for reflection. He will be forced to reassess his life with true remorse. I am confident my

nephew, Christopher Samuel Templeman, is one of those who would find correction in a Correctional Facility.  Enforced living routines and the surprising terror of having to face the consequences for his actions, I believe, will be mind altering. I remember who my nephew used to be and I am confident he will do the difficult work of returning to sanity.

To further enlighten you as to Chris's behavior I must add, unfortunately, that my brother, even though he was able to remain functional, was one of Chris's earliest examples of addictive behavior. If a father's behavior is imprinted on the child, then it is almost like the man before you was set up to fail.

And so, Judge,  I hope you will show him whatever mercy you find fitting.


Thank you,

Louis D. Templeman

Your Honor,

I am Patricia A. Shelton, and I am the paternal grandmother of Christopher Samuel Templeman, (we call him Chris.)

I have worked for the State of Florida for more than 25 years. I retired in 1957, and am now 91 yrs old. I have known Chris since the day he was born on July 9, 1974.

He was a beautiful child and was loved by all who knew him. As a young child, and later young boy, he was kind, considerate, loving and obedient. I don't recall any behavior problems. I was privileged to "baby sit" him on weekends and he was always a sweet joy and a lot of fun. He was an especially good baseball player and his dream was to play with the Atlanta Braves team.

As a teenager he held several jobs and was very good with his money. We were all impressed how he could save his money.

It is my belief that Chris is aware of the choices he has made in these last few years I love Chris. I am his grand mother and I believe he has learned my love is unconditional.

Sincerely, Pat Shelton

Todd Munnell

Jacksonville, Fl 32225

8.11.2021

The Honorable Judge Marcia Morales Howard

U.S. District Court, Middle District of Florida

Jacksonville Division

Judge Howard,

My name is Todd Munnell and I have known Samuel "Chris" Templeman for basically all my life. If you'll give me a few moments to talk about Chris, our relationship and a couple of stories about who he really is.

I was born and raised in Jacksonville and have lived here most of the 47 years I've been living and only in the house I grew up in, an apartment for a year while I had built the current house I share with my wife and children for the last 25. My father was a navy man stationed here until he got out and retired not long ago after a long career with WW Gay. My mother was a housewife who loved her antiques and would craft stuff bears and other designs and pedal her wares at the trade shows. After many years traveling and working in the audio-visual hospitality industry I have settled down where I currently work for Jacksonville University in the Academic Technology office supporting the classrooms as well as new technology for possible teaching tools.

Chris and I grew up basically as brothers in the Arlington area only separated by a couple of backyards from each other. Most of the time we would hop the fence of a neighbor's house and cut through their backyard to get to our houses. Something that wouldn't be accepted by today's standards, but our neighbors were fine with it most of the time as we all knew each other pretty well.

We had the privilege of playing t-ball and both of our fathers coaching our teams for 4-5 of years and we kept playing and practicing together until late in our teens when we both had tryouts with the Cincinnati Reds. Unfortunately, that didn't work out for either of us, but the love of baseball has always kept us talking. His support for the Atlanta Braves and mine for the Miami Marlins

One of our dreams as young men was to move to Hawaii and live to surf and figure out life from there. Unfortunately, that didn't work out either.

I could go on about how we were inseparable for a lot of years. We were so close that we would go to each other's house, knock on back door to go in. Only times we would go to the front door was if we were on a bicycle or skateboard.

Only a few things that I can think of when we weren't together was when he went fishing or I was skateboarding or when we had girlfriends. He loved to fish especially when his dad would go out on the boat. They loved having their time together on the water, casting a line and bringing home dinner. I would go but I hated to touch the fish after I reeled them in and they made fun of me for it and deservedly so.

I'm telling you this because Chris has a zest for life and nature and his best days would be if he was fishing or watching the Braves play baseball. As our lives grew apart with getting married and having kids, every time we connected either by phone, messaging or getting together face to face, it was a blessing to talk about our children's accomplishments and reminiscing of the good old' days.

Unfortunately, he developed demons and started fighting with them and losing his battles. I remember one of our last conversations about how he was getting clean, and I couldn't have been happier about it. I know a lot of choices he has made was while not being in the right state of mind and those choices can have severe consequences but that shouldn't prevent them from not getting help and turning their life around. He really is a good person who, loves his family, friends and once gets clean can finally be who he was. Someone who works hard, loves fishing, baseball and everything that life can offer.

Thank you for letting me spend a moment to describe Chris to you, He is my friend, my brother and I hope that one day soon I can look him in the eye again, shake his hand, give him a hug and tell him it will get better one day at a time.


Regards,


Todd Munnell

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

SAMUEL CHRISTOPHER TEMPLEMAN

Case Number: 3:21-cr-19-MMH-PDB

USM Number: 34827-509

Maurice C. Grant, II, FPD
200 W. Forsyth Street
Ste. 1240
Jacksonville, FL 32202

## JUDGMENT IN A CRIMINAL CASE

The defendant pleaded guilty to Count One of the Indictment. The defendant is adjudicated guilty of this offense:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
| --- | --- | --- | --- |
| 18 U.S.C. §§ 1594(c), 1591(b)(2) and 1591(a) | Conspiring to Traffic a Child for Commercial Sex | December 2019 | One |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

Count Two of the Indictment is dismissed on the motion of the United States and pursuant to the Plea Agreement.

**IT IS ORDERED** that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Date of Imposition of Sentence:
May 17, 2022

*Marcia Morales Howard*
MARCIA MORALES HOWARD
UNITED STATES DISTRICT JUDGE

May 18, 2022

AO245B (Rev. 09/19) Judgment in a Criminal Case

Samuel Christopher Templeman
3:21-cr-19-MMH-PDB

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of **ONE HUNDRED SIXTY (160) MONTHS**.

The Court makes the following recommendations to the Bureau of Prisons:
- Incarceration at a facility located as close as possible to Jacksonville, Florida.
- Defendant receive mental health treatment.
- Defendant participate in the 500 hour, intensive residential substance abuse treatment program, as well as any other substance abuse treatment programs available.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By: _____
Deputy United States Marshal

AO245B (Rev. 09/19) Judgment in a Criminal Case

Samuel Christopher Templeman
3:21-cr-19-MMH-PDB

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of **TEN (10) YEARS**.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
4. You must cooperate in the collection of DNA as directed by the probation officer.
5. You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO245B (Rev. 09/19) Judgment in a Criminal Case

Samuel Christopher Templeman
3:21-cr-19-MMH-PDB

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchucks or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

AO245B (Rev. 09/19) Judgment in a Criminal Case

Samuel Christopher Templeman
3:21-cr-19-MMH-PDB

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature:_____   Date:_____

AO245B (Rev. 09/19) Judgment in a Criminal Case

Samuel Christopher Templeman
3:21-cr-19-MMH-PDB

## ADDITIONAL CONDITIONS OF SUPERVISED RELEASE

1.    You shall participate in a substance abuse program (outpatient and/or inpatient) and follow the probation officer's instructions regarding the implementation of this court directive. Further, you shall contribute to the costs of these services not to exceed an amount determined reasonable by the Probation Office's Sliding Scale for Substance Abuse Treatment Services. During and upon the completion of this program, you are directed to submit to random drug testing.

2.    You shall participate in a mental health program specializing in sexual offender treatment and submit to polygraph testing for treatment and monitoring purposes. You shall follow the probation officer's instructions regarding the implementation of this court directive. Further, you shall contribute to the costs of such treatment and/or polygraphs not to exceed an amount determined reasonable by the probation officer based on ability to pay or availability of third party payment and in conformance with the Probation Office's Sliding Scale for Treatment Services.

3.    You shall register with the state sexual offender registration agency(s) in any state where you reside, visit, are employed, carry on a vocation, or are a student, as directed by the probation officer.

4.    The probation officer shall provide state officials with all information required under Florida sexual predator and sexual offender notification and registration statutes (F.S. 943.0435) and/or the Sex Offender Registration and Notification Act (Title I of the Adam Walsh Child Protection and Safety Act of 2006, Public Law 109-248), and may direct the defendant to report to these agencies personally for required additional processing, such as photographing, fingerprinting, and DNA collection.

5.    You shall submit to a search of your person, residence, place of business, any storage units under your control, computer, or vehicle, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. You shall inform any other residents that the premises may be subject to a search pursuant to this condition. Failure to submit to a search may be grounds for revocation.

AO245B (Rev. 09/19) Judgment in a Criminal Case

Samuel Christopher Templeman
3:21-cr-19-MMH-PDB

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments set forth in the Schedule of Payments.

| | Assessment | AVAA Assessment[1] | JVTA Assessment[2] | Fine | Restitution |
|---|---|---|---|---|---|
| TOTALS | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 |

## SCHEDULE OF PAYMENTS

The Special Assessment in the amount of **$100.00** is due in full and immediately.

Unless the court has expressly ordered otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

## FORFEITURE

The defendant shall forfeit the defendant's interest in the following property to the United States:

ZTE model Z899VL cellular telephone, serial number 32FB76122680; iPhone model XR cellular telephone, serial number 356450103439078; LG model LGK50 cellular telephone, serial number 359962102240361; and Samsung model SM-A102U cellular telephone, serial number 356274100620948.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

---

[1] Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
[2] Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

AO245B (Rev. 09/19) Judgment in a Criminal Case

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 1 of 35 PageID 485
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 81 of 231

1

<pre>
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                   JACKSONVILLE DIVISION

 3   UNITED STATES OF AMERICA,       Case No. 3:21-cr-19-MMH-PDB

 4          Plaintiff,               Jacksonville, Florida

 5   v.                              Thursday, June 17, 2021

 6   SAMUEL CHRISTOPHER TEMPLEMAN,   10 a.m. - 10:33 a.m.

 7          Defendant.               Courtroom 5B
     _____

 8

 9                  CHANGE-OF-PLEA HEARING

10       BEFORE THE HONORABLE PATRICIA D. BARKSDALE
                 UNITED STATES MAGISTRATE JUDGE
11

12

13

14

15

     OFFICIAL COURT REPORTER:
16
       Katharine M. Healey, RMR, CRR, FPR-C
17     PO Box 56814
       Jacksonville, FL 32241
18     Telephone: (904) 301-6843
        KatharineHealey@bellsouth.net
19

20
                    (Proceedings recorded by electronic sound
21           recording; transcript produced by computer.)

22

23

24

25
</pre>

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 2 of 35 PageID 486
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 82 of 231

2

 1                        A P P E A R A N C E S

 2
     COUNSEL FOR THE GOVERNMENT:
 3
     LAURA TAYLOR, Esquire
 4     United States Attorney's Office - FLM
       300 North Hogan Street, Suite 700
 5     Jacksonville, FL 32202
       (904) 301-6301
 6     Laura.c.taylor@usdoj.gov

 7   - A N D -

 8   MELISSA W. NELSON, Esquire
       Special Assistant United States Attorney
 9     Office of the State Attorney
       311 West Monroe Street
10     Jacksonville, FL 32202
       (904) 255-2500
11     Mwnelson@coj.net

12

13   COUNSEL FOR DEFENDANT:

14   MAURICE C. GRANT, II, Esquire
       Federal Public Defender- MDFL
15     200 West Forsyth Street, Suite 1240
       Jacksonville, FL 32202
16     (904) 232-3039
       Maurice_grant@fd.org

17

18

19   ALSO PRESENT:

20   JESSICA MAYNARD, Task Force Officer, Federal Bureau of
     Investigation
21

22

23

24

25

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 3 of 35 PageID 487
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 83 of 231

3

P R O C E E D I N G S

June 17, 2021                                          10 a.m.

THE COURT:  We're on the record in United States vs.
Samuel Templeman.  It's Case 3:21-cr-19.

Assistant United States Attorney Laura Taylor is here
for the United States.  Would you like to introduce the people
at counsel table for the record, Ms. Taylor.

MS. TAYLOR:  Yes, Your Honor.  On the far end of
counsel table, Special Assistant United States Attorney Erin
Wolfson, and next to me is Task Force Officer Jessica Maynard.

THE COURT:  Good morning.

Assistant Federal Defender Maurice Grant is here for
Mr. Templeman.  Good morning, Mr. Grant.

MR. GRANT:  Good morning, Your Honor.

THE COURT:  We have Mr. Templeman here as well.  Good
morning.

THE DEFENDANT:  Good morning.

THE COURT:  Mr. Templeman, this proceeding has been
set up as a change-of-plea proceeding.  It's my understanding
that you're here to plead guilty to Count One of the
indictment; is that correct?

THE DEFENDANT:  Yes.

THE COURT:  This is a really important decision that
anyone makes in a criminal case.  Have you had enough time to
think about this decision?

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 4 of 35 PageID 488
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 84 of 231

4

```
 1              THE DEFENDANT:  Yes.

 2              THE COURT:  Have you had enough time to talk to Mr.

 3   Grant or anyone else you care to talk to about the case and the

 4   decision to plead guilty?

 5              THE DEFENDANT:  Yes.

 6              THE COURT:  Did Mr. Grant tell you what would happen

 7   today?

 8              THE DEFENDANT:  Yes.

 9              THE COURT:  We'll start by having you stand and raise

10   your right hand, please.

11              COURTROOM DEPUTY:  Do you solemnly swear or affirm

12   that the answers you will give during these proceedings will be

13   the truth, the whole truth, and nothing but the truth so help

14   you God?

15              THE DEFENDANT:  Yes.

16              THE COURT:  Thank you, Mr. Templeman.  If you

17   wouldn't mind just pulling your seat forward.  You can remain

18   seating for the -- seated for the rest of the proceeding.  And

19   if you'll move the microphone really close to you so that we

20   can hear you.

21              THE DEFENDANT:  Okay.

22              THE COURT:  Much better.  Thank you.

23              Mr. Templeman, you just took an oath to tell the

24   truth.  If you don't tell the truth or you leave something

25   important out, that could be used against you by the United
```

1    States in a prosecution for perjury, or making a false

2    statement.

3            Do you understand the significance and importance of

4    being placed under oath?

5            THE DEFENDANT:  Yes.

6            THE COURT:  You should also know that your testimony

7    today is being recorded.  Whatever you say can be used against

8    you, including during later proceedings in this case.  That

9    includes if you were to challenge the taking of the plea, the

10   judgment, the conviction, the sentence.

11           Do you understand that as well?

12           THE DEFENDANT:  Yes.

13           THE COURT:  You have a right to plead guilty, but

14   before the Court can accept any guilty plea in any case, the

15   Court has to find that it's made knowingly, freely,

16   intelligently, and voluntarily.  In other words, you know what

17   you're doing; you know the consequences of what you're doing;

18   no one's forcing you, threatening you, or promising you

19   anything beyond the plea agreement.

20           So the questions I ask pertain to those findings.  If

21   you don't understand a question that I ask or word I'm using,

22   please stop me and ask me to explain further.

23           If you need to meet with Mr. Grant in private, that's

24   perfectly fine, you just have to let me know.  If it's for a

25   few minutes, you can meet at counsel table.  If you need a

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 6 of 35 PageID 490
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 86 of 231

6

```
 1   longer period of time, we'll recess and come back later, okay?

 2           THE DEFENDANT:  Okay.

 3           THE COURT:  Again, you just have to let me know.

 4           THE DEFENDANT:  All right.

 5           THE COURT:  The next set of questions pertain to your

 6   ability to understand.

 7               If you'll state your full name, please.

 8           THE DEFENDANT:  Samuel Chris Templeman.

 9           THE COURT:  How old are you?

10           THE DEFENDANT:  46.

11           THE COURT:  What is your birthday?

12           THE DEFENDANT:  7/24/1974.

13           THE COURT:  How much school did you complete?

14           THE DEFENDANT:  I did one year in college, JU.

15           THE COURT:  Okay.  You can read, write, and

16   understand English?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Did you understand the plea agreement?

19           THE DEFENDANT:  Yes.

20           THE COURT:  In the past 24 hours have you had any

21   drugs, alcohol, medication or other intoxicant?

22           THE DEFENDANT:  No, ma'am.

23           THE COURT:  Do you see a doctor for any reason?

24           THE DEFENDANT:  No.

25           THE COURT:  Do you take prescription medication?
```

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 7 of 35 PageID 491
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 87 of 231

7

```
 1              THE DEFENDANT:  No.

 2              THE COURT:  Have you ever been treated for or

 3    suffered from any mental illness, emotional disability,

 4    anything like that?

 5              THE DEFENDANT:  No.

 6              THE COURT:  Have you been evaluated for mental health

 7    issues while in custody?

 8              THE DEFENDANT:  Uh, not really, no.

 9              THE COURT:  Okay.  But why were you hesitating?

10              THE DEFENDANT:  I was -- I mean, I was seeing a

11    psychologist over at the jail, but -- for mental health,

12    but . . .

13              THE COURT:  And that was when you were in state

14    custody --

15              THE DEFENDANT:  Yeah.

16              THE COURT:  -- or currently?

17              THE DEFENDANT:  Currently.

18              THE COURT:  Currently?

19              THE DEFENDANT:  Yeah.

20              THE COURT:  And what is the psychiatrist seeing you

21    for?

22              THE DEFENDANT:  I was just talking about problems I

23    was having.

24              THE COURT:  Okay.  Did that doctor diagnose you with

25    anything?
```

```
 1              THE DEFENDANT:  No, unh-unh.
 2              THE COURT:  Do you clearly understand where you are,
 3    what you're doing, and the importance of the proceeding?
 4              THE DEFENDANT:  Yes.
 5              THE COURT:  And let me go back.  Did that doctor
 6    prescribe any medication for you?
 7              THE DEFENDANT:  No.
 8              THE COURT:  All right.  Mr. Grant, do you have any
 9    concerns about Mr. Templeton's competency to enter a guilty
10    plea?
11              MR. GRANT:  No, Your Honor.
12              THE COURT:  Templeman, sorry.
13              Ms. Taylor, would you like me to ask any other
14    questions regarding competency?
15              MS. TAYLOR:  No, Your Honor.
16              THE COURT:  Mr. Templeman, your case has two judges
17    assigned to it.  One's the district judge; that's the Honorable
18    Marcia Morales Howard.  You haven't met her yet.  One is the
19    magistrate judge; that's me.  I handle most of the proceedings
20    up until now.
21              You have the right to have your guilty plea taken by
22    the district judge or you can consent to having it taken by a
23    magistrate judge, me, this morning.  If you consent to me
24    taking your guilty plea this morning, the district judge is
25    going to be the one who decides whether to accept the guilty
```

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 9 of 35 PageID 493
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 89 of 231

9

 1  plea, and then if she accepts it, she'll be the one who imposes

 2  the sentence.  Under no circumstances will I be the judge who

 3  sentences you.

 4        If you consent to me taking your plea this morning,

 5  you simply give up the right to have the sentencing judge hear

 6  and listen to your plea directly.

 7        Does that make sense?

 8        THE DEFENDANT:  Yes.

 9        THE COURT:  Would you prefer to have your plea taken

10  by the district judge or would you like me to take it this

11  morning?

12        THE DEFENDANT:  Um, you can do it.

13        THE COURT:  All right.  I have a notice regarding

14  entry of guilty plea that says that you consent to me taking

15  your guilty plea.  It looks like it was signed by you and Mr.

16  Grant earlier today.

17        Is that right, Mr. Grant?

18        MR. GRANT:  Yes, Your Honor.

19        THE COURT:  And Mr. Templeman, you remember signing

20  this?

21        THE DEFENDANT:  Yes.

22        THE COURT:  Did anyone force you, threaten you,

23  coerce you, intimidate you, or promise you anything to get you

24  to consent to me taking your plea?

25        THE DEFENDANT:  No.

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 10 of 35 PageID 494
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 90 of 231

10

1          THE COURT:  All right.  I find your waiver and

2    consent are made knowingly, freely, intelligently, and

3    voluntarily.  I'll therefore proceed with the colloquy and next

4    go into all of the rights that you have in this case.

5          You have the right to the assistance of a lawyer at

6    every stage of the proceedings whether or not you can afford

7    one.  That's why Mr. Grant was appointed.  That right persists

8    whether you plead guilty or not guilty.

9          You have the right to plead not guilty, as you

10   previously did, and to persist in that not guilty plea.

11         If you persisted in the not guilty plea, you'd have

12   these rights under the United States Constitution and the other

13   laws of the United States:

14         First, you have the right to a speedy and public

15   trial and to be tried by a jury of 12 people.  If tried by a

16   jury of 12, all 12 of those jurors would have to unanimously

17   agree on your guilt before you could be convicted.

18         You're presumed innocent.  Before you can be found

19   guilty, the burden is on the United States to overcome that

20   presumption and prove your guilt by competent and sufficient

21   evidence beyond a reasonable doubt.  You don't have a burden of

22   proving innocence.

23         At a trial the witnesses for the United States would

24   have to come into court and testify in your presence.  You'd

25   have the right to confront them, see, hear, question, and

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 11 of 35 PageID 495
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 91 of 231

11

1   cross-examine them.

2          You'd also have the right to present evidence and

3   witnesses in your own defense.  If any defense witnesses

4   refused to come into court voluntarily, the Court would issue

5   orders to make them come into court.

6          At a trial you'd have the right to choose whether to

7   testify.  The choice would be entirely up to you.  No one could

8   force you to testify.  Conversely, no one could force you to

9   not testify.

10          Do you understand these rights?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Do you have questions about those?

13          THE DEFENDANT:  No.

14          THE COURT:  If you plead guilty to Count One of the

15   indictment, you waive and give up the trial rights that I just

16   told you about.  There would be no trial.  On your guilty plea

17   the Court would find you guilty, skip the trial, and ultimately

18   proceed to sentencing.

19          Do you understand hat?

20          THE DEFENDANT:  Yes.

21          THE COURT:  A plea of guilty admits the truth of the

22   charge.  A plea of not guilty denies the charge.

23          Do you understand the difference?

24          THE DEFENDANT:  Yes.

25          THE COURT:  If you choose to plead guilty you have to

1  give up your right to not incriminate yourself because I have

2  to ask you some questions about the offense to which you're

3  pleading guilty to ensure there's a factual basis for the plea;

4  in other words, the facts that you're admitting establish the

5  elements of the charge against you.

6          You might have defenses to that charge, but if you

7  plead guilty, you waive and give up your right to assert any

8  defenses you might have.

9          By pleading guilty you also waive and give up your

10 right to challenge the way in which the government obtained any

11 evidence, statement, or confession against you.

12         In addition, by pleading guilty you may lose the

13 right to challenge on appeal any rulings this Court has made in

14 your case.

15         Do you fully understand the rights that you have and

16 the rights you give up by pleading guilty?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Can I answer any questions about those?

19         THE DEFENDANT:  No.

20         THE COURT:  Now, this is a felony.  By pleading

21 guilty to a felony you may lose certain civil rights.  That

22 includes your right to vote, to hold public office, to serve on

23 juries, and to own and possess firearms.  A felony conviction

24 may also prevent you from obtaining or keeping certain

25 occupational licenses.

1          There's also a Sex Offender Registration and

2    Notification Act component to this that will require you to

3    register as a sex offender.  That's a federal law.  There's

4    also some state, or local, laws that might apply to you as

5    well.

6          Do you understand the consequences of pleading

7    guilty?

8          THE DEFENDANT:  Yes.

9          THE COURT:  I read this in every case.  I'm not sure

10   if it applies to you, but I'm required to read it.

11         If convicted, a defendant who is not a United States

12   citizen may be removed from the United States, denied

13   citizenship, and denied admission to the United States in the

14   future.

15         Let's turn to the indictment, the charge, the

16   elements, and the penalties.  Did you receive a copy of the

17   indictment?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Has Mr. Grant explained the charge to

20   you?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Have you discussed the charge and the

23   case in general with him?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Has he answered all of your questions?

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 14 of 35 PageID 498
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 94 of 231

14

1          THE DEFENDANT:  Yes.

2          THE COURT:  Now, did you explain everything that you

3     know about the case to him?

4          THE DEFENDANT:  Yes.

5          THE COURT:  The charge against you in Count one is

6     that you conspired to traffic a child for commercial sex, in

7     violation of Title 18, United States Code, Section 1594.  And

8     the child is identified in the indictment as Minor Victim 1.

9          Do you understand the charge against you?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you have any questions about that

12     charge?

13          THE DEFENDANT:  No.

14          THE COURT:  The elements the United States has to

15     prove for there to be a conviction of that type of charge are

16     as follows:

17          First, that you knowingly conspired with another

18     person to violate Title 18, United States Code, Sections

19     1595(a) and (b)(2); that is, to recruit, entice, harbor,

20     transport, obtain, maintain, patronize, and solicit, by any

21     means, the person named in the indictment, in and affecting

22     interstate and foreign commerce, knowing and in reckless

23     disregard of the fact that the person named in indictment was

24     under the age of 18 years and would be caused to engage in a

25     commercial sex act.

1          Second, that you did so knowingly -- excuse me, that

2     you did so knowing the conspiratorial goal.

3          And third, that you voluntarily assisted in

4     accomplishing that goal.

5          Do you understand the elements of this offense?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Do you have any questions about those?

8          THE DEFENDANT:  No.

9          THE COURT:  Penalties that you face by pleading

10    guilty to this charge are as follows:

11         You face a term of imprisonment of up to life, a fine

12    of up to $250,000, you could get both a term of imprisonment

13    and a fine.

14         You face a term of supervised release after any

15    period of incarceration of not less than five years and up to

16    life.  You face a mandatory special assessment of $100 that's

17    due on the date of sentencing.

18         Do you understand those penalties?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Continuing on -- and Ms. Taylor, is Mr.

21    Templeman required to register under SORNA?

22         MS. TAYLOR:  Yes, Your Honor.

23         THE COURT:  All right.  The Court must revoke your

24    supervised release and require you to serve a term of

25    imprisonment of not less than five years and up to life if you

1  commit any particular criminal offense while serving on

2  supervised release.  Those offenses are described in Title 18,

3  United States Code, Chapters 109A and 110, 117, or 1201 or

4  1591.

5        If you violated a term or condition of supervised

6  release in any other way, you could be sent back to prison for

7  a period of up to five years and face an additional term of

8  supervised release.

9        Did you understand that?

10        THE DEFENDANT:  Yes.

11        THE COURT:  In addition, the Court must impose a

12  $5,000 special assessment on any non-indigent defendant

13  convicted of an offense in violation of certain statutes.

14        Ms. Taylor, this is one of them?

15        MS. TAYLOR:  Yes, Your Honor.

16        THE COURT:  So the Court must impose that $5,000

17  special assessment if it finds you non-indigent.

18        In addition, the Court must order you to make

19  restitution to any victim of the offense.  And there's a Victim

20  Restitution section in the plea agreement.

21        Where is that, Ms. Taylor?

22        MS. TAYLOR:  It's paragraph A5, Your Honor.

23        THE COURT:  What page is that?

24        MS. TAYLOR:  I apologize.  It's at page three.

25        THE COURT:  That restitution provision is there on

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 17 of 35 PageID 501
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 97 of 231

17

```
 1    page three, paragraph five.  There it says that you agree to

 2    make full restitution to any victim -- or, excuse me, to the

 3    victim identified as Minor Victim 1 in the indictment.  You

 4    agree that the restitution must be made as to all counts

 5    charged, whether or not you entered a guilty plea to such

 6    counts and whether or not such counts are dismissed under the

 7    agreement.  You agree to pay restitution to Minor Victim 1 for

 8    the entire scope of the criminal conduct, including, but not

 9    limited to, all matters included as relevant conduct.

10            Ms. Taylor, did I state the penalties correctly?

11            MS. TAYLOR:  Yes, Your Honor.

12            THE COURT:  Mr. Grant, do you agree?

13            MR. GRANT:  Yes, Your Honor.

14            THE COURT:  All right.  I said a lot there, Mr.

15    Templeman.  Did you understand all of that?

16            THE DEFENDANT:  Yes.

17            THE COURT:  Any questions about the penalties?

18            THE DEFENDANT:  No.

19            THE COURT:  Let's talk for a few minutes about

20    sentencing, unless you have questions about anything so far?

21            THE DEFENDANT:  No.

22            THE COURT:  The United States Sentencing Guidelines

23    apply in your case.  Did you talk to Mr. Grant about those?

24            THE DEFENDANT:  Yes.

25            THE COURT:  I won't go into that much more detail,
```

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 18 of 35 PageID 502
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 98 of 231

18

1  then, but I do want to make sure you understand how sentencing

2  in federal court works.

3         To decide your sentence the district judge must

4  calculate the applicable sentencing guidelines range.  She's

5  unable to do that until after acceptance of your guilty plea

6  and after preparation of what's called a Presentence

7  Investigation Report, which is quite extensive.

8         The judge is tasked with determining a reasonable

9  sentence.  To do that, the judge must consider the guidelines

10  range, any possible departures under the guidelines, and

11  certain factors.  They include the nature and circumstances of

12  your offense; your history; your characteristics; the need for

13  the sentence imposed to reflect the seriousness of the offense;

14  to promote reflect for the law; to provide just punishment for

15  the offense; to afford adequate deterrence to criminal conduct;

16  to protect the public from any further crimes by you; to

17  provide you with needed educational or vocational training,

18  medical care, or other correctional treatment in the most

19  effective manner; kinds of sentences that are available for

20  this; the need to avoid unwarranted sentencing disparities

21  among defendants who have similar records who have been found

22  guilty of similar conduct; and finally, the need to provide

23  restitution to any victim in the case.

24         The judge is not bound by the guidelines range.  She

25  has the authority to impose a sentence that is more severe or

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 19 of 35 PageID 503
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 99 of 231

19

1    less severe than what the guidelines recommend.  She's bound

2    only by the statutory maximum that I read to you earlier.

3           The United States may appeal a sentence the district

4    judge imposes.  It's rare, but it sometimes happens.  That

5    means the United States could ask a court of appeals to reverse

6    the sentence, for example, because it's too low or based on a

7    sentencing guidelines miscalculation.

8           Parole has been abolished in the federal system.  If

9    sentenced to prison, you won't be released on parole.

10          The sentence the district judge imposes might be

11   different from any estimated sentence Mr. Grant or anyone else

12   has given to you.  In fact, it might be higher than you expect.

13   If that were to happen, you would still be bound by your guilty

14   plea and would not have a right to withdraw it.

15          Do you understand all of these things?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Do you have any questions about

18   sentencing?

19          THE DEFENDANT:  No.

20          THE COURT:  I have in front of me what's marked as an

21   original plea agreement.  Do you understand there have been

22   discussions between Ms. Taylor and Mr. Grant that have resulted

23   in a plea agreement?

24          THE DEFENDANT:  Yes.

25          THE COURT:  All right.  I'm going to hand this plea

Case 3:21-cr-00019-MMH-PDB   Document 115   Filed 07/12/22   Page 20 of 35 PageID 504
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 100 of 231

20

1  agreement to Mr. Grant.

2          Mr. Grant, will you please verify your signature.

3  Mr. Templeman, if you'll verify your signature and your

4  initials and then pass it over to Ms. Taylor to do the same.

5          THE DEFENDANT:  Yes.

6          THE COURT:  All right.  Mr. Templeman, you signed

7  that agreement?

8          THE DEFENDANT:  Yes.

9          THE COURT:  That's your signature?

10          THE DEFENDANT:  Uh-hmm.

11          THE COURT:  And are your initials on each page?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And Mr. Grant, did you sign it as well?

14          MR. GRANT:  I did, Your Honor.  I signed it

15  yesterday.  I witnessed Mr. Templeman sign the document,

16  initial each page, and he also was the one who put the date,

17  the 16th of June, 2021.

18          THE COURT:  Thank you.

19          MS. TAYLOR:  Your Honor, I received the original plea

20  agreement from Mr. Grant.  And I recognize the initials of Mai

21  Tran on the bottom right-hand corner of the first page of the

22  agreement.  She is our asset forfeiture AUSA in Jacksonville.

23          On page 15 I recognize my own signature as well as

24  the signature of Kelly Karase, who is the deputy chief of the

25  Jacksonville division.

 1          THE COURT:  Thank you.

 2          Mr. Templeman, you said earlier that you understood

 3   the plea agreement.  Did you read the entire thing?

 4          THE DEFENDANT:  Yes.

 5          THE COURT:  Did Mr. Grant go over it with you and

 6   answer any questions you had?

 7          THE DEFENDANT:  Yes, he did.

 8          THE COURT:  Did he walk through it with you one by

 9   one?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you feel like you understand each

12   part?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Do you have any questions about any part

15   of this?

16          THE DEFENDANT:  No.

17          THE COURT:  I'm going to review some of the

18   provisions with you today.  Just remember that you're bound by

19   the entire agreement and not just those that I read today.

20   When I'm done, if you want me to review anything else, just let

21   me know.

22          The first thing I want to talk to you about is on

23   page three, paragraph four, titled Counts Dismissed.  Here, I

24   just want you to know that a Court can accept a plea agreement

25   that involves the dismissal of some charges only if the Court

 1   finds the charge to which you're pleading guilty adequately

 2   reflects the seriousness of your actual offense behavior and

 3   that accepting the agreement won't undermine the statutory

 4   purposes of sentencing.

 5          Know, also, that although charges are to be dismissed

 6   pursuant to this plea agreement, you could still be held

 7   accountable under the sentencing guidelines for conduct

 8   underlying those charges even though they have been dismissed.

 9          Do you understand that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  The next paragraph I want to talk about

12   is on the same page leading into the next page, paragraph six

13   titled Acceptance of Responsibility - Three Levels.  That says

14   that at the time of sentencing, and in the event no adverse

15   information is received suggesting such a recommendation to be

16   unwarranted, the United States will recommend to the Court that

17   you receive a two-level downward judgment for acceptance of

18   responsibility.  You understand that recommendation or request

19   is not binding on the Court, and if not accepted by the Court,

20   you won't be allowed to withdraw from the plea.

21          Same goes, Mr. Templeman, really for any

22   recommendation made by either side, or even both sides.  If the

23   Court doesn't accept the recommendation for some reason, you're

24   still bound by your guilty plea and won't have a right to

25   withdraw it.

1                Do you understand that?

2                THE DEFENDANT:  Yes.

3                THE COURT:  That paragraph goes on to say -- or that

4     provision, at the time of sentencing, if your offense level

5     prior to the two-level reduction is 16 or greater and you

6     comply with the guidelines and the plea agreement, the United

7     States agrees to file a motion for a downward adjustment of one

8     additional level.  You understand that the determination as to

9     whether you qualify for that rests solely with the United

10    States Attorney and you agree you won't challenge that

11    determination.

12                Do you understand that?

13                THE DEFENDANT:  Yes.

14                THE COURT:  The next provision is that Sex Offender

15    Registration and Notification.  That's explaining that you

16    understand requirements for that.

17                Do you understand that provision?

18                THE DEFENDANT:  Yes.

19                THE COURT:  There's Forfeiture of Assets that

20    follows.  In that provision you agree to forfeit to the United

21    States immediately and voluntarily any property subject to

22    forfeiture, and it describes some of the assets, including cell

23    phones.

24                Do you understand the forfeiture provision?

25                THE DEFENDANT:  Yes.

 1          THE COURT:  And that's separate from any of the

 2   penalties I discussed earlier.  Do you understand that?

 3          THE DEFENDANT:  Yes.

 4          THE COURT:  Skipping all the way to page 12,

 5   paragraph seven, that's titled Defendant's Waiver of Right to

 6   Appeal the Sentence.  In that provision you agree the Court has

 7   jurisdiction and authority to impose any sentence up to the

 8   statutory maximum, and you expressly waive your right to appeal

 9   your sentence on any ground.  That includes the ground that the

10   Court erred in determining the applicable guidelines range

11   under the sentencing guidelines.

12          There are some exceptions listed.  You can appeal

13   your sentence on the ground that it exceeds your guidelines

14   range as determined by the Court; you can appeal your sentence

15   on the ground that it exceeds the statutory maximum penalty;

16   you can appeal your sentence on the ground that the sentence

17   violates the Eighth Amendment to the United States Constitution

18   prohibiting cruel and unusual punishment; and you can appeal

19   your sentence if the government appeals your sentence.

20          But absent one of those four circumstances, you waive

21   and give up the right that you have to appeal your sentences.

22   Do you understand that?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Do you have questions about that?

25          THE DEFENDANT:  No.

1           THE COURT:  Ms. Taylor, would you like me to review

2   anything else in the plea agreement?

3           MS. TAYLOR:  No, Your Honor.

4           THE COURT:  Mr. Grant, would you like me to?

5           MR. GRANT:  No, Your Honor.

6           THE COURT:  Mr. Templeman, would you like me to?

7           THE DEFENDANT:  No.

8           THE COURT:  Are you willing to be bound by all of the

9   provisions in the plea agreement?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Have any promises or assurances been made

12  to you of any kind by anyone that are not reflected in this

13  plea agreement that pertain to this case?

14          THE DEFENDANT:  No.

15          THE COURT:  What we've talked about so far, Mr.

16  Templeman, are your rights, the rights you're giving up by

17  pleading guilty, the charge against you, potential penalties,

18  we talked about potential consequences, we talked about the

19  sentencing guidelines and a little bit about sentencing, and

20  then we just talked about your plea agreement.

21          In just a second I'll ask you how you plead, but

22  before I do that, do you have questions about any of those

23  topics or anything else?

24          THE DEFENDANT:  No.

25          THE COURT:  Let me ask you directly, then, Mr.

```
 1   Templeman:  Do you plead guilty or not guilty to Count One of
 2   the indictment?
 3              THE DEFENDANT:  Guilty.
 4              THE COURT:  All right.  Now, I'd ordinarily have the
 5   prosecutor read a proffer of facts that the United States says
 6   it's prepared to prove beyond a reasonable doubt.  They're
 7   important because these facts will be used in preparation for
 8   that presentence report.  Judge Howard will use that report to
 9   decide a guidelines range and a reasonable sentence for you
10   considering these facts and then a number of different other
11   factors.
12              In lieu of that, Mr. Templeman, have you read the
13   factual basis attached to the plea agreement carefully?
14              THE DEFENDANT:  Yes.
15              THE COURT:  And here -- is it in front of you right
16   now?
17              THE DEFENDANT:  Yes.
18              THE COURT:  I'm talking about page -- if you'll turn
19   to -- it's fairly lengthy.  If you start on page 17, it goes
20   all the way to page 23.
21              THE DEFENDANT:  Okay.
22              THE COURT:  And so you're -- you agree and
23   acknowledge you've read all of those pages?
24              THE DEFENDANT:  Yes.
25              THE COURT:  Ms. Taylor, are you comfortable with this
```

1   procedure?

2          MS. TAYLOR:  Yes, Your Honor.

3          THE COURT:  Mr. Grant?

4          MR. GRANT:  I am, Your Honor.

5          THE COURT:  Mr. Grant, do you have any objections to

6   any of the facts in the factual basis?

7          MR. GRANT:  No, Your Honor.

8          THE COURT:  Mr. Templeman, having read the facts in

9   the factual basis, I'll ask you:  Are those facts true?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Then let me ask you the questions on page

12   16 right before the factual basis.

13          It says -- first question, there's three parts to it.

14   Number one, beginning at least by some date in or around

15   November 2019 and continuing through on or about December 11,

16   2019, did you knowingly conspire with another person, namely,

17   Deborah Lynn Templeman, to violate Title 18, United States

18   Code, Section 1591(a) and (b)(2)?

19          THE DEFENDANT:  Yes.

20          THE COURT:  1a:  Specifically, did you agree with

21   Deborah Lynn Templeman to recruit, entice, harbor, transport,

22   obtain, maintain, patronize, and solicit, by any means, Minor

23   Victim 1, the person referenced in Count One of the indictment?

24          MR. GRANT:  Your Honor, we would just stipulate to

25   transport.

1          THE COURT:  To transport.  Okay.  Any issue with
2   that, Ms. Taylor?
3          MS. TAYLOR:  Can I discuss it with Mr. Grant, Your
4   Honor?
5          THE COURT:  Yes.
6      (Pause in proceedings.)
7          MS. TAYLOR:  Your Honor, I'm not sure that Mr. Grant
8   and I see eye to eye as to which terms apply and don't apply,
9   but certainly I think we do agree that transport applies and
10  that is sufficient.  And so I think if the Court just asked him
11  if he transported her, then that's sufficient for the plea.
12         THE COURT:  Let me ask you this question over again,
13  then.
14         Mr. Templeman, this is 1a.  Specifically, did you
15  agree with Deborah Lynn Templeman to transport, by any means,
16  Minor Victim 1, the person referenced in Count One of the
17  indictment?
18         THE DEFENDANT:  Yes.
19         THE COURT:  1b, did you do so knowing that Minor
20  Victim 1 had not obtained the age of 18 years and would be
21  caused to engage in a commercial sex act?
22         THE DEFENDANT:  Yes.
23         THE COURT:  1c, were your acts in or affecting
24  interstate or foreign commerce, including through the use of
25  the website www.skipthegames.com, which is based in Europe, and

1  through the use of Samsung Model SM-A102U cellular telephone, a

2  facility of interstate commerce, which had been manufactured in

3  Vietnam?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Second question:  Did you do so knowing

6  the conspiratorial goal?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And third question:  Did you voluntarily

9  assist in accomplishing that goal?

10         THE DEFENDANT:  Yes.

11         THE COURT:  All right.  I find a factual basis for

12 your plea.  Are you pleading guilty freely and voluntarily?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Are you pleading guilty because you are

15 guilty?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Has anyone threatened you, forced you,

18 coerced you, or intimidated you in any way regarding this

19 decision?

20         THE DEFENDANT:  No.

21         THE COURT:  Has anyone made a promise or assurance to

22 you of any kind to get you to plead guilty other than what's in

23 the plea agreement?

24         THE DEFENDANT:  No.

25         THE COURT:  Are you relying on any understanding as

```
 1     to what particular sentence will be imposed?

 2              THE DEFENDANT:  Repeat that again.

 3              THE COURT:  That's a bad question.  Let me ask a

 4     different question.

 5              As you sit here today, do you understand that you

 6     don't know the exact sentence you'll receive?

 7              THE DEFENDANT:  Right.

 8              THE COURT:  Has anyone promised that you'll receive a

 9     light sentence or otherwise be rewarded for pleading guilty

10     other than what's in your plea agreement?

11              Let me ask that again.  Has anyone promised you that

12     you'll receive a light sentence or otherwise be rewarded in

13     some way for pleading guilty other than what's in your plea

14     agreement?

15              THE DEFENDANT:  No.

16              THE COURT:  Counsel, do you assure the Court as far

17     as you know, no assurances, promises, or understandings have

18     been given to Mr. Templeman as to a disposition in this case

19     that are different from or contrary to what's in the plea

20     agreement?

21              MS. TAYLOR:  I do, Your Honor.

22              THE COURT:  Mr. Grant?

23              MR. GRANT:  I do.

24              THE COURT:  Mr. Templeman, you're represented by Mr.

25     Grant.  Are you satisfied with him and the way he's represented
```

1    you in the case?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Do you have any complaints about the way

4    he's represented you in the case?

5            THE DEFENDANT:  No.

6            THE COURT:  Do you have any complaints about the way

7    you've been treated by the Court or anyone else that's causing

8    you to plead guilty?

9            THE DEFENDANT:  No.

10           THE COURT:  Has anyone suggested that you answer

11   untruthfully today?

12           THE DEFENDANT:  No.

13           THE COURT:  Have you told the truth today?

14           THE DEFENDANT:  Have what?

15           THE COURT:  Have you told the truth today?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Do you fully understand the rights and

18   procedures you waive and give up by pleading guilty?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Having heard everything I've said, is it

21   your final desire to plead guilty to Count One pursuant to the

22   terms of your plea agreement?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Now is your last chance to state any

25   hesitancy if you have any.  Do you feel comfortable with your

1    plea?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Is the United States satisfied with the

4    colloquy?

5              MS. TAYLOR:  Yes, Your Honor.

6              THE COURT:  Is the defense?

7              MR. GRANT:  Yes, Your Honor.

8              THE COURT:  Mr. Grant, are you also satisfied Mr.

9    Templeman knows what he's charged with, you've had enough time

10   to counsel with him, and he's pleading guilty freely and

11   voluntarily and with full knowledge of the consequences of his

12   guilty plea?

13             MR. GRANT:  Yes as to each of those matters.

14             THE COURT:  Mr. Templeman, I'm going to make some

15   findings on the record.  If you'll please listen carefully to

16   me, I'll ask if you agree with them when I'm done.

17             I find that you, Samuel Templeman, are now alert and

18   intelligent; that you understand the nature of the charge

19   against you and the possible penalties; and you appreciate the

20   consequences of pleading guilty.

21             I find the facts the United States is prepared to

22   prove and which you've admitted establish all of the essential

23   elements of the offense to which you pleaded guilty.

24             I find your decision to plead guilty is made

25   knowingly, freely, intelligently, and voluntarily, that you've

 1   had the advice and counsel of a competent lawyer with whom you

 2   say you are satisfied.

 3            Do you agree with those findings?

 4            THE DEFENDANT:  Yes.

 5            THE COURT:  I'll write a report and recommendation to

 6   Judge Howard recommending that she accepts your guilty plea.

 7   Parties ordinarily have 14 days to object to that

 8   recommendation, but that period can be waived.

 9            Mr. Grant?

10            MR. GRANT:  Your Honor, the defense will waive the

11   14-day period.

12            THE COURT:  All right.  Ms. Taylor?

13            MS. TAYLOR:  The United States will waive it.

14            THE COURT:  Okay.  You were getting up, so I thought

15   you had something to say before Ms. Taylor, so I took that out

16   of order.

17            All right.  Mr. Templeman, from here, the probation

18   office will prepare that presentence report that I referenced.

19   I did say it's extensive; in part because it will go into a lot

20   of your background, education, employment, family history, that

21   type of thing.  You'll be required to provide information for

22   the report.

23            Mr. Grant's going to continue to represent you during

24   that process.  He'll also represent you in making any

25   objections to the report if there are any.  And, of course,

1  he'll represent you at the sentencing hearing.

2         At that time Judge Howard will ask you directly

3  whether you'd like to say anything or make a statement before

4  she imposes the sentence.  If you'd like to do that, you'll

5  have an opportunity to do that at that time.  So between now

6  and then you can think about that.

7         Your sentencing, you know, should be scheduled within

8  the next 75 days.  Mr. Grant will be in touch with you once

9  that's put on the calendar.

10         Ms. Taylor, is there anything else we can do today?

11         MS. TAYLOR:  No, Your Honor.

12         THE COURT:  Mr. Grant, anything else?

13         MR. GRANT:  No, Your Honor.

14         THE COURT:  Mr. Templeman, anything else?

15         THE DEFENDANT:  No.

16         THE COURT:  All right.  Thank you.  Court's in

17  recess.

18         COURT SECURITY OFFICER:  All rise.

19      (The proceedings concluded at 10:33 a.m.)

20                              -     -     -

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER
 2    UNITED STATES DISTRICT COURT)
 3    MIDDLE DISTRICT OF FLORIDA )
 4
 5         I, court approved transcriber, certify that the
 6    foregoing is a correct transcript from the official electronic
 7    sound recording of the proceedings in the above-entitled
 8    matter.
 9
10         DATED this 12th day of July, 2022.
11
12                        /s/ Katharine M. Healey
                          Katharine M. Healey, RMR, CRR, FPR-C
13                        Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    UNITED STATES DISTRICT COURT
                        MIDDLE DISTRICT OF FLORIDA
 2                        JACKSONVILLE DIVISION

 3    UNITED STATES OF AMERICA,        Case No. 3:21-cr-19-MMH-PDB

 4          Plaintiff,                 Jacksonville, Florida

 5    v.                               Tuesday, May 17, 2022

 6    SAMUEL CHRISTOPHER TEMPLEMAN     9:35 a.m. - 12:01 p.m.
      and DEBORAH LYNN TEMPLEMAN,      3:37 p.m. - 4:21 p.m.
 7
            Defendants.                Courtroom 10B
 8    _____

 9

                              SENTENCING
10

            BEFORE THE HONORABLE MARCIA MORALES HOWARD
11                     UNITED STATES DISTRICT JUDGE

12

13

14

15

16    OFFICIAL COURT REPORTER:

17      Katharine M. Healey, RMR, CRR, FPR-C
        PO Box 56814
18      Jacksonville, FL 32241
        Telephone: (904) 301-6843
19      KatharineHealey@bellsouth.net

20

21                          (Proceedings reported by stenography;
                             transcript produced by computer.)
22

23

24

25
```

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 2 of 113 PageID 559
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 118 of 231

2

1                              A P P E A R A N C E S

2

   COUNSEL FOR THE GOVERNMENT:
3

   LAURA TAYLOR, Esquire
4  MAI TRAN, Esquire
     United States Attorney's Office - FLM
5     300 North Hogan Street, Suite 700
      Jacksonville, FL 32202
6     (904) 301-6301
      Laura.c.taylor@usdoj.gov
7     Mai.tran2@usdoj.gov

8  - A N D -

9  MELISSA W. NELSON, Esquire
      Special Assistant United States Attorney
10    Office of the State Attorney
      311 West Monroe Street
11    Jacksonville, FL 32202
      (904) 255-2500
12    Mwnelson@coj.net

13
   COUNSEL FOR DEFENDANT SAMUEL CHRISTOPHER TEMPLEMAN:
14
   MAURICE C. GRANT, II, Esquire
15    Federal Public Defender- MDFL
      200 West Forsyth Street, Suite 1240
16    Jacksonville, FL 32202
      (904) 232-3039
17    Maurice_grant@fd.org

18  COUNSEL FOR DEFENDANT DEBORAH LYNN TEMPLEMAN:

19  ANDREW BONDERUD, Esquire
      The Bonderud Law Firm, P.A.
20    2130 Riverside Ave
      Jacksonville, FL 32204
21    (904) 438-8082
      Bonderudlaw@gmail.com

22

23  ALSO PRESENT:

24  JESSICA MAYNARD, Task Force Officer, Federal Bureau of

25  Investigation

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 3 of 113 PageID 560
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 119 of 231

3

1                             I N D E X

2                                                        PAGE

3    DEFENDANT DEBORAH LYNN TEMPLEMAN'S OBJECTIONS TO PSR....8

4    GOVERNMENT'S RESPONSE TO OBJECTIONS.....................9

5    DEFENDANT SAMUEL CHRISTOPHER TEMPLEMAN'S WITNESSES:

6    **DR. VALERIE R. McCLAIN**

7      DIRECT EXAMINATION BY MR. GRANT.......................20

8      CROSS-EXAMINATION BY MS. TAYLOR......................35

9    **TONYA DOUGLAS**

10     DIRECT EXAMINATION BY MR. GRANT.......................41

11   GOVERNMENT'S RECOMMENDATIONS FOR SENTENCE...............57

12   DEFENDANT SAMUEL CHRISTOPHER TEMPLEMAN'S ARGUMENTS......73

13   STATEMENT BY DEFENDANT SAMUEL CHRISTOPHER TEMPLEMAN.....80

14   DEFENDANT DEBORAH LYNN TEMPLEMAN'S ARGUMENTS............81

15   STATEMENT BY DEFENDANT DEBORAH LYNN TEMPLEMAN...........85

16   COURT'S PRONOUNCEMENT OF SENTENCE......................91

17

18

19

20

21

22

23

24

25

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 4 of 113 PageID 561
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 120 of 231

4

```
 1                     P R O C E E D I N G S

 2

 3   May 17, 2022                                9:35 a.m.

 4           COURT SECURITY OFFICER:  All rise.  The United States

 5   District Court in and for the Middle District of Florida is now

 6   in session.  The Honorable Marcia Morales Howard presiding.

 7           Please be seated.

 8           THE COURT:  This is Case No. 3:21-cr-19-MMH-PDB,

 9   United States of America vs. Samuel Christopher Templeman and

10   Deborah Lynn Templeman.

11           Ms. Taylor is here on behalf of the United States

12   along with Ms. Tran and Ms. Taylor.  Can you introduce the case

13   agents, please?

14           MS. TAYLOR:  Yes, Your Honor.  Seated immediately to

15   my right is Task Force Officer Jessica Maynard with the Federal

16   Bureau of Investigation, and then at the other end of the table

17   is Special Assistant United States Attorney Erin Wolfson, who

18   is my co-counsel on this case.

19           THE COURT:  Have you just not made an appearance?  I

20   don't see another AUSA on the docket.

21           MS. TAYLOR:  Your Honor, I'm not sure.  I believe

22   that Ms. Wolfson signed the indictment, but she may not

23   formally be on the docket.  I don't anticipate that she's going

24   to have a speaking role today.

25           THE COURT:  Okay.  No, that's fine, I just felt bad
```

1   for not realizing that you're counsel on the case.

2          All right.  And Mr. Grant is here on behalf of

3   Mr. Templeman and Mr. Bonderud is here on behalf of

4   Mrs. Templeman.

5          Mr. and Mrs. Templeman are both in the courtroom.

6          Mr. Grant, are you prepared to proceed?

7          MR. GRANT:  I am, Your Honor.

8          THE COURT:  Mr. Bonderud?

9          MR. BONDERUD:  Yes, Your Honor.

10          THE COURT:  And you, Ms. Taylor?

11          MS. TAYLOR:  Yes, Your Honor.

12          THE COURT:  Mr. Templeton (verbatim), on June 17th of

13   2021 you entered a plea of guilty to Count One of the

14   indictment which charged you with conspiring to traffic a child

15   for commercial sex, in violation of Title 18, United States

16   Code, Sections 1594, 1591(b)(2), and 1591(a).

17          The Court has accepted your guilty plea, and so we're

18   at the stage of the proceedings where it's necessary for the

19   Court to determine an appropriate sentence.

20          There is a process that we follow for sentencing, and

21   it begins with the preparation of a presentence report.  And

22   the next thing that's supposed to happen is that you're

23   supposed to review that presentence report with your attorney.

24          Did you have an opportunity to do that, sir?

25          DEFENDANT SAMUEL TEMPLEMAN:  Yes, Your Honor.

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 6 of 113 PageID 563
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 122 of 231

6

1        THE COURT:  And did Mr. Grant answer any question

2   that you may have had about the presentence report?

3        DEFENDANT SAMUEL TEMPLEMAN:  Yes, Your Honor.

4        THE COURT:  All right.  Mr. Grant, did you have

5   sufficient opportunity to review the PSR with this gentleman?

6        MR. GRANT:  I did, Your Honor.

7        THE COURT:  And does he have any outstanding

8   objections to the factual statements or the guideline

9   calculations?

10       MR. GRANT:  No, Your Honor.

11       THE COURT:  Mr. Grant, you filed a sentencing

12   memorandum and then an amended sentencing memorandum.  I'm

13   going to ask -- I'm going to ask the clerk to remove both of

14   those from the docket, and if you could refile it.  The letter

15   from --

16       MR. GRANT:  Oh, does one include the name?

17       THE COURT:  Yes.

18       MR. GRANT:  Oh, I am so sorry.

19       THE COURT:  Yeah, the one from Jean Pattee includes

20   the name of the minor child.

21       MR. GRANT:  I am so sorry.

22       THE COURT:  No, that's okay.  But I'd like to take it

23   off the docket.  So if you could replace it with a redacted --

24       MR. GRANT:  Yes, thank you.

25       THE COURT:  Thank you.

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 7 of 113 PageID 564
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 123 of 231

7

1          Ms. Taylor, on behalf of the United States, any

2     objections with respect to the presentence report as to

3     Mr. Templeton (verbatim) --

4          MS. TAYLOR:  No, Your Honor.

5          THE COURT:  Then as to Mr. Templeton (verbatim) --

6          MR. GRANT:  Your Honor, it's Templeman.

7          THE COURT:  I don't know why I --

8          MR. GRANT:  You're not the only one who makes that

9     mistake.

10          THE COURT:  I've been saying it right this whole

11     time.  I don't know why I decided to change it today in court.

12     I apologize, Mr. and Mrs. Templeman.  And thank you, Mr. Grant.

13          So as to Mr. Templeman, the Court accepts the factual

14     statements set forth in the presentence report as the Court's

15     findings of fact and determines that the guidelines applicable

16     to him are a Total Offense Level of 38, Criminal History

17     Category of I, which yields a guideline term of imprisonment of

18     235 to 293 months, five years of supervised release, up to

19     life, no restitution, fines ranging from $50,000 to $250,000, a

20     $100 special assessment, as well as a $5,000 JVTA assessment.

21          Is that consistent with your understanding,

22     Mr. Grant?

23          MR. GRANT:  Yes, Your Honor.

24          THE COURT:  And yours, Ms. Taylor?

25          MS. TAYLOR:  Yes, Your Honor.

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 8 of 113 PageID 565
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 124 of 231

8

```
 1                 THE COURT:  Mrs. Templeman, on June 21st of 2021 you

 2    entered a guilty plea to Count Three of the indictment which

 3    charged you with possession of child sex abuse material, in

 4    violation of Title 18, United States Code, Section

 5    2252(a)(4)(b) and 2252(b)(2).  The Court has accepted your

 6    guilty plea as well.  And the probation office has prepared a

 7    presentence report as to you.

 8                 Did you have an opportunity to review that

 9    presentence report with Mr. Bonderud?

10                 DEFENDANT DEBORAH TEMPLEMAN:  Yes.

11                 THE COURT:  And did he answer all of your questions?

12                 DEFENDANT DEBORAH TEMPLEMAN:  Yes.

13                 THE COURT:  Mr. Bonderud, did you have sufficient

14    opportunity to review the PSR with Mrs. Templeman?

15                 MR. BONDERUD:  Yes, Your Honor.

16                 THE COURT:  I know you withdrew some of your previous

17    objections.  Are you still pursuing the objection with regard

18    to the number of images?

19                 MR. BONDERUD:  Yes, Your Honor.

20                 THE COURT:  All right.  Let me hear from you on that.

21    And then, Ms. Taylor, I'll hear from you.

22                 MR. BONDERUD:  Your Honor, the objection is on the

23    basis that Mrs. Templeman did not have knowledge of the

24    quantity of images.  With the benefit of discovery, obviously

25    she -- she knows that there was a large volume of images of
```

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 9 of 113 PageID 566
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 125 of 231

9

 1    child sex abuse material on the cellular telephones, and so

 2    she -- she stipulated to that as part of the factual basis.

 3            However, she did not have knowledge of the large

 4    quantity of images and -- and her -- really her plea of guilty

 5    was to one or more images.  So we think the enhancement is

 6    inappropriate.

 7            THE COURT:  Ms. Taylor.

 8            MS. TAYLOR:  Yes, Your Honor.  Your Honor, the number

 9    of images at issue here, frankly, is not that substantial

10    and -- in kind of the grand scheme of what this Court usually

11    sees where somebody is being sentenced for possession of child

12    sex abuse material.  And it gets expanded, in a sense, because

13    of the way the guidelines direct videos to be counted.  But

14    there are only two videos.  So there's two videos, 23 still

15    images.

16            Mrs. Templeman admitted in her plea agreement to

17    knowingly possessing the phone, knowing that it contained child

18    sex abuse material.  She admitted that she knew that the phone

19    contained at least one video and images.

20            Your Honor, the way that the guidelines work is she's

21    held accountable for what's on the phone.  She is pleading

22    guilty to knowingly possessing that phone that contained the

23    child sex abuse material.  The guidelines state that if the

24    offense involved a certain number of images, then you apply the

25    corresponding enhancement.

1          In the United States's view, the admissions that

2    Mrs. Templeman made in the factual basis of the plea agreement

3    and the personalization of elements that she was aware that

4    this material was on the phone is sufficient to support the

5    enhancement.

6          There doesn't appear to be any dispute over whether

7    the -- whether the number is correct, whether that's an

8    accurate number of images and videos on the phone.  The dispute

9    is over whether she should be held accountable for it.  And the

10   United States believes that she should be because that's --

11   that's the number of images and videos that she, in fact,

12   possessed.

13         THE COURT:  Doesn't she have to have knowingly

14   possessed them?  Let me get to the right -- let me get the

15   language of the right guideline in front of me, 2G2.2.  2G2.2.

16         I guess what I'm struggling a little bit with is the

17   offense is the knowing possession of the material.  And she

18   admitted in her plea agreement to knowingly possessing at least

19   one video and images, plural.  So let's say two or three.

20         Does the United States not have to establish that --

21   at least by a preponderance of the evidence that she

22   knowingly -- that she knew more than that was on there given

23   the fact that -- because you're not -- it's not -- you don't

24   have any evidence that she created the pornography.

25         MS. TAYLOR:  That's correct, Your Honor.  We believe

1  that the minor victim created it and then used it as part of

2  essentially procuring the sex dates, which she appears to have

3  done mostly herself.  You know, it wasn't the parents operating

4  the phone; it was the minor victim operating the phone.

5          Your Honor, what I would say to the Court is in terms

6  of it being to a preponderance of the evidence, again, she's

7  admitted multiple images and a video, that she knew that those

8  were on the phone.  She -- and that was -- the fact that there

9  was going to be child sex abuse material on the phone was

10  disclosed by Mrs. Templeman to the detective while the

11  detective was waiting in her office, before the detective ever

12  got the phone or started looking at it, which clearly

13  demonstrates that she was aware of what was on the phone.

14          Additionally, the phone was a phone that had been

15  purchased using some of the inheritance money only a few months

16  before.  The detective counted the total number of images that

17  were stored on the phone.  It was -- it was 629 images.  80 of

18  those images were lewd images of the minor victim.

19          So moreover, the phone contained many -- the bulk of

20  the text messaging on the phone was the child victim procuring

21  sex dates.  This is something the child victim was doing sort

22  of in the open with the knowledge of the parents.  Clearly it

23  was with their knowledge.  I mean, they were driving her to the

24  sex dates and they knew what she was doing with the phone.

25          This isn't like a phone that somebody's had for years

1   that's got, you know, 10,000 photos in it and, you know, buried

2   somewhere five years ago there's a little cache of child sex

3   abuse material.  This child sex abuse material is replete

4   throughout the 600 total images and videos that are stored on

5   the phone.  The lewd images and the child sex abuse material

6   are intermixed throughout, you know, with selfies of the

7   mother, selfies of the child, selfies of the father, pictures

8   of the wrecked car, apparently it was wrecked at some point.

9   It's not a small portion of the material that's stored on the

10  phone.

11          And frankly, this is the major thing that the phone

12  was used for, was procuring sex dates for the child.  The

13  mother knew that.  The mother admitted that she knew what was

14  stored on the phone.  Your Honor, in my view, I think that

15  meets the preponderance of the evidence standard.

16          I don't have more specific -- I don't have a specific

17  admission by Mrs. Templeman of like, "I" -- you know, "I

18  counted and there were exactly these many images and videos on

19  the phone."

20          But that is the number of images and the videos on

21  the phone.  She knew that there was child sex abuse material on

22  the phone.  And I would submit that the guidelines -- what the

23  guidelines envision is that a person is held accountable for

24  what's stored on the device that they plead guilty to knowing

25  that it contains that type of material.

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 13 of 113 PageID 570
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 129 of 231

13

1        And those are my arguments, Your Honor.

2        THE COURT:  Well, she didn't -- her -- if she just

3   possessed the device, that wouldn't be enough for her to be

4   guilty of the offense.  It was -- it's the possession of the

5   images.  And I think that the -- the disconnect -- and I

6   understand your argument.  And the difficulty I'm having is

7   that under the guidelines, Mrs. Templeman is specifically -- on

8   an evidentiary basis for purposes of sentencing, is

9   specifically objecting to the enhancement based on her having

10  possessed more than 150 images.  And so then the burden shifts

11  to the United States at sentencing to bring forth evidence that

12  she did have knowledge of at least 150 images for the -- for

13  the plus-three enhancement to apply.

14        We have a clear admission of at least 77, 78.  You

15  know, if "multiple images" was 15, then, you know, maybe as

16  much as -- I'm horrible at math -- 90.  But there's a gap

17  there, and I don't think -- I don't think -- I don't think

18  reckless disregard is enough for knowing possession.  Perhaps

19  it's conscious disregard?  Avoidance?  I'm not sure.  But

20  simply arguing that how many images were on there in the face

21  of her affirmative objection I don't think is enough for me to

22  apply the three-level enhancement.

23        So I don't know if you want to talk to the case agent

24  or if you want to make any other sort of evidentiary

25  presentation, but short of that, I think I would have to

```
 1    sustain the objection and just apply a two-level enhancement
 2    rather than a three-level enhancement, but you're free to
 3    consult with them and tell me how you would like to proceed.
 4            MS. TAYLOR:  Your Honor, I wouldn't be able to give
 5    the Court, you know, testimony saying she admitted she knew
 6    there were two videos, for example.  I don't have that
 7    evidence.  I accept the Court's ruling, although, again, I
 8    would submit that based on the circumstances surrounding this
 9    particular phone and her admission of knowledge, I would submit
10    that it's sufficiently proof that she knew what was contained
11    on the phone.  But I accept the Court's ruling.
12            THE COURT:  All right.  Then I'll sustain the
13    objection as to the number of images.
14            And let me -- Mr. Bonderud, any other -- well,
15    that -- let me make the -- let me make the changes to the
16    presentence report.  So that on page nine of the presentence
17    report -- well, on page eight it would be less than 150 images
18    in paragraph 31.
19            On page nine in paragraph 31 it's a plus-two rather
20    than a plus -three.
21            That means the adjusted offense level in paragraph 35
22    becomes 29.
23            The Total Offense Level in paragraph 39 becomes 26.
24            And then turning to page 16, paragraph 95 becomes 26.
25    Criminal History Category, I.
```

1           That changes her guideline range from 70 to 87 to 63

2      to 78.  And the fine range remains the same.

3           Mr. Bonderud, is that consistent with your

4      understanding?

5           MR. BONDERUD:  Yes, Your Honor, it is.

6           THE COURT:  Does Mrs. Templeman have any other

7      objections to the presentence report?

8           MR. BONDERUD:  No, Your Honor, she does not.

9           THE COURT:  Ms. Taylor, understanding your position,

10     but is the Court's calculation -- recalculation, shall I say,

11     of the guidelines consistent with your understanding?

12          MS. TAYLOR:  Yes, Your Honor.

13          THE COURT:  Does the United States have any other

14     objections?

15          MS. TAYLOR:  No, Your Honor.

16          THE COURT:  All right.  Then the total -- then the

17     Court accepts the -- I think there's one other place I need to

18     change -- let me look at the -- I think paragraph 21 that says

19     the number of images and videos that were on there can remain

20     the same because that doesn't say anything about her knowledge.

21     So I don't think there are any other changes that need to be

22     made.

23          Mr. Blakely, is there anything else that you're --

24          PROBATION OFFICER:  No, Your Honor.

25          THE COURT:  Okay.  All right.  So then the Court will

1    accept the factual statements set forth in the presentence

2    report and then -- and also the guideline calculations as

3    modified based upon my sustaining Mrs. Templeman's objection.

4              So Total Offense Level is 26, Criminal History

5    Category is I, guideline term of imprisonment 63 to 78 months,

6    five years to life supervised release, no restitution, fines

7    ranging from 25 to $250,000, special assessments in the amount

8    of 100 and $5,000.

9              Mr. Bonderud, is that correct?

10             MR. BONDERUD:  Yes, Your Honor.

11             THE COURT:  Ms. Taylor?

12             MS. TAYLOR:  Yes, Your Honor.

13             THE COURT:  All right.  Then Ms. Taylor, I'll hear

14   from you as to the government's recommendation.  Then I'll hear

15   from Mr. Grant and from Mr. Bonderud.

16             I did receive a sentencing memorandum on behalf of

17   Mrs. Templeman and Mr. Templeman, and I did review those as

18   well as the letters that were submitted in support.  And so if

19   any of the folks that wrote those letters are here in the

20   courtroom, thank you for taking the time to write them.  I do

21   read every word of them.

22             Ms. Taylor.

23             MR. GRANT:  Your Honor, if I may, just for a second.

24             THE COURT:  Sure.

25             MR. GRANT:  I do have two witnesses that I do intend

1  to call.  I don't know if you'd rather hear from them first.

2  That would -- at least the government would have an opportunity

3  to adjust their position.  Not saying that they would, but I'm

4  talking about just in terms of logistics.

5          THE COURT:  Okay.  Ms. Taylor, any objection to me

6  hearing from those witnesses?

7          MS. TAYLOR:  No, Your Honor.  And I -- obviously I

8  don't have an objection to the witnesses being called, but the

9  situation is I didn't receive any disclosure that these expert

10  witnesses existed until yesterday.

11          THE COURT:  Are they expert witnesses?

12          MR. GRANT:  One -- the answer to that is yes, but I

13  think one of them may not necessarily qualify.  But one is a

14  neuropsychologist.  I provided that to the government, also the

15  CD and report.  Did that yesterday.

16          THE COURT:  Okay.  Go ahead, Ms. Taylor.  I was

17  just -- I was caught off guard by that as well, so . . .

18          MS. TAYLOR:  Your Honor, well, my concern -- well, so

19  I -- as Mr. Grant said, he disclosed a report of one of the

20  witnesses, so I've had a chance to review that.

21          I don't know that this testimony would impact my view

22  of what an appropriate sentence is, but depending on I guess

23  what the testimony is and how it comes out, it's possible that

24  had I had sufficient notice of this, we would have sought to

25  have our own expert conduct an evaluation and provide a

```
 1   contrary opinion, and not having known that this was coming, I

 2   haven't had the opportunity to do that.

 3          I think at this point it makes sense to have

 4   Mr. Grant's witnesses go ahead and testify.  And if we need a

 5   continuance because that is necessary, then we can address that

 6   at that time.

 7          THE COURT:  Okay.  That's what I was going to

 8   propose.  So Mr. Grant, let me go ahead and hear -- I guess I

 9   need to make a record on one thing, because ordinarily, before

10   hearing from your witnesses, I would have given the victim the

11   opportunity to address the Court.  I think I need to make a

12   record that the victim has passed away.  And in light of that,

13   Ms. Taylor, I assume that there's no victim for me to hear

14   from; is that correct?

15          MS. TAYLOR:  That's correct, Your Honor.  I do

16   have -- we spent substantial amounts of time with the victim

17   over last summer as we were preparing her for a material

18   witness deposition.  And I did have an opportunity to speak

19   with her, you know, more broadly about her views of this case

20   and culpability.  And I have information that I can share with

21   the Court in that regard as part of my presentation.  And, you

22   know, the Court will hear that in part, that's what -- that's

23   what led to the decision to offer the plea agreements that were

24   offered in this case, was it was the desires of the victim.

25          And so -- so I have information to provide the Court
```

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 19 of 113 PageID 576
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 135 of 231

19

```
 1    in terms of what her -- what her view was of the case, and

 2    that's how I intend to proceed.  But as the Court notes, she

 3    passed away from a drug overdose I believe it was in October of

 4    last year.

 5            And so she never submitted a written statement to me

 6    that I could present to the Court or anything else sort of

 7    documentary that I could present to the Court, but we do have

 8    information about what her views were.

 9            THE COURT:  Okay.  All right.  Thank you, Ms. Taylor.

10            Mr. Grant.

11            MR. GRANT:  Yes, Your Honor, we would like to call

12    Valerie McClain.

13            THE COURT:  Ma'am, if you'll come over here to the

14    witness stand.  And remain standing for a moment.

15            Ms. Wiles.

16            COURTROOM DEPUTY:  Please raise your right hand.  Do

17    you solemnly swear that the testimony you're about to give

18    before this Court will be the truth, the whole truth, and

19    nothing but the truth so help you God?

20            THE WITNESS:  I do.

21            COURTROOM DEPUTY:  You may have a seat.

22            THE WITNESS:  I don't think there's a seat over here.

23            COURTROOM DEPUTY:  We weren't anticipating this.

24            THE COURT:  Nothing like not having a witness stand

25    for the witness.
```

```
 1          COURTROOM DEPUTY:  And if you could please state your

 2   name for the record and spell your last name.

 3          THE WITNESS:  Certainly.  Dr. Valerie R. McClain,

 4   M-c-C-l-a-i-n.

 5          THE COURT:  Go ahead, Mr. Grant.

 6                         -    -    -

 7                   DR. VALERIE R. McCLAIN,

 8           DEFENDANT SAMUEL TEMPLEMAN'S WITNESS, SWORN,

 9                      DIRECT EXAMINATION

10   BY MR. GRANT:

11   Q.   All right.  Dr. McClain, if you would, please, tell us

12   your occupation.

13   A.   Yes, sir.  I'm a licensed psychologist in the state of

14   Florida.

15   Q.   And do you have any area of specialty?

16   A.   I do, sir.

17   Q.   And what is that?

18   A.   Neuropsychology and forensic psychology.

19   Q.   And how -- well, back up.  What is your education?

20   A.   My education and training was in Florida, at Florida Tech

21   in Melbourne, Florida.  I received my bachelor's, my master's,

22   and doctoral degree from Florida Tech in Melbourne, Florida.

23   Q.   And you received your doctorate degree when?

24   A.   1992.

25   Q.   And have you been practicing in the field of psychology
```

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 21 of 113 PageID 578
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 137 of 231

21

1   since that time?

2   A.   Yes, sir.

3   Q.   Are you board certified with any organization?

4   A.   I'm not board certified, sir.

5   Q.   Okay.  Have you practiced in the area of neuropsychology,

6   and if so, for how long?

7   A.   Yes, sir.  I did my education and training back in

8   undergraduate school in neuropsychology.  I completed two years

9   of training in my internship and post doctoral fellowship.

10   That would have been at Portland VA Medical Center in Portland,

11   Oregon, working with Larry Binder and Diane Howieson.

12          I also did an additional year of post doctoral

13   training at the rehab hospital, the Pacific, in Honolulu,

14   Hawaii.  I also completed three years of training under the

15   supervision of Dr. Theodore Blau, who was board certified in

16   neuropsychology, forensic psychology, and clinical psychology.

17   Q.   And are you licensed to practice in the state of Florida?

18   A.   Yes, sir.

19   Q.   Dr. McClain, have you ever been called to testify in

20   federal court?

21   A.   I have, sir.

22   Q.   And have you been qualified as an expert in the area of

23   neuropsychology?

24   A.   Yes, sir.

25   Q.   And how many times?

```
 1   A.   Over 50 times.
 2   Q.   And specifically, have you been qualified in the Middle
 3   District of Florida?
 4   A.   I have.
 5   Q.   And have you been qualified in the Jacksonville division?
 6   A.   Yes, I have.
 7   Q.   And have you been qualified in the Orlando division?
 8   A.   Yes.
 9   Q.   Tampa division?
10   A.   Yes.
11        MR. GRANT:  All right.  Your Honor, at this time I
12   would offer Dr. Valerie McClain as an expert in the field of
13   neuropsychology.
14        THE COURT:  Any objection, Ms. Taylor?
15        MS. TAYLOR:  No, Your Honor.
16        THE WITNESS:  Thank you.
17        THE COURT:  All right.  The Court accepts
18   Dr. McClain's qualifications and she may express her opinions.
19        Go ahead, Mr. Grant.
20   BY MR. GRANT:
21   Q.   Dr. McClain, did you have an occasion to conduct a
22   neuropsychological evaluation of Samuel Templeman?
23   A.   I did.
24   Q.   And did you have an opportunity to meet him at the Baker
25   County Jail?
```

1   A.   I did, sir.

2   Q.   And how many times did you meet with him?

3   A.   I met with him on two occasions.

4   Q.   And when you met with him on the first occasion, was he

5   receptive to the evaluation?

6   A.   Mr. Templeman had concerns about the evaluation and

7   necessity of the evaluation, so I did not push him to complete

8   testing.

9        Part of testing requirements is the cooperation of

10  the client in completing it.  So I did reapproach and talk with

11  defense again regarding testing and to reapproach

12  Mr. Templeman.

13  Q.   And as a result of communicating with myself, you did, in

14  fact, then conduct the second evaluation?

15  A.   Yes.  He was very receptive on the second occasion as he

16  understood more about the testing.

17  Q.   Okay.  Now, if you could first and foremost tell us

18  exactly what the field of neuropsychology is.

19  A.   Absolutely.  Neuropsychology encompasses basically how

20  different neurological disease processes or acute neurological

21  insults impact the brain functioning.  So it's the study of

22  various areas of the brain, for example, attention, memory,

23  concentration, motor skills, verbal skills, and looking at how

24  potential trauma, such as a brain injury, ingestion of

25  substances, toxic substances, and/or other insults such as a

1    stroke may impact the person's functioning residually.

2    Q.    And again, you conducted an evaluation of Mr. Templeman

3    with regard to those -- that field?

4    A.    I did, sir.

5    Q.    Okay.  And when you conducted your evaluation, did you

6    engage in various testing regimens?

7    A.    Yes, I did.

8    Q.    And if you would, tell us those tests that you

9    implemented.

10   A.    Yes, I will.  I basically did a malingering measure or

11   screen.  I also did full intellectual assessment with the

12   defendant.  I did neuropsychological testing with what we call

13   the Repeatable Battery for the Assessment of Neuropsychological

14   Status.  And I also did some executive testing, known as the

15   Delis-Kaplan, that looks at higher-level functioning such as

16   problem-solving, shifting sets, and the ability to basically

17   problem-solve.

18   Q.    All right.  Now, on the -- now, also during the

19   evaluation, you did a -- you conducted an interview to acquire

20   information to utilize in making your -- rendering your

21   opinion; is that correct?

22   A.    That's correct.

23   Q.    And when you conducted that part of the exam, was there

24   anything that stood out in terms of what Mr. Templeman told you

25   about himself that you later incorporated or used in your

1  evaluation?

2  A.   Well, there were several things in his medical history as

3  well as his mental health history and substance abuse history.

4  Q.   All right.  If you could tell us about his medical

5  history.

6  A.   One of the most significant things that he reported was a

7  work-related accident in 2005 that had led him to having

8  continuous back pain.  And the reason that this became an

9  important factor in my assessment was that he had escalated in

10  drug use at that time, especially opiates related to pain.  And

11  that was pretty much chronic and intractable for him on a daily

12  basis.  So that was one important factor.

13         Another important factor was that he did have a

14  history of being diagnosed when depression and anxiety and was

15  prescribed medication in the past.  He had gone through

16  counseling in 2012, so there was also mental health history

17  that was documented.

18         His substance use history began essentially when he

19  started consuming alcohol at 14.  In 2005 his drug use

20  escalated again related to the accident and the pain related to

21  the work-related accident.  So that became a very important

22  part of looking at potential toxic effects on the brain

23  functioning over time.  So that was one of the considerations

24  as I was approaching testing to consider that could have

25  impacted test results.

1   Q.   Okay.  Now, you mentioned that you conducted a test

2   regarding malingering.  What exactly was that test that you

3   conducted?

4   A.   There's basically an entrance level malingering test.

5   It's a very basic malingering test.  If the person doesn't pass

6   that one, then you proceed to other more complex malingering

7   tests.

8        The Rye 15-Item Test was within normal limits,

9   suggesting that he was adequately motivated to participate in

10  the evaluation.

11       There was also embedded measures within the

12  intellectual assessment indices that we look at, such as

13  reliable digit span, that were within normal limits,

14  suggesting, again, that he was adequately motivated to

15  participate.

16  Q.   And that's what you were concerned with with the initial

17  contact that you had with him, that that part of the exam may

18  not be suitable?

19  A.   Yes.  That's exactly correct.  In order to have valid test

20  results, it is important that the defendant be engaged in the

21  process of testing; otherwise, the results will not be

22  considered what we call valid.

23  Q.   All right.  Now, in this instance, what was your

24  determination as to that particular test regarding malingering?

25  A.   That it was valid.

1   Q.   Now, you mentioned also that you conducted the Repeatable

2   Battery for Assessment of Neuropsychological Status, acronym

3   RBANS, correct?

4   A.   Correct.

5   Q.   Okay.  And if you could tell us what the RBANS is.

6   A.   Sure.  Again, the RBANS is used as a neuropsychological

7   screen.  It's frequently given to individuals who have had head

8   trauma, traumatic brain injuries, strokes.  And essentially it

9   spans five areas.  It looks at immediate memory and then

10  delayed memory; it looks at basic attention; language skills;

11  and visual/spatial constructional skills.  Five different areas

12  of brain functioning that are important in terms of predicting

13  possible impairment and then subsequently residual impairment.

14  Q.   Okay.  And so in this particular case when you conducted

15  the RBANS, you came up with different measures relating to each

16  of those categories?

17  A.   Yes.  It's an objective test that has normative data.  So

18  you would compare him with individuals with similar education,

19  background, same age, and then look at the results in

20  comparison with the average for that particular age range.  And

21  then it would take basically the average and then look at what

22  we call standard deviations of change that would go, for

23  example, from average to below average to borderline to

24  extremely low.

25  Q.   Okay.  Now, what is the methodology that is used in

1   actually getting those numbers, the score?

2   A.   Well, basically the test is a functional test.  For

3   example, for immediate memory, a word list of ten words is

4   given to the individual.  You have them repeat as many as they

5   can recall after you read ten words to them.  And then you do

6   that over four repetitions to see if there is what we call a

7   learning curve.  In other words, it's speculated that that

8   person should show a gain in the number of words they can

9   recall over those four trials.

10  Q.   Okay.  Now, with respect to Mr. Templeman, what was your

11  finding as it related to the immediate memory?

12  A.   He was in what we call the extremely low range for his

13  overall results.  And what that means is that relative to the

14  average person, he was over two standard deviations below

15  expected, meaning that there was a significant, significant

16  difference.  He was at what we call the less-than-first

17  percentile, meaning that 99.9 percent of his peers would be

18  functioning at a higher level in that area.

19  Q.   Okay.  And again, based upon your conclusion that he was

20  not malingering, then you took that as being a valid measure?

21  A.   I did.

22  Q.   Now, there's also the -- I don't know if I can pronounce

23  this correctly -- the visual/spatial and constructional measure

24  that is used?

25  A.   Correct.  Correct.

1    Q.    And --

2    A.    And that involves showing them basically a line array and

3    having them compare lines to say which lines match two lines at

4    the bottom.  So you show an array of, for instance, ten lines,

5    but they have to pick out from that one angle which of those

6    lines would match that angle.  And it also involves drawing a

7    geometric figure as you're looking at it, and then subsequently

8    from memory creating that figure.

9    Q.    Okay.  And with respect to that particular measure, where

10   did Mr. Templeman fall?

11   A.    He was in the average range for his visual/spatial

12   constructional skills.

13   Q.    And again, based upon your previous -- your previous

14   determination that he wasn't malingering, that appeared to be a

15   valid test, correct?

16   A.    Correct.

17   Q.    And the fact that it's average is even more of an aspect

18   that it's valid?

19   A.    Correct.

20   Q.    Okay.  The next one is the language skill.  And what was

21   your -- what does that entail?

22   A.    That's basically like a naming task where common objects

23   are shown to the person, such as a chair, a well, a kite, a

24   trumpet.  There's ten pictures.  It's a naming task.  And the

25   person has to produce the correct answer for the object that's

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 30 of 113 PageID 587
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 146 of 231

30

1   pictured.

2          It also involves what we call a verbal fluency task

3   where they're asked to name as many fruits and vegetables as

4   they can think of over a minute, and then there's normative

5   data for how many they're able to produce.

6   Q.   And again, with respect to that particular measure, where

7   did Mr. Templeman fall?

8   A.   He was in the borderline range.

9   Q.   And "borderline" being how many deviations of --

10  A.   "Borderline" is approximately 70, so it's two standard

11  deviations.  One standard deviation is 15, so it would be two

12  standard deviations below the average, placing him at the third

13  percentile.

14  Q.   And the "third percentile," again, meaning that 97 percent

15  of his peers have a greater ability than himself?

16  A.   Correct.

17  Q.   The next one is the attention.  What was your finding with

18  regard to that?

19  A.   He was, again, in the borderline range for basic attention

20  skills.

21  Q.   And what is utilized in determining that particular

22  measure?

23  A.   Essentially digits are administered to the individual

24  spanning anywhere from three digits to eight digits, and then

25  the person has to repeat back after the administrator gives the

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 31 of 113 PageID 588
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 147 of 231

31

1   series of digits, numbers, and to do those correctly.  And

2   there's two trials.  When they fail both trials, then you stop

3   the task.  But he was in the borderline range for basic

4   attention.

5   Q.   And then the last of the five is the delayed memory

6   measurement.  What does that entail?

7   A.   Delayed memory would be where that initial word list of

8   ten words is used to say to the individual, "I read you ten

9   words earlier.  What of those words do you remember?"  Without

10  giving them the words.  So from memory they're asked to repeat

11  to you as many of those ten words as they can.

12          And there's also a story that was read at the

13  beginning, and they'll tell you what they can remember from the

14  sorry.

15  Q.   And just so we're clear, when you're conducting this test,

16  you're in his presence, correct?

17  A.   Correct.

18  Q.   And part of the evaluation is the observation of the

19  individual while they're conducting the -- this test, correct?

20  A.   Correct.

21  Q.   All right.  And what was your assessment of him while he

22  was conducting that portion and the earlier portions of the

23  test?

24  A.   That he was trying to focus and to recall the words.  And

25  that his performance suggested that he was able to recall some

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 32 of 113 PageID 589
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 148 of 231

32

1  of the words over time, and he actually was in the borderline

2  range for that.  So he was able to provide some of the words to

3  the point where he was able to perform somewhat better than his

4  immediate memory.

5  Q.   Okay.  And again, he fell in what we call the borderline

6  range; is that correct?

7  A.   Correct.

8  Q.   Now, part of this evaluation is that you take those five

9  and you come up with a total score; is that correct?

10  A.   That's correct.

11  Q.   And how is that total score amassed?

12  A.   Basically it's a conglomerate of the five different areas.

13  So it's considered total score for the cognitive functioning

14  overall.

15  Q.   Okay.  And in Mr. Templeman's evaluation, where did he

16  fall?

17  A.   He was at the first percentile.

18  Q.   All right.  And that was borderline?

19  A.   First percentile is extremely low; lower than borderline.

20  Q.   And again, the one percentile means that 99 percent of his

21  peers would have performed greater than him?

22  A.   Correct.

23  Q.   All right.  And when we're talking peers, I think you

24  mentioned earlier that it's done by age groups, correct?

25  A.   Correct.  Age and education.

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 33 of 113 PageID 590
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 149 of 231

33

1   Q.    Okay.  And in Mr. Templeman's case, you have an individual
2   who is in his 40s who has a high school degree?
3   A.    He does.  He has a high school education.
4   Q.    And so that was a factor that you used as part of this
5   evaluation, correct?
6   A.    As a baseline, that's correct.
7   Q.    Now, given the measures, given the scores, specifically
8   given the total score, were you able to render -- or are you
9   able to render an opinion as to Mr. Templeman's cognitive
10  abilities?
11  A.    Well, based upon just that test alone, taking that test as
12  valid, he does show significant cognitive deficits that would
13  be consistent with a neurocognitive disorder.
14  Q.    And what would be the cause of that neurological deficit
15  in your opinion?
16  A.    Well, he does not -- just to clarify for the record, he
17  does not report having had any significant head trauma, per se.
18  And so that wouldn't be something that I would point to.
19        What was reported was pretty extensive ingestion of
20  drugs over time.  And I think that it's more related to his
21  drug ingestion as far as it leaving systemic impact on the
22  brain.
23  Q.    And when you say "systemic impact on the brain," you're
24  talking about as a result of this toxicity, that there's actual
25  damage to the brain at some -- at some measure?

1  A.    That's correct.

2  Q.    Now, an individual's cognitive abilities, does it -- does

3  it impact or have any correlation to their decision-making

4  ability?

5  A.    Yes.

6  Q.    And so can you explain that to us.

7  A.    Again, first I want to just clarify that I did also do

8  intellectual assessment for the defendant, and I think it's

9  important to couch the cognitive implications within the

10  estimated IQ.  And I think premorbidly, meaning before the

11  ingestion of all the substances, Mr. Templeman's graduating

12  from high school, you know, not being in SLD classes, or

13  special education classes, would suggest at least low average

14  to average intelligence.

15        However, when I tested him with intelligence testing,

16  his overall IQ was a 67, at the first percentile, which would

17  be unexpected given his academic history.

18        Relative to his overall cognitive functioning,

19  neuropsychological functioning, it's consistent.  He was a 67

20  for his overall index.  So in other words, there is just a

21  general suppression of his intellect as well as his cognitive

22  functioning based on test results.

23        And the -- in answer to your question, his abilities

24  to process information, for example, on the intelligence

25  testing were extremely low.  So his processing speed is low.

1  It's at a less than .1 percentile.  His ability to take in new

2  information and use that information is decreased.  So it

3  definitely affects his memory, his processing, and his ability

4  to problem-solve.

5  Q.   And so again, is it your opinion that his continuous and

6  long abuse of controlled substances has impaired his ability to

7  make decisions?

8  A.   Most assuredly.  The addiction itself, the physiological

9  dependence and the psychological dependence, coupled with the

10 ongoing damage to the brain, certainly impacts his behavior and

11 decision-making.

12 Q.   Now, this is not to say that, you know, he can't conduct

13 just general tasks, for example, you know, driving a car or

14 making change when purchasing items; is that correct?

15 A.   Correct.  He's able to be functional.  His activities of

16 daily living.  He's able to follow directions at the jail, do,

17 you know, basic care, drive a car.

18            If he were to be more significantly impaired by the

19 brain impairment, it would be more of a major neurocognitive

20 disorder.  But his basic functional skills are intact.

21            MR. GRANT:  I have no further questions, Your Honor.

22            THE COURT:  Thank you, Mr. Grant.

23            Ms. Taylor.

24                          CROSS-EXAMINATION

25 BY MS. TAYLOR:

1  Q.   Ms. McClain, if I can ask, of the 50 times that you've

2  been qualified as an expert, what portion of those were you

3  called by defense attorneys versus by the government?

4  A.   Typically I am called by the Court or by the defense

5  attorneys as to mitigation in sentencing.

6  Q.   "By the Court" meaning the Court independently appointed

7  you to conduct an evaluation?

8  A.   Yes.  I do court-ordered federal evaluations, especially

9  in Tampa.  So on cases where there's issues of competency, I've

10  been asked before by the courts to come forward and be present

11  as a witness.

12  Q.   Okay.  And so absent -- have you ever been hired

13  independently by the government to be a government witness, or

14  has it always been either -- you know, for both sides or for

15  defense?

16  A.   For the purposes of competency, yes, I've been retained by

17  the government.

18  Q.   Okay.  Not for purposes of mitigation or enhancement of

19  sentences?

20  A.   No.

21  Q.   Okay.  You -- so I took from your testimony that you infer

22  that there's been some decrease in Mr. Templeman's cognitive

23  functioning over time based upon his academic history and what

24  you observed in the present day; is that fair to say?

25  A.   That's correct.

1  Q.   And your inference is that -- well, I guess you didn't see

2  any like physical trauma or stroke or anything like that in his

3  past that would explain it, correct?

4  A.   Correct.

5  Q.   And so therefore you attribute it to the drug use?

6  A.   Correct.

7  Q.   And is that mostly absent another explanation, or did you

8  conduct some kind of testing that was -- allowed you to

9  pinpoint that it was a drug-induced deficit?

10 A.   I do not have brain imaging results, so I can't look at

11 brain scans to look at potential like undetected strokes, but

12 from his history, there was no suggestion that he had a history

13 of mini strokes or anything like that or a major head trauma.

14 So the only information that would have suggested damage to the

15 brain or a source, causal source, would have been the drug

16 ingestion over time.

17 Q.   And you were aware at the time you evaluated him that

18 Mr. Templeman at one point had attended Jacksonville

19 University, correct?

20 A.   Yes.

21 Q.   And would that -- are you familiar with Jacksonville

22 University and its academic standards at least on a broad

23 level?

24 A.   I am.

25 Q.   Would it -- would it be unusual for somebody with an IQ of

1  67 to be able to obtain admission to a university such as

2  Jacksonville University?

3  A.   I think it would be highly unusual.  And from what he had

4  explained, he had discontinued due to poor grades.  So I don't

5  have a baseline at that point when he entered the school, but I

6  can tell you that I -- again, premorbid estimate would be at

7  least average intelligence.

8  Q.   When you were conducting your evaluation and forming your

9  opinions, did you review any -- any materials, you know, that

10 would reflect Mr. Templeman's functioning outside of, you know,

11 the testing environment?  For example, you know, his

12 post-arrest interview or jail phone calls or anything like that

13 that would be reflective of his abilities?

14 A.   I reviewed his work records, the indictment, discovery,

15 the pretrial services report, mental health records, DCF

16 records, and the Presentence Investigation Report.

17 Q.   When you reviewed the discovery, did that include his

18 post-arrest interview?

19 A.   No.

20 Q.   Did it include any of the jail phone calls?

21 A.   No.

22 Q.   Okay.  So you didn't review any kind of like recordings of

23 Mr. Templeman outside of a testing environment?

24 A.   No.

25 Q.   How long -- how long was your -- you said during the first

1  meeting he was kind of uncooperative with testing, correct?

2  A.   He was cooperative with the interview but did not want to

3  do the testing.  It was a very cooperative interview, but he

4  didn't want to do testing.  And I think he didn't understand

5  why he was going to be doing testing.  So I did defer to that

6  and then spoke with defense team and said, you know, "I can do

7  testing, but it requires that the defendant be cooperative and

8  be amenable to testing."

9  Q.   How much time in total did you spend with Mr. Templeman?

10  A.   I would say three and a half hours.

11  Q.   Were there any other tests that you administered to him

12  that you didn't discuss in your direct testimony?

13  A.   Absolutely not.

14  Q.   And you said the percentiles that you discussed in your

15  direct testimony were based on age and education, correct?

16  A.   Correct.

17  Q.   And so for Mr. Templeman you put him in a category with

18  high school graduates, not with like people who had at least

19  some college?

20  A.   Actually, the level -- they asked specifically for that

21  level.  So, in other words, when you're doing the test, it

22  would have been listed at 13 years of education.

23  Q.   Okay.  So some college?

24  A.   Correct.

25  Q.   Okay.  So those percentiles are based on people who are

```
 1    around his age and have some college?

 2    A.    That is correct.

 3            MS. TAYLOR:  Could I have a moment, Your Honor?

 4            THE COURT:  Of course.

 5            MS. TAYLOR:  I don't have any other questions, Your

 6    Honor.

 7            THE COURT:  Mr. Grant?

 8            MR. GRANT:  Nothing further, Your Honor.

 9            THE COURT:  You may step down.

10            THE WITNESS:  Thank you, Your Honor.

11            MR. GRANT:  Next, Your Honor, we would like to call

12    Tonya Douglas.

13            THE COURT:  Ms. Wiles.

14            COURTROOM DEPUTY:  Please raise your right hand.  Do

15    you solemnly swear that the testimony you're about to give

16    before this Court will be the truth, the whole truth, and

17    nothing but the truth so help you God?

18            THE WITNESS:  I do.

19            COURTROOM DEPUTY:  You may have a seat.  And if you

20    could please state your name for the record and spell your last

21    name.

22            THE WITNESS:  Tonya J. Douglas, D-o-u-g-l-a-s.

23            THE COURT:  Can I get you to pull a little closer to

24    that microphone.

25            THE WITNESS:  Sure.
```

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 41 of 113 PageID 598
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 157 of 231

41

```
 1              THE COURT:  You're kind of soft spoken.

 2              THE WITNESS:  How's that sound?

 3              THE COURT:  Better.  Thank you.

 4                           -   -   -

 5   TONYA J. DOUGLAS, DEFENDANT SAMUEL TEMPLEMAN'S WITNESS, SWORN,

 6                      DIRECT EXAMINATION

 7   BY MR. GRANT:

 8   Q.   Ms. Douglas, where are you employed?

 9   A.   I own my own private practice in Macclenny, Florida.

10   Q.   And what is your practice?

11   A.   It is -- I do counseling for adults, children, families

12   and individuals.

13   Q.   And what is your education?

14   A.   I have a bachelor's degree and I also hold a master's

15   degree in clinical counseling.

16   Q.   And when did you obtain your master's degree in clinical

17   counseling?

18   A.   In 1997.

19   Q.   All right.  Ms. Douglas, have you -- well, let me do it

20   this way.  What is your field of expertise?

21   A.   It's in neuroscience.  I do trauma work, substance abuse.

22   I've done court-ordered substance abuse.  I do families.  I do

23   children, things like that.

24   Q.   All right.  In the area of substance abuse specifically,

25   what has been your training and experience?
```

1   A.   Aside from what I did in my master's degree, I did -- I

2   worked for the Baker County Sheriff's Office.  I was the

3   director of mental health services there.  I rewrote the

4   program because it wasn't sufficient for the inmates there.  So

5   I focussed mainly on relapse prevention since they were sober,

6   being incarcerated.  And we worked on screening.  We did the

7   substance abuse intakes.  And then I did, you know, some

8   training and -- or not training, but I did counseling that was

9   specific for each of the individuals there at the jail.

10  Q.   Okay.  Now, as part of -- again, as part of the substance

11  abuse program that you had at Baker County Jail, did you do

12  evaluations and assessments of individuals?

13  A.   Correct.

14  Q.   Did you prepare treatment plans for individuals?

15  A.   Correct.

16  Q.   When was -- when did you leave the Baker County Jail?

17  A.   I was employed in October of 2012 and left in February of

18  2018.  I went into private practice.

19  Q.   All right.  And so again -- back up.  Have you ever been

20  called to testify -- testify in court?

21  A.   Yes.  As a fact witness.

22  Q.   Okay.  As a fact witness?

23  A.   Correct.

24  Q.   But not as an expert in any particular field?

25  A.   Correct.

1  Q.   All right.  Have you submitted any letters or anything to

2  a court from -- and that is, from an expert perspective?

3  A.   I have.  I've also worked with the Federal Public

4  Defender's Office with several of the attorneys doing forensic

5  evaluations and submitting those reports for the attorneys.

6  Q.   Now, again, as part of your experience and training in the

7  field of substance abuse, if you could just tell us exactly

8  what it is that you do in terms of your evaluation and

9  treatment.

10 A.   When you're evaluating someone, if it is specific for

11 substance abuse, you are looking for -- looking at the whole

12 person.  So we do a mental health history.  We do family

13 history.  But we also track the timeline of how the addiction

14 process -- from the time it started to where they are now.  And

15 then we look at co-occurring disorders like depression,

16 anxiety, bipolar, things like that.  So then the treatment plan

17 will include some type of substance abuse treatment plus

18 counseling for the co-occurring disorder.

19 Q.   Now, are you licensed to practice in the state of Florida?

20 A.   I am.

21 Q.   And in what capacity?

22 A.   I'm a licensed mental health counselor.  I'm also board

23 certified as a counselor.  I'm board certified as a forensic

24 expert.  And also board certified as a forensic behavior

25 analyst.

1          MR. GRANT:  Your Honor, at this time I would offer

2     Dr. -- excuse me, Tonya Douglas as an expert specifically in

3     the field of substance abuse.

4          THE COURT:  Ms. Taylor, any objection?

5          MS. TAYLOR:  Your Honor, I'm just not sure that I

6     heard background specifically in that area that would reflect

7     that she's an expert in that particular field.

8          MR. GRANT:  I believe she testified that she's the

9     one who redid the program at Baker County Jail and she's the

10    one that was involved in the substance abuse program there and

11    the treatment.

12         MS. TAYLOR:  I mean, looking at her licensures,

13    certifications, forensic training, I mean, I see forensic

14    criminal interviewing, fact vs. expert witness, mental health

15    evaluator training, different things about being a mental

16    health counselor.  I just -- I'm not sure that I heard what

17    exactly her training is with regard to substance abuse, setting

18    aside the fact that she worked on that program at the Baker

19    County Jail.

20         THE COURT:  Do you want to elaborate on that,

21    Mr. Grant, with regard to her training in substance abuse?

22         MR. GRANT:  Yes.

23    BY MR. GRANT:

24    Q.   Yes.  If you would explain to us what exactly your

25    training is in substance abuse counseling and treatment.

1   A.   Substance abuse training involves knowing how the

2   addiction process works.  So that started in my master's

3   program.  I did a specific course on that.

4        Then when I worked in the jail, the most important

5   thing about substance abuse treatment is that you look at what

6   types of, you know, programs would be suitable for each

7   individual client.

8        So, for instance, if they came in and --  with

9   Mr. Templeman --

10  Q.   Well, let's don't talk about specifics right now.

11  A.   Certainly.  So I mainly -- what I did was I did relapse

12  prevention.  And so my training involved working, developing a

13  program that would be suitable for each individual there.  We

14  did group -- group therapy.  We did individual therapy.

15  Sometimes they weren't suitable for group therapy so we worked

16  on an individual basis.

17  Q.   And on this relapse, I mean, what's the -- how do you

18  determine a plan for relapse?

19  A.   My -- my program was targeted -- was -- I used Terence

20  Gorski.  He's the foremost authority in relapse prevention.  So

21  I specifically targeted the areas that each individual would

22  need.

23        For instance, we look at -- we look at their

24  environment.  So environment has a lot to do with it.  We look

25  at their health plan; are they exercising, are they changing

1   their habits.  We look at cognitive choices; are they making

2   good excuses or are they making -- or good excuses -- good

3   choices versus excuses for getting back into using drugs.  What

4   kind of coping skills are they using.  We develop coping skills

5   for them.

6           May I have a glass of water, please?  Thank you very

7   much.  Thank you.

8   Q.   Now, to get to the point, as part of the treatment, is

9   it -- is it necessary to first know what drugs that the

10  individual is utilizing?

11  A.   Yes.

12  Q.   And given that, with that knowledge, what do you do?  How

13  do you utilize that?

14  A.   You want to know what kind of drugs they're on because

15  those affect cognitive ability.  So a lot of times the inmates

16  would come in and they would be depressed or anxious.  Those

17  kinds of mental health disorders would be indicative sometimes

18  of previous history, but it would also be exacerbated by the

19  fact that they were now clean and sober so that dopamine and

20  serotonin levels were low.  They were put on antidepressants to

21  counter that.  But we would talk about what would be effective

22  ways to increase those things.

23          They need to know that they have to change everything

24  about their lifestyle.

25  Q.   Now, as part of your -- your experience in the substance

1    abuse program, are you able to differentiate between one

2    substance, its effect -- for example, marijuana, another

3    substance, cocaine, and another substance, heroin?  Are you

4    able to differentiate the impact of each and how your treatment

5    plan adjusts?

6              MS. TAYLOR:  Your Honor, I'm going to object because

7    I still -- she hasn't been qualified as an expert, and I still

8    haven't heard any testimony about what her background is in

9    terms of being an expert in substance abuse beyond that she

10   took one course as part of her master's degree.

11             MR. GRANT:  I'm not asking her for her opinion right

12   now, I'm trying to lay the foundation that she is aware of

13   those various aspects to answer the government's question of

14   whether or not she is qualified to render an opinion regarding

15   substance abuse.

16             THE COURT:  I think in terms of your question of

17   whether she can differentiate those things, maybe -- maybe if

18   you inquire how that would occur to lay that foundation.

19             MR. GRANT:  All right.

20   BY MR. GRANT:

21   Q.   Again, how would you go about differentiating an

22   individual's drug use?

23   A.   You ask them for their drug history.  You ask when it

24   started; that's significant.  You ask, for instance, if they

25   had a tendency to smoke marijuana versus alcohol or if they

1   combined several substances; that has an impact on their

2   ability and their mental health presentations when you see them

3   for the first time.

4   Q.   And again, how long were you at the Baker County Jail?

5   A.   Over five years.

6   Q.   And how many detainees did you observe or did you treat

7   during the time that you were there?

8   A.   Well, every month how many inmates did I see?  I can't

9   distinguish without -- I don't recall how many I saw in

10  substance abuse, but I saw 300 inmates a month.

11          MR. GRANT:  Again, Your Honor, I'd offer her as an

12  expert in the area of substance abuse.

13          THE COURT:  Ms. Taylor.

14          MS. TAYLOR:  Your Honor, I object.  She was asked

15  what her background and training is with regard to being an

16  expert in substance abuse, and the only specific training that

17  she mentioned was a course that she took -- one course that she

18  took as part of her master's degree, which she obtained in

19  1997.  She mentioned somebody named Terence Gorski and stated

20  she used him.  It's unclear whether he provided her any

21  training or she hired him as a consultant or did he come and

22  actually advise on the program.

23          I mean, it appears she certainly has -- she has

24  practical experience dealing with people who have substance

25  abuse issues, but whether she has training that would render

1    her an expert in the sense that she is going to be testifying

2    about generally accepted methods, I don't see that background

3    here, Your Honor.

4            THE COURT:  Mr. Grant, did the witness actually treat

5    Mr. Templeman?

6            MR. GRANT:  She actually saw him for a period of

7    time.

8            Your Honor, I think that the standard for an expert

9    is not your actual, you know, course, your academic training;

10   although we typically rely on that.  It's based upon the

11   individual's experience as well.  And in Ms. Douglas's case,

12   she had five years at the Baker County Jail, specifically

13   dealing with, you know, mental health and substance abuse

14   issues.

15           THE COURT:  I think that the Court's view on

16   whether -- whether Ms. Douglas should be able to express her

17   opinions is influenced by the fact that over a period of six

18   years, I routinely receive letters from inmates crediting their

19   sobriety and the change that they've made in their life to

20   Ms. Tonya, as she is referred to in the letters.  So what I'm

21   struggling with is that seems that's slightly outside the

22   record.

23           I'm also very aware that Baker County was very -- not

24   only Baker County, but the inmates were very disappointed with

25   Ms. Douglas left because of the value of the services that she

1   provided.

2          I think her background is sufficient to allow her to

3   express her opinions.  The weight of the particular opinion --

4   that I give a particular opinion may be diminished depending on

5   the subject matter.  But I'm going to allow the witness to

6   testify, and I'm satisfied that her training and experience

7   is sufficient that she can express opinions on the matter of

8   substance abuse counseling.

9          But, Ms. Taylor, to the extent there are particular

10  opinions that go beyond her experience of counseling inmates at

11  the Baker County Jail, I'll certainly hear from you as to the

12  weight of those when I hear from you, okay?

13          MS. TAYLOR:  Yes, Your Honor.

14          THE COURT:  Go ahead, Mr. Grant.

15          MR. GRANT:  Thank you.

16  BY MR. GRANT:

17  Q.   Ms. Douglas, did you have an occasion to meet with

18  Mr. Templeman?

19  A.   I did.

20  Q.   And do you recall what date that was?

21  A.   I have it here in my notes.  I met with him on March -- I

22  forgot to put it in my notes.  It was in March this month -- of

23  this year.

24  Q.   Okay.

25  A.   Sorry about that.

1    Q.    And how long -- that's okay.  And how long did you spend

2    with him?

3    A.    I spent two hours.

4    Q.    All right.  And what was the purpose of that meeting or

5    evaluation?

6    A.    I was sent records from your office, and after reviewing

7    those, I reviewed Dr. McClain's report.  And so I had some more

8    questions specific to substance abuse.  I was asked to come

9    here and talk about how substance abuse impacts

10   decision-making, so I wanted to get the timeline of Mr.

11   Templeman's substance abuse history.  I felt like that was

12   important.  And so I wanted to get specific dates.  That's one

13   of the things I always did, was I wanted to know when it

14   started.  That impacts the emotional capacity of the person.

15          So, for instance, if a person starts drinking or

16   using marijuana at the age of 14, there are significant

17   developmental -- developmental issues pertaining to their

18   cognitive abilities that get stunted because they introduced

19   that into their brain.

20   Q.    Okay.  So again, in this particular instance, you did

21   conduct an interview of Mr. Templeman?

22   A.    Yes, I did.

23   Q.    And what information did you obtain from him that you

24   found relevant to your ultimate assessment?

25   A.    I found out that at age 14 he began drinking alcohol.  He

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 52 of 113 PageID 609
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 168 of 231

52

1   was a typical teenager.  And that continued.  He said he began

2   binge drinking at 16.  So that's significant.  Then added

3   cocaine at the age of 21, and then at age 24 introduced

4   marijuana.

5          And then the significant substance abuse really began

6   in 2005, when he pulled his back working for the Duval County

7   School Board.  And that's when opiates were introduced into his

8   life.  He was prescribed them, and then I believe he obtained

9   some of them from his father as well.

10          And then from there he lost his job, and that was --

11   the shame and guilt of that increased.  He coped by using

12   substances.  So he used opiates; he used benzodiazepines; he

13   continued to use marijuana.  Drinking was the real drug, or the

14   gateway drugs.  Usually there is one.  That was the significant

15   thing.  That was always the substance that led him into other

16   drug abuse.

17          He used fentanyl; he used Xanax; he used ecstasy from

18   time to time; he binged on cocaine.  Mr. Templeman told me that

19   he would use it one to two times a month and binge an eight

20   ball.  So those things are significant to me if I'm assessing

21   someone trying to find out how that impacts their

22   decision-making processes.

23   Q.   And so you say it's significant to you in terms of -- and

24   I'm speaking specifically about the laundry list of drugs.  Why

25   is it significant?

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 53 of 113 PageID 610
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 169 of 231

53

```
 1   A.    Each of them has a different impact.  For instance,

 2   opioids impact the pleasure and pain receptors in the brain.

 3   And long-term use of opioids depletes the dopamine in the

 4   brain, which what happens is that --

 5          THE COURT:  Mr. Grant, I think this might be going

 6   into an area that would be beyond --

 7          THE WITNESS:  Sure.

 8          MR. GRANT:  That's fine.

 9          THE COURT:  -- the very limited area that I've

10   allowed her to testify.

11   BY MR. GRANT:

12   Q.    In terms of a treatment plan, right, is it essential that

13   you have this history of use?

14   A.    Yes.

15   Q.    All right.  And when you formulate a plan, how do you

16   utilize this history in developing the plan?

17   A.    So Mr. Templeman began using alcohol at 14.  So coping

18   skills are developed during those formative teenage years.

19   Impulse control; consequences, learning about consequences.

20          So the treatment plan would center on helping him

21   with coping skills; how to manage stress; how to learn how to

22   delay gratification, so to speak; how to make -- how to handle

23   sadness, depression, anxiety in appropriate ways rather than

24   escaping into drugs.  Those would be the bullet points of the

25   substance abuse plan for him.
```

1  Q.    Okay.  Are you aware of whether or not Baker County Jail

2  currently has a substance abuse program?

3  A.    I am not aware of that.  I know that there is a mental

4  health director there.  I'm not sure what type of program they

5  currently have.

6  Q.    With respect -- and having conducted your evaluation of

7  Mr. Templeman and having made an assessment, what is your

8  opinion of his need going forward?

9  A.    Mr. Templeman -- if I were to make recommendations, I

10  would definitely address the substance abuse from a relapse

11  prevention perspective.  His -- he's -- he was at Gateway three

12  different times and also did inpatient therapy and then

13  relapsed.  But each time he was there, he relapsed.  So relapse

14  prevention is going to be the goal in his substance abuse

15  treatment.  So that's going to involve how you handle when you

16  have cravings; how do you handle it when you are stressed; what

17  kind of coping skills do you develop in him to help him manage

18  the things in life that we all have the do.  We all have to

19  make choices when we're stressed.  What do we do about that?

20          The other thing I would do is he has a long history

21  of anxiety and depression.  He was very shy when he was young.

22  He said alcohol gave him liquid courage.  So instead of using

23  alcohol to give him self confidence, using coping skills that

24  would help build his confidence.  How do you feel good about

25  yourself?  How do you build this man's self esteem back?

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 55 of 113 PageID 612
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 171 of 231

55

1          The third leg of his treatment would involve grief

2   counseling because of the loss of his daughter.

3   Q.   Now, are you aware that the Bureau of Prisons has a

4   program, acronym we recall RDAP, Residential Drug Abuse

5   Program?  What would be your opinion regarding that program?

6   A.   The federal system has a fairly good program.  I've been

7   involved with that program when I was employed at the Lake --

8   Lake City Correctional Facility from 2011 to 2012.  That was

9   the program that was employed in my unit.  The substance --

10  that was the substance abuse program that we used.

11  Q.   And do you believe that Mr. Templeman would benefit from

12  that program?

13  A.   Absolutely.

14          MR. GRANT:  I have no further questions, Your Honor.

15          THE COURT:  Ms. Taylor?

16          MS. TAYLOR:  Your Honor, I have no questions.

17          THE COURT:  Mr. Grant, I want to -- just for purposes

18  of any representation later, I want to clarify that I allowed

19  Ms. Douglas to offer her opinion solely in the area of

20  substance abuse counseling.  And I'm actually not terribly sure

21  that any of what she told us really about her interview with

22  Mr. Templeman is expert testimony.  So I think I would caution

23  that probably this proceeding would not serve the basis of

24  representing that she was qualified as an expert in future

25  proceedings.

 1          MR. GRANT:  And if you recall, when we first

 2  initially discussed this, I said that we had one expert and

 3  someone who might not --

 4          THE COURT:  Yeah.  So I'm going to -- I'm going to

 5  accept Ms. Douglas's testimony, but for purposes of future

 6  representations, I would not think that this qualifies as

 7  having been qualified as an expert in federal court.

 8          MR. GRANT:  Thank you.

 9          THE COURT:  But before you step down, Ms. Douglas, I

10  will tell you that you have positively impacted the lives of

11  countless individuals.

12          THE WITNESS:  Pleasure meeting you finally.

13          THE COURT:  You're excused.

14          Are those all your witnesses, Mr. Grant?

15          MR. GRANT:  Yes, Your Honor.

16          THE COURT:  Okay.  Then, Ms. Taylor, you --

17          Mr. Bonderud, are you okay with presenting anybody as

18  part of your -- anybody else that you would want to call just

19  as part of your statements after I hear from Ms. Taylor?

20          MR. BONDERUD:  The only person you're going to hear

21  from on behalf of Mrs. Templeman is Mrs. Templeman.

22          THE COURT:  Okay.

23          MR. BONDERUD:  We can do that now or we can do it

24  after.

25          THE COURT:  No, I think what I'll do is we'll revert

 1   to our normal practice, which is Ms. Taylor will make her

 2   recommendations and then I'll hear from counsel.

 3           Mr. and Mrs. -- and, of course, if there are any

 4   character witnesses you want to present at that time, I'll hear

 5   from them.

 6           Mr. and Mrs. Templeman, I'll give you the opportunity

 7   to speak if you wish to speak.  You do not have to, but it's

 8   certainly your right to do so.

 9           Ms. Taylor.

10           MS. TAYLOR:  Your Honor, this is a -- this is a

11   difficult case.  It's an unusual case, and it's a tragic case

12   as it turns out.

13           As this Court knows from its review of the materials

14   in the PSR, this case involves sex trafficking by both of the

15   defendants of a minor child who was their biological daughter.

16           I referenced earlier having, you know, spoken with

17   the minor child last summer as we were preparing her for a

18   material witness deposition, which never ended up happening

19   because the defendants decided to accept guilty pleas that we

20   offered to them.  But again, we did meet with the minor child I

21   would guess on at least five occasions to prepare her for that

22   deposition.  And a substantial portion of our conversations

23   also revolved around whether this case should be resolved short

24   of the most serious offense that was charged, which is the

25   substantive sex trafficking offense for Mr. Templeman.  Had his

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 58 of 113 PageID 615
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 174 of 231

58

1   case gone to trial, it was certainly my intention to charge

2   Mrs. Templeman as well with that offense.

3           And right from the outset, I structured the

4   indictment purposefully to have more significant consequences

5   for Mr. Templeman than Mrs. Templeman because in my view he is

6   the more culpable party.  That's certainly reflected here at

7   this stage of sentencing by the fact that he has a

8   substantially higher statutory maximum penalty that could be

9   imposed.  His is life; Mrs. Templeman's is ten years.  It's

10  reflected in their guidelines range.  But what each of them did

11  was certainly extremely serious.  But the government's view is

12  Mr. Templeman is the more culpable party here for multiple

13  reasons.

14          But as we were having discussions with the minor

15  victim while preparing her for the material witness deposition

16  last year, we did directly ask her whether she wanted us to

17  offer the plea agreements that we tendered to the defendants,

18  which would give them each the opportunity to plead guilty to

19  an offense that carried no minimum mandatory, and for the

20  mother capped her exposure to ten years, and the minor victim

21  was in favor of that.  And that was essentially really the

22  primary reason for offering those plea agreements, was to give

23  her the chance to have a say in how the case resolved, make her

24  voice heard, as well as not put this family through that

25  experience of, you know, cross-examining their child in a

1   deposition or at a trial, which we were able to avoid through

2   these -- through these plea agreements.

3          But that shouldn't, at the same time, be a reflection

4   on whether the government views this case as serious.  It's

5   incredibly serious.  It's amongst the -- as one of the

6   sentencings memos noted, it's amongst -- this is amongst the

7   most serious types of crimes that comes before this Court.

8   That's reflected in the fact that the substantive offense

9   carries a minimum mandatory of ten years.  It's reflected in

10  the fact that the guidelines, as they're calculated for the sex

11  trafficking offense, start at about 20 years.

12         It's extremely serious what they did, and it's only

13  made more serious by what their relationship was to the child.

14  And one fact that is highly pertinent here that I think is

15  glossed over in the sentencing memos that were submitted by the

16  defendants is kind of where things were in terms of their

17  relationship with the child and their legal status with regard

18  to the child when this offense occurred.

19         As reflected in the PSR and in their plea agreements,

20  the defendants' parental rights were terminated in July of

21  2019.  That wasn't something that happened all of a sudden.  It

22  was something that was a long time coming because they had been

23  failing the minor victim for years at that point.  She had a

24  serious drug addiction.

25         And again, this is -- this is reflected in the PSR

1   where it summarized the state court's findings at the time of

2   the hearing where the parental rights were terminated.

3           I'm sorry, I'm just trying to find where that is.

4           THE COURT:  In Mrs. Templeman's it's in paragraph 60

5   and 61.

6           MS. TAYLOR:  Thank you, Your Honor.

7           The court's findings were based upon the long

8   documented history of the defendants failing that child, of the

9   years of the father using not just -- you know, not just

10  marijuana with the child, but he's using heroin with the minor

11  child.  They're going out, he's, you know, driving her around

12  to drug dealers.  And, you know, yet in his sentencing memo his

13  justification is he was trying to protect her and trying to not

14  lose her to the streets.  He was the streets.

15          They were living in a vehicle at the time this

16  offense occurred.  They were at times staying at

17  Mrs. Templeman's place of employment.  At times they would get

18  hotels, but they were on the streets.  And how Mr. Templeman

19  possibly could have protected the minor victim as he's out

20  riding around with her all day long using heroin and cocaine

21  and allowing her to engage in commercial sex acts with multiple

22  strange men all day long is really unfathomable what he

23  possibly could have done to protect her.  I mean, it may be

24  fair to say that in his mind he believed that that was what he

25  was doing at the time, but the reality is he wasn't protecting

1   her.

2         In fact, at the time that his happened, again, their

3   parental rights were terminated.  They were not to have contact

4   with the child.  The parental rights were terminated, to my

5   understanding, as part of a deal where the criminal charges of

6   child abuse were dropped in exchange for the defendants

7   agreeing that they would relinquish their parental rights,

8   which they did.

9         But even with all of that background, all of those

10  kind of warning shots of -- you know, this is a toxic, toxic

11  situation.  You know, the two of you and this child can't be

12  together.  You're failing to care for her; you're failing to

13  protect her.  Both the father and the child have just

14  completely out-of-control addictions to opiates and are using

15  them together.

16        Despite all of those warnings and despite them

17  relinquishing their parental rights to the child, it was

18  Mrs. Templeman, as reflected in the plea agreement, in the PSR,

19  who reached out to the child after their parental rights were

20  terminated and let the child know, "Hey, we just got a big

21  chunk of money."  And the child went to them because the

22  child's a drug addict.

23        And that amount of money was approximately $26,000.

24  Seems like it should be enough money to keep a family afloat

25  for a little while.  My understanding is they -- and I believe

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 62 of 113 PageID 619
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 178 of 231

62

1    this is reflected in the plea agreements as well -- they used

2    some of that money to put a down payment on the vehicle that

3    they were living in afterward part-time.  They used some of the

4    money to buy the cell phones, which were later recovered from

5    various pawn shops.  And then essentially, within about a

6    month, the rest of the money was spent mostly on drugs.

7            After that -- Mrs. Templeman's continuing to work

8    throughout this time, but she's handing over her paycheck to

9    the father and the minor victim and allowing them to spend

10   that -- to spend her paycheck, again, mostly on drugs.

11   According to the minor victim, and what's admitted in their

12   plea agreement, Mrs. Templeman was getting paid about every

13   other week.  That money that she made would be spent within

14   about 24 to 48 hours because that was the level of severity of

15   the addictions of the -- of the father and the minor child.

16           And thereafter their only source of income was the

17   minor child engaging in these sex dates.

18           It -- it has perplexed me throughout this case why

19   Mrs. Templeman remained in that situation, because to all of --

20   everything that we've been able to determine through this

21   investigation, she was not using drugs.  There was a --

22   appeared to be an accidentally-made recording of the three of

23   them kind of getting ready to go to sleep in their car.  And in

24   the recording Mr. Templeman and the minor child can be heard

25   arguing about brillo, which is something that the Court may be

```
 1    familiar is commonly used when you're smoking crack, and
 2    they're arguing about where did the brillo go.  And they just
 3    treat Mrs. Templeman terribly in the recording.
 4          But nonetheless, you know, she continued to stay with
 5    them.  She enabled their addictions by turning over her
 6    paycheck.  And despite what she maintains in the sentencing
 7    memo, it's made out like she got charged because she aided and
 8    abetted or didn't prevent what was happening.  But that's not
 9    what she admitted.  She admitted to the substantive sex
10    trafficking offense and she admitted to the conspiracy.  The
11    facts that are in the factual basis of her plea agreement
12    support that she committed both of those crimes, and
13    specifically reflect that at times she was the one to drive the
14    minor victim to the sex dates.
15          So it wasn't that she was just along for the ride;
16    she was doing it too.  Not to the same degree as Mr. Templeman.
17    She wasn't using the drugs with the child like Mr. Templeman
18    was, but she was fully engaged in this crime.
19          And certainly she was doing nothing to help the minor
20    victim during this time.  And again, she was the one who
21    reached out to the minor victim an enticed her back by letting
22    her know about the settlement money after the parental rights
23    had been terminated, after both Mr. and Mrs. Templeman were
24    fully aware of how toxic that situation of the three of them
25    being together was.  Fully aware of how unable they had been to
```

1   help the minor child, not to mention Mr. Templeman's failure to

2   help himself.

3            And despite all that, you know, they get back with

4   her, and the results were ultimately tragic.

5            In Mr. Templeman's post-arrest interview -- well, and

6   they obviously knew that they weren't supposed to be with her.

7   On the date that JSO Detective Task Force Officer Maynard went

8   to Mrs. Templeman's place of work, when she got there,

9   Mrs. Templeman's coworkers told her that Mrs. Templeman was out

10  to lunch with Mr. Templeman and the minor child.

11           And they, apparently knowing that the police were

12  looking for the minor child, dropped Mrs. Templeman off several

13  blocks away and allowed her to walk back to the office in order

14  to avoid being detected.  And so Task Force Officer Maynard

15  remained at Mrs. Templeman's place of work all throughout the

16  day, overhearing conversations, as reflected in the plea

17  agreement, where Mrs. Templeman -- excuse me, Mr. Templeman

18  made phone calls in to Mrs. Templeman to let her know that they

19  were, you know, out going, taking the daughter around to sex

20  dates.

21           Apparently at five o'clock the phones at the place of

22  employment would -- would cut off, and so Mr. Templeman

23  couldn't call in to the insurance company, but Mrs. Templeman

24  could still call out to Mr. Templeman.  Her work day ended at

25  five o'clock.  Mr. Templeman at one point called in to let her

1   know they were going to another date, and then he ended up not

2   coming to pick her up until about 7 p.m. that night, at which

3   point the minor child was finally recovered.  Mr. Templeman was

4   arrested.  He agreed to an interview.

5          Mrs. Templeman was not arrested that day as the

6   detective had told her, you know, essentially, "If you

7   cooperate with me in helping to recover this child" -- which

8   she did -- "then I'll not arrest you today."  But, of course,

9   she was arrested later on.

10         In Mr. Templeman's interview, he -- again, he

11  explained that he was concerned that the minor victim was

12  essentially putting herself in danger being out on the street,

13  using drugs, and associating with a bad crowd, and if she were

14  going to do that, he would rather that she did it with him.

15         He acknowledged in that interview that he really

16  couldn't protect her.  And he stated, "I just kind of leave it

17  in the Lord's hands when she goes" -- you know, when she goes

18  to one of these other vehicles.  He stated that he attempts to

19  screen the customers, but acknowledged in the interview that he

20  really can't protect her and that he was aware that there was a

21  chance that she might not come back each time she left to go do

22  a sex date.  And admitted -- estimated that he had taken her to

23  20 to 30 sex dates total.  I suspect that that's a substantial

24  underestimate.

25         And he clearly knew the lingo that the minor victim

 1  was using to engage in these dates.  He knew that "QV" meant a

 2  quick visit, meant she wants it quick.  Knew exactly which

 3  types of sex acts the minor victim would and would not engage

 4  in.  He was aware of specific -- there were specific regular

 5  customers that he was aware of.  He was able to describe them

 6  to the detectives, including their nicknames, ages, the

 7  vehicles they drove.  So he was --

 8          THE COURT:  Have any of those folks been prosecuted?

 9          MS. TAYLOR:  Your Honor, we attempted -- there were

10  several regulars in particular that we attempted to prosecute,

11  but without the full cooperation of the minor victim, we were

12  unable -- unable to have sufficient evidence to do so.  I would

13  have loved to have prosecuted those customers.

14          There are ongoing matters on the State side related

15  to the minor victim.  I believe at least one or two of which

16  involve Johns.  Three?  Okay.

17          THE COURT:  Go ahead.  I didn't mean to interrupt.

18          MS. TAYLOR:  Yes, Your Honor.

19          Of course, each of those people are highly culpable

20  in my view too.  But frankly, the minor victim, I think, was

21  trying to protect some of them because she really clearly never

22  quite got in the mindset of actually wanting recovery.

23          One of the tragedies of this case is that repeated

24  efforts were made by the State to get her into an appropriate

25  placement, get her counseling and treatment, and she would

1    rarely stay in a placement for more than a handful of days.

2         And I suspect that she was protecting some of these

3    Johns because she knew that she would need them for her

4    financial support when she was back on the street in the

5    future.

6         Ultimately -- and really one of the real tragedies of

7    this case is when we were meeting with her to prepare her, she

8    expressed a very strong desire to be here before the Court for

9    sentencing.  I suspect that she would have told you that she

10   viewed this as being her fault; that she was out of control and

11   that there was nothing that her parents could have done to

12   change what she was doing.

13        And that -- that may be at least partially true, but

14   what they could have changed was not continuing to actively

15   contribute to her downfall.

16        And I remember her specifically saying that she was

17   not going to run away this time when we were preparing for the

18   deposition because she wanted to be here.  And that was -- and

19   that was what she stated was her motivation, was she wanted to

20   be here to speak and tell you her views and she was not going

21   to run away.  But sadly, she stayed only a few days once again

22   in treatment before running away and then overdosing and

23   passing away in October.

24        Obviously she wasn't in the custody of the parents at

25   that time, but the time that they spent further enabling her,

1    essentially encouraging her noncompliance with what the State

2    was trying to do in terms of getting her help and services,

3    cannot have helped that situation with regard to her motivation

4    and to -- to comply with those services and get better, nor did

5    it set -- it certainly did not set the right example for her

6    for her parents to condone her engaging in the sex dates.  And

7    more than condone it, but agree that they were all going to

8    live off of the money and just engage in this drug-fueled

9    lifestyle that they were engaging in at the time that this

10   crime occurred.

11          Your Honor, the Court heard testimony earlier today

12   from Mr. Templeman's two witnesses.  Certainly clearly he needs

13   drug addiction treatment.  He desperately needs it, as -- let's

14   see, I'm forgetting her last name -- Ms. Tonya --

15          THE COURT:  Douglas.

16          MS. TAYLOR:  Yes.  As Ms. Douglas testified, he's had

17   drug treatment multiple times.  You know, one hopes that going

18   forward he's going to be successful in that treatment, but

19   only -- he's the only one really with control over that.  But

20   certainly he's in need of it again.

21          But the Court also heard testimony that he -- he has

22   a diminished -- well, it certainly appears inferentially that

23   he has diminished his mental capacity possibly through drug use

24   over a number of years.  Again, he obviously was of a

25   sufficient intelligence to complete high school, to gain

1   admission to Jacksonville University.  While the PSR reflects

2   that he was not an outstanding student at JU, even being able

3   to qualify for admission to JU is a substantial accomplishment.

4   And so to the extent that the testing is accurate, that his

5   current IQ is approximately 67, it wasn't at one point.  And I

6   think the expert agreed that that was -- that was likely

7   accurate.

8        But there was nothing in that testimony that would

9   suggest that Mr. Templeman didn't know what he was doing, that

10  this was a situation that arose suddenly and he didn't have

11  time to process the wrongness of it before the crime was

12  committed.  This was activity that he engaged in for an

13  extended period of time.  And the wrongness of it could not be

14  more obvious.

15       So to the extent that he has slow processing, has a

16  diminished intellectual capacity, there's nothing to suggest

17  that he didn't know what he was doing, that he didn't

18  understand right from wrong, that he didn't understand the

19  consequences of what he was doing, both to him and to his

20  daughter.  He clearly understood those consequences, as he told

21  the detective in the post-arrest interview, that he knew that

22  she may not come back.  That each time that he dropped her off

23  for one of these sex dates, she may not come back.  Because

24  that's the level of danger that this activity posed to her, and

25  ultimately it -- the streets cost her her life.  And that,

1  again, is the real tragedy of this case, because when -- when

2  sober, the minor victim was a really pleasant child.  You know,

3  she understood as well -- despite the fact that she was

4  essentially hostile to this prosecution throughout it, she also

5  understood why we were doing what we were doing.  We talked

6  about that.  We talked about how serious what the parents were

7  doing was with her.  And she -- she did cooperate with us,

8  agreed to meet with us, prepare with us, talk with us, because

9  she understood, as well, that we were trying to protect her and

10 trying to protect her interests.

11         So again, an unusual case where you have a victim who

12 both -- what she would say is, "I disagree with the

13 prosecution, but I understand why you're doing what you're

14 doing."  And that was her viewpoint on it.

15         But, Your Honor, I would suggest to the Court that

16 that's only one factor for the Court to consider.  Obviously

17 the victim's wishes are important.  We have honored her wishes

18 through these plea agreements.  I've honored her wishes by

19 coming in here and telling the Court very straightforwardly

20 what her viewpoint was, even though it is hostile to our

21 position.  But ultimately, when it comes down to it, Your

22 Honor, this is a case where a child lost her life; where her

23 parents failed to protect her in the most fundamental way

24 possible; and then contributed to her downfall by engaging in

25 one of the most serious crimes that you can -- you can do on

1    the federal side.

2         A serious punishment is appropriate and necessary in

3    this case.  The guidelines for Mrs. Templeman and Mr. Templeman

4    are pretty disparate.  And obviously that's one of the factors

5    that the Court needs to consider, is avoiding unwarranted

6    disparities in sentencing.  And you could make arguments that

7    that means Mr. Templeman's -- you know, he should come down or

8    Mrs. Templeman should go up.  My view is Mrs. Templeman should

9    go up.  She, again, admitted to her role in this offense, which

10   is that while she wasn't engaging in the conduct to the same

11   degree as Mr. Templeman was, she was engaging in the sex

12   trafficking.

13        You know, frankly the child sex abuse material is not

14   really what this case is about.  This case is about the

15   trafficking of the child.  Were she to have pleaded to the

16   conspiracy as the PSR reflects, her guidelines would be the

17   same as Mr. Templeman's.

18        Your Honor, I would ask for the Court to impose high

19   end of the guidelines on Mrs. Templeman and a low end of the

20   guidelines on Mr. Templeman.  I don't think that there's any

21   reason to depart from the guidelines as to Mr. Templeman.

22   Certainly his conduct, especially with regard to the drug use

23   with the daughter, is really atrocious and really serious.  And

24   the seriousness of what went on, again, is only underlined here

25   because, you know, sometimes you can come and say, "Well, this

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 72 of 113 PageID 629
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 188 of 231

72

1   is really dangerous.  Somebody could have died from this.

2   Somebody could have overdosed on drugs."  Well, here it

3   happened.  We don't have to speculate about how serious this

4   was or what the consequences might be if this conduct went

5   unchecked.  We know what the consequence was because the

6   consequence happened.

7          Surely Mr. Templeman and Mrs. Templeman have suffered

8   as well from the loss of their daughter.  I would not and don't

9   argue that they did not care about her, but there certainly was

10  an indifference, at best, to her situation.

11         Maybe they just couldn't do better.  I don't know.  I

12  don't know what the explanation is.  I don't think that they

13  went out -- and this is just my opinion.  I don't have the

14  impression that they recruited her because they were looking

15  for some way to make money.  I don't think that that's what

16  happened.

17         But again, at best, they were indifferent to her

18  suffering and to what -- and to the trauma that she endured

19  every time she was out on the street to make money so that she

20  and the father could buy more heroin and then go do another

21  date.

22         It's incredibly serious, and the United States would

23  suggest that a guideline sentence for Mr. Templeman is

24  appropriate in this case, Your Honor.

25         THE COURT:  Thank you, Ms. Taylor.

1          Mr. Grant.

2          MR. GRANT:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. GRANT:  Everybody here knows that this is a

5     troubling case not only because of the nature of the charge, or

6     charges, that Mr. Templeman and Mrs. Templeman are facing, and

7     the time that they're both facing, but more specifically

8     because of the death of their daughter.

9          I have given so much thought to this case over the

10    months that I've represented Mr. Templeman.  The -- when we

11    were originally set last year for sentencing, the daughter was

12    alive.  We had every hope that she would come to this Court and

13    say to the Court, you know, "Not that my parents shouldn't be

14    punished, but the measure of which the government is seeking to

15    punish my parents is far greater than I would want."

16         And, you know, Ms. Taylor has said that to the Court.

17    But the difference is she's not here to direct the Court.

18         And as, you know, Ms. Taylor said, you know, victim

19    impact is not the end-of-all in terms of the punishment that

20    the Court should mete out, but I think in this particular case,

21    it should weigh heavily.

22         And I say that because -- in my sentencing memo I

23    stated, you know, the means don't justify the ends and the ends

24    don't justify the means in this case.  The bottom line is that,

25    you know, the conduct that took place cannot be justified on

1    any level.  None whatsoever.  It cannot be justified, but it

2    can be explained.

3           And what we have is the explanation that we, the

4    defense, have tried to communicate to the Court.

5           Mr. Templeman had such an addiction that it has

6    impacted his ability to make decisions.  No, those -- it does

7    not affect his culpability.  We didn't raise that as a defense

8    because it doesn't qualify on that level.  It doesn't justify

9    his conduct.  But it does explain it.

10           Mr. Templeman, you know, even as Ms. Taylor stated,

11   in his mind he thought he was doing what was right to protect

12   his daughter.  That's in his mind.  We know that his mind was

13   deficient when it comes to making decisions based upon the

14   testimony of Dr. McClain.

15           When their daughter was placed into the care of the

16   Department of Children and Family Services in July of 2019, she

17   was sent to Daytona.  Shortly after arriving in Daytona she ran

18   away.  It wasn't until August, late August, that Mrs. Templeman

19   reached out.  From July to August she is out in the wind.  They

20   don't know what's going on; they don't know what she's doing.

21           But even the government tells you that she was

22   protecting her pimps, you know, that she is -- and again, I

23   want to make it clear:  I am not trying to, you know, place

24   blame on her, because the blame is not hers.  The blame is on

25   Mr. Templeman primarily, and on his wife tertiary, because from

1   my perspective, she did enable them.

2          But Mr. Templeman is the one who bears the greater

3   responsibility.  I acknowledge that.  I accept that.

4   Mr. Templeman accepts that.  He understands that had he not had

5   an addiction, he would not have contributed to his daughter's

6   addiction.

7          But Mr. Templeman, in August and September of 2019,

8   the only thing that's on his mind with respect to his

9   daughter's safety is making sure that he at least has eyes on

10  her.

11         One of the things that is important to understand is

12  that earlier, when an intervention was brought with respect to

13  R, and I believe this was in July of 2019 --

14         THE COURT:  Madame Court Reporter, just put the first

15  initial.

16         MR. GRANT:  Oh, I'm sorry.  I tried so hard to say --

17         THE COURT:  I know, and you were doing great.

18         MR. GRANT:  I apologize.  She was in a hospital, and

19  she jumped from the third floor to avoid being placed in

20  placement or getting care.  This is known to Mr. Templeman,

21  that she will go to any extent to try to avoid.  Jumping from a

22  third floor.

23         Mr. Templeman at that point is of the mind that he

24  has to do whatever to make sure that she is with them.  Again,

25  it does not justify what he did, but it does explain from his

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 76 of 113 PageID 633
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 192 of 231

76

1    perspective what it was he was trying to do.  He was trying to

2    make sure his daughter was safe.  He was trying to be there for

3    her.

4            This was a dysfunctional family, no question

5    whatsoever.  As I put in my sentencing memo, when Mr. Templeman

6    was six years old, his father allowed him to travel from

7    Jacksonville to South Carolina on a Greyhound bus all by

8    himself, trusting a friend of a friend, a friend of an uncle, I

9    believe it was.  Now, I mean, I remember back in the days

10   catching the Greyhound buses.  I remember seeing kids that were

11   on the buses by themselves.  But none as young as six.  And to

12   send that child to go up to see his mother, who the father knew

13   had mental health issues, which is why she was there, to send

14   the child there to bring the mother back.

15           Mr. Templeman, even as a child, was concerned about

16   trying to hold together his family.  It didn't change when he

17   became an adult.  It didn't change in 2019.  He's trying to

18   hold his family together.  He's not doing a good job.  He's not

19   utilizing the proper means.  But from his perspective, all he

20   thinks is:  I need to keep us together.  Living out of a car.

21   Living in a hotel.  Sleeping in the business place where my

22   wife works.  But we're together.

23           This is a very difficult case.  Society tells us that

24   children are what we should hold up the greatest.  And I agree.

25   I have two daughters.  I understand.  But I also understand

1   that countless number of children are committing suicide, you

2   know, for whatever reason.  Oftentimes because they don't feel

3   like their family loves them or cares about them.

4         Here we have the opposite, what we would think is --

5   what the government is telling us that the parents don't care

6   about the child, but the child cares about the parents.  But

7   the reality is the parents do actually care about their child.

8   They love their child.  They were just poor at raising her.

9   They allowed their desire to keep their child in their life to

10   lead them to allow the child to do what the child should not

11   have been permitted to do.

12         We see individuals all the time, you know, who are

13   not bad people, who make bad choices.  I would suggest to you

14   that these two individuals are not bad people.  They made a

15   horrible choice because what they saw as an alternative was

16   something that they didn't want.  They didn't want their

17   daughter to be away from them.  They didn't want their daughter

18   to be at the hand of pimps, to be abused and misused by pimps.

19         The government spoke earlier about the fact that

20   there are individuals who are being prosecuted in state court.

21   In August of 2021, while Mr. Templeman and Mrs. Templeman are

22   in custody, their daughter was the victim of an assault.  She

23   had been, for all intents and purposes, kidnapped by three

24   individuals.  She convinced them to allow her to go into a

25   convenience store, and in the convenience store she's trying to

```
 1   get the clerk to call the police.  These individuals came into

 2   the store, started beating her, in the presence of the clerk.

 3   They left.  But that wasn't enough.  They drove by and fired

 4   shots into the convenience store.  This is what the Templemans

 5   were concerned about.  How do we make sure our daughter doesn't

 6   get in that situation?

 7          Again, their choice in what they did was absolutely

 8   wrong.  But the question becomes ultimately, as a parent, when

 9   you're in a situation -- forget how you got to the situation,

10   but when you're in a situation in which there is possible

11   danger to your child if she is not with you, which choice do

12   you make?

13          Now, I would hope that most people would have said:

14   I'll take my daughter and make her go to, you know, the police,

15   make her go into child care.  But if you have fear that your

16   child is going to run away again but next time not come back to

17   you, your question becomes -- your answer may change.

18          Now, again, that doesn't allow you to go and benefit

19   off of your child's prostitution.  But again, it's always

20   ultimately, we say it all the time, the lesser of two evils.

21   You don't want your child to run away.  You don't want your

22   child to be out there.

23          And again, this case is made even worse because she's

24   not here to tell you what she really wants.

25          Mr. Templeman made poor choices; made poor decisions.
```

1   Mr. Templeman committed a crime.  Mr. Templeman pled guilty to

2   the crime.  Mr. Templeman just wants this Court to understand

3   that he, in this situation, didn't know how to make the proper

4   decision.  That his capacity was diminished in the sense of his

5   decision-making.  Because in addition to just the fact that he

6   has the cognitive deficiency that has set in, he also has a

7   drug craving, and so his decisions are even further complicated

8   and further compromised.

9            Mr. Templeman is not asking this Court to not give

10  him a sentence.  Mr. Templeman is not asking for time served.

11  Mr. Templeman is asking this Court to impose a sentence that

12  is -- that respects the law, but understands that, you know,

13  this particular intent, as the government said, it wasn't to

14  recruit anybody to go out and commit offenses, to go out and

15  prostitute themselves.  They didn't recruit anybody.  Mr.

16  Templeman would never do that.

17           Did they benefit?  Did he benefit from his daughter's

18  actions?  Yes.  Did he take his daughter to these contacts?

19  Yes.

20           But it's what he was trying to do, it was what he was

21  trying to do that should matter, and why he was trying.

22           Your Honor, as I've indicated in my sentencing

23  memorandum, we're asking the Court to impose a term of

24  72 months, six years.  Mr. Templeman has been in custody for

25  about two and a half years.  A sentence of that magnitude will

```
1   allow him to get the necessary treatment that he would need at

2   the Bureau of Prisons, the RDAP program, as well as mental

3   health treatment.  And that's what we're asking the Court to do

4   because I believe that is what their daughter would ask.

5           Thank you.

6           Oh, and also, I know the Court referenced the fact

7   that there were letters that we submitted, and I will remember

8   when I get back to the office to redact that letter from

9   Ms. Pattee.

10          Ms. Pattee is present in the court.  She has

11  indicated that she doesn't want to address the Court, she wants

12  to rely on her letter.  And to be honest with you, she's

13  concerned that people might take out of context what she wants

14  to say in terms of the dynamics within the family.  And as the

15  Court is aware, we're all walking on eggshells in terms of, you

16  know, everybody's involvement.

17          THE COURT:  Thank you, Mr. Grant.

18          And Madam Deputy, I don't know if I said out loud to

19  direct the clerk to remove those two from the docket.

20          COURTROOM DEPUTY:  Yes, Your Honor.

21          THE COURT:  Mr. Templeman, I said earlier you have

22  the right to speak if you would like to.  You don't have to.

23  But if there's anything you'd like to say, now would be your

24  opportunity.

25          DEFENDANT SAMUEL TEMPLEMAN:  Yes.  I would just like
```

 1   to apologize to the city of Jacksonville, you know, the

 2   sheriff's office.  And, you know, this is really tragic.  My

 3   daughter, it's the worst thing, hearing that news.  And I

 4   was -- I mean, prior, leading up to that, I was worried about

 5   that phone call.  I just want to apologize to my wife.  I'm

 6   sorry.  I'm sorry.  Thank you.

 7            THE COURT:  All right, sir.

 8            Mr. Bonderud.

 9            MR. BONDERUD:  Thank you, Your Honor.  Andrew

10   Bonderud on behalf of Mrs. Templeman.  Mrs. Templeman has pled

11   guilty, and she's -- she's agreed with the factual basis as

12   reflected in the plea agreement.  She's very remorseful.

13            The Court will hear from her that given the

14   opportunity, she would do a lot of things differently.  She

15   made many mistakes, criminal mistakes.  And she deserves to be

16   held accountable and she acknowledges that.

17            I adopt a lot of -- let's say all of what Mr. Grant

18   represented to the Court on behalf of Mr. Templeman.  I believe

19   those sentiments that Mr. Grant expressed are correct.  I do --

20   I do want to make a couple of additional comments.

21            The government I think rightly pointed out that there

22   was a recording made from the family, the Templeman family's

23   vehicle, while Mr. and Mrs. Templeman and the minor child were

24   in it.  And counsel for the government indicated that

25   Mr. Templeman and the minor child treated Mrs. Templeman

1    terribly.  "Terribly" was the word.

2          And counsel for the government used:  Why would she

3    remain in that situation?  And I think I'd like to pose a

4    possible answer to that question.  And I think the -- the

5    answer can be found in Mrs. Templeman's background as described

6    in the presentence investigation report, some of the details of

7    which I highlighted in my sentencing memorandum.

8          Mrs. Templeman is the product of a broken home.  Her

9    parents divorced when she was three.  She was sexually molested

10   at age five.  She was raped at age seven.  She was raped at age

11   18.

12         Why did she remain in the situation?  I think it's

13   fair to suggest that Mrs. Templeman was conditioned to believe

14   that she could not say no.  She could not say no.

15         Of course, she could say no.  She had alternative

16   options available to her that she didn't avail herself of.  She

17   did benefit from the proceeds of her daughter's commercial sex

18   activity.  But I just want to reiterate to the Court that

19   Mrs. Templeman is not somebody who laid back and kicked her

20   feet up knowing that her daughter's illicit activity would be

21   funding the family's lifestyle.

22         Mrs. Templeman, in her mind at the time, believed

23   that she was doing everything she could do.  She was wrong.

24         But what she did was she went out and worked.  She

25   worked days, she worked nights, she worked three jobs at a

1    time.  Only for her husband and daughter to blow the money on

2    drugs.

3           It's hard to comprehend why she didn't do more to

4    protect her daughter, to get her husband and her daughter the

5    help that they so desperately needed.

6           The Court will hear from Mrs. Templeman that, I guess

7    with the benefit of hindsight, there's several things that

8    Mrs. Templeman would do differently.  But Mrs. Templeman knew

9    what those things were at the time because Mrs. Templeman

10   threatened to do those things at the time.  But she didn't

11   follow through with them.  She could have, but she didn't.  She

12   could have taken all the electronics away from her daughter and

13   the family.  She could have stopped paying the bill for the

14   telephones.  She could have left.  But she didn't.

15          And like Mr. Grant said, it's not -- it's not -- it's

16   not an effort to undermine her culpability, it's an effort to

17   explain why she did what she did.

18          I think Mrs. Templeman would say and will say to the

19   Court that there could be no greater punishment -- there's

20   nothing that the Court could impose on her that will be more

21   severe than the prospect of living the rest of her life without

22   her daughter.  She will have to do that, and she will be a

23   registered sex offender for the rest of her life.

24          Mrs. Templeman -- I think with respect to the risk of

25   sentencing disparities, I would note that, you know, I think

 1   there should be a sentencing disparity in this case because I

 2   think the conduct and behavior at issue is disparate between

 3   the two parties.

 4           Mrs. Templeman has a criminal history of zero;

 5   Criminal History Category of zero.  And she was not engaged in

 6   the kind of drug use, drug addiction that Mr. Templeman and

 7   their minor child were engaged in.  I think there's definitely

 8   a difference between the two, and I think that's borne out by,

 9   frankly, the plea agreements that were offered to the two

10   defendants.

11           And beyond that, Your Honor, I'm not going to ask the

12   Court to impose a particular sentence.  This case is

13   complicated.  And it's tragic.  And I'll leave that very

14   difficult decision without comment to the Court.

15           And beyond that, I'll rely on the arguments that we

16   made in our sentencing memorandum, in addition to the

17   statements that you'll hear from Mrs. Templeman directly.

18   Thank you.

19           THE COURT:  All right.  Thank you, Mr. Bonderud.

20           Mrs. Templeman, was there anything that you wanted to

21   say, ma'am?  Why don't you come up to the podium.  Watch your

22   step.

23           MR. BONDERUD:  And if it's okay, Your Honor, I'd like

24   to guide her with some questions.

25           THE COURT:  Sure.  And Madam Deputy, do you have --

```
 1    Mr. Bonderud, there's some Kleenex on your table.

 2             DEFENDANT DEBORAH TEMPLEMAN:  Sorry.

 3             MR. BONDERUD:  So Mrs. Templeman, first of all,

 4    you've had an opportunity to both review the presentence

 5    investigation report as well as the sentencing memorandum that

 6    I filed; is that right?

 7             DEFENDANT DEBORAH TEMPLEMAN:  Yes.

 8             MR. BONDERUD:  And are the facts that are reflected

 9    in the presentence investigation report and our memorandum

10    correct?

11             DEFENDANT DEBORAH TEMPLEMAN:  Yes.

12             MR. BONDERUD:  I'd like you to tell the Court a

13    little bit about the early years of your marriage.  But when

14    you -- when you were married to Mr. Templeman you had a couple

15    children from prior relationships; is that correct?

16             DEFENDANT DEBORAH TEMPLEMAN:  I did, yes.

17             MR. BONDERUD:  And tell the Court about the early

18    years of your marriage as well as the early years of you being

19    a mother to the minor child.

20             DEFENDANT DEBORAH TEMPLEMAN:  We got married in April

21    of '98 and we had a good marriage.  Chris, when he's not on

22    drugs or drinking, he's a sweet, kind person.  And he was very

23    helpful in all areas.  And when we had R, she was planned.

24    R -- sorry.

25             THE COURT:  That's okay.  To the extent that you --
```

1  you can call her whatever you want, we're just going to -- in

2  the transcript we're just going the change it to R.  But you go

3  right ahead and use your daughter's name.

4        DEFENDANT DEBORAH TEMPLEMAN:  We were excited and

5  scared at the same time when I found out I was pregnant with

6  her.  And I was excited that I was having another little girl.

7        And Chris was real helpful and real good to her.  He

8  was a good dad.  But when -- when R was little, we -- we had

9  family time.  And she was real close to her grandma and she got

10  to meet her sister and her brother.

11        And she was a very happy child and she went to

12  elementary school and she had friends and she lived a normal

13  life.

14        And it wasn't -- and Chris was always good to me.

15  And he was good to R.  And R and her dad were close because he

16  is -- he's a good person.  We both just made mistakes.  And I

17  made a lot of mistakes, too, because I didn't -- I didn't know

18  how to handle stuff.

19        And I worked a lot because that was an escape for me

20  because pretty much I didn't know what was going to happen at

21  night.  So I had normalcy during the day.  So I used my job as

22  a crutch, I guess.

23        But I tried to keep my family together because I

24  thought that was the right thing to do.

25        MR. BONDERUD:  Now, there came a turning point, and I

```
 1  think the Court has heard about it, when your husband had a
 2  work-related injury.  Do you recall?
 3            DEFENDANT DEBORAH TEMPLEMAN:  Yes.  He hurt his back.
 4            MR. BONDERUD:  And then he became addicted?
 5            DEFENDANT DEBORAH TEMPLEMAN:  Addicted to pain
 6  medicine.  And that's when it started.  And then it went from
 7  the pain medicine to the drinking and the other drugs.
 8            MR. BONDERUD:  And at the same time your daughter was
 9  in middle school?
10            DEFENDANT DEBORAH TEMPLEMAN:  Uh-hmm.
11            MR. BONDERUD:  Is that correct?
12            DEFENDANT DEBORAH TEMPLEMAN:  Yes.
13            MR. BONDERUD:  And when did your daughter start
14  having problems?
15            DEFENDANT DEBORAH TEMPLEMAN:  She started having
16  problems in middle school.  She was being bullied at school and
17  she was into boys and stuff.  And I tried to explain to her
18  that boys will come later, that, you know, school is more
19  important.  I tried to tell her because I had a kid when I was
20  17 and I didn't want the same thing to happen to her.
21            But then -- and then the principal talked to us about
22  home school.  And I made the wrong choice there, too, and home
23  schooled her when she was more of a structured type of child.
24  She needed to be in a regular school.  And I messed that up
25  too.
```

```
 1            And she did really well.  She was an A/B student.
 2    She did really well in the home school in the beginning, until
 3    she got hooked more on the drugs and stuff.  And then it got
 4    worse.  And then she didn't do her school.  And I kept checking
 5    it at work, and it just -- she wasn't doing it.
 6            And then I let her go to her sister's when she begged
 7    me.  And I should have let her stay home to try to help her.
 8    And I didn't do it because, like I said, I made a lot of
 9    mistakes that I have to regret and now my daughter's gone and I
10    can't fix it.  And I thought I could fix stuff and I can't.  I
11    can't fix everything.  And I guess I thought I could.
12            I'm not perfect and I made the wrong choices for my
13    baby, but I loved her and we both love her.  And Chris and I
14    always loved R.  I -- I was stuck in jail and I couldn't do
15    anything to help her.  And when I talked to her on the phone,
16    she said that she was -- she said that she was sorry for her
17    and her dad putting me through hell.  And she said that she
18    loved me and loved her dad and that she was sorry.
19            And I told her I was sorry and that I didn't -- I'm
20    sorry I didn't save her and help her.  And she told me that
21    she -- that she loved me and that she knows that I did
22    everything I could and that she was happy I stayed with her
23    dad.  Because I tried to keep the family together even though I
24    should have took her away temporarily so Chris could get help
25    and then she could get help.
```

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 89 of 113 PageID 646
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 205 of 231

89

```
 1              But I didn't make the right choice.  All I did was

 2    work.  But if I didn't work, we wouldn't have had any money or

 3    anything and they wouldn't have had food.  So I just made poor

 4    choices.  At my age I should have known better and I didn't.

 5              And I want to tell my husband I'm sorry because I

 6    even was -- I yelled a lot.  I hold everything in until the

 7    end, and then I get fed up and then I yell.  And that doesn't

 8    do anything.  It just makes it worse.

 9              And I could say mean things because I don't

10    understand drug addiction because I'm not a drug person.  And I

11    could say mean things, and I didn't mean to.  But I love my

12    husband and he's not a bad person and neither am I.

13              That's all.  Thank you.

14              THE COURT:  Thank you, ma'am.

15              MR. BONDERUD:  I have nothing further, Your Honor.

16              THE COURT:  Thank you, Mr. Bonderud.

17              Ms. Taylor, anything else from the United States?

18              MS. TAYLOR:  No, Your Honor.

19              THE COURT:  It's about noon and we've been convened

20    for about two and a half hours.  I've heard from all the

21    parties.  I would like to take some time to collect my thoughts

22    before I pronounce sentence.  As you-all know, once I say the

23    sentence out loud, that's it.  So I would like to take some

24    time.  And what I would like to do is reconvene at 3 o'clock

25    this afternoon.
```

```
 1              Ms. Taylor, does that work for the United States?

 2              MS. TAYLOR:  At least I will be here, Your Honor.

 3    Ms. Wolfson may or may not be able to come back at 3.

 4              THE COURT:  Okay.  My apologies, Ms. Wolfson.

 5    There's a lot to process, and I want to make sure that I

 6    have -- that I've considered everything fully before I

 7    determine an appropriate sentence.

 8              MS. WOLFSON:  Yes, Your Honor.

 9              THE COURT:  Mr. Grant, does that work for you?

10              MR. GRANT:  I think I have initial appearance because

11    I'm duty today, but I have enough time to be able to get

12    someone else to cover it.

13              THE COURT:  Okay.  Thank you.

14              Mr. Bonderud?

15              MR. BONDERUD:  Your Honor, I'm going to pick my

16    children up from school a few minutes before 3.  I could have

17    child care right after that.  Could we reconvene maybe a few

18    minutes after, maybe 3:30?

19              THE COURT:  Or we can do 4 o'clock.

20              MR. BONDERUD:  Actually --

21              THE COURT:  3:30 works for me.

22              MR. BONDERUD:  I would prefer 3:30 so that I can get

23    back to them sooner than later.

24              THE COURT:  All right.  I apologize for messing with

25    everybody's schedules, but there's a lot for me to process with
```

 1   all the information that's been presented, and I'd just -- I'd

 2   like to have some time to do that.

 3        So Ms. -- well, since you're standing, I'll start

 4   with you.  Mr. Bonderud, is there any bar to sentencing?

 5        MR. BONDERUD:  No, Your Honor, there's not.

 6        THE COURT:  Mr. Grant?

 7        MR. GRANT:  No, Your Honor.

 8        THE COURT:  Ms. Taylor?

 9        MS. TAYLOR:  No, Your Honor.

10        THE COURT:  With that, I understand that I have heard

11   the positions of all the parties and I'm going to take the

12   matter under advisement.  We will reconvene at 3:30 this

13   afternoon, at which time the Court will impose sentencing as to

14   Mr. and Mrs. Templeman.

15        For the folks that were here, if you're not able to

16   return, my apologies, but thank you for your presence.

17        We're in recess.

18        COURT SECURITY OFFICER:  All rise.

19      (Recess from 12:01 p.m. to 3:37 p.m.)

20      (Ms. Wolfson not present.)

21        COURT SECURITY OFFICER:  All rise.  This Honorable

22   Court is back in session.

23        Please be seated.

24        THE COURT:  Sentencing is by far, way far, the

25   hardest thing that any United States District Judge faces.  It

1   is exceedingly difficult in the most ordinary of cases, if

2   there could ever be -- if you could ever describe depriving an

3   individual of their liberty as ordinary, because when one is

4   sentencing an individual, as I have said very often, you're

5   sentencing not just the person, but their mother, their father,

6   their siblings, their family, their friends.

7          And you're also sentencing, oftentimes, an individual

8   on what Mr. Grant's colleague Ms. Call often reminds me is the

9   worst window period of their life.  And that is certainly true

10  in this particular case.

11         And this case can only be described as anything but

12  ordinary.  The circumstances of it, I think probably to every

13  person in this room, including the Templemans themselves, are

14  unimaginable.  And I think if it hadn't happened -- if the

15  Templemans hadn't lived through it, they wouldn't think it was

16  possible.  Certainly the rest of us wouldn't.

17         But regardless of how difficult it is, having been

18  assigned the case, I am charged with determining an appropriate

19  sentence for Samuel and Deborah Templeman.  And I have the

20  guidance of the United States Sentencing Guidelines, and I am

21  told to consider those guidelines, to consider the nature and

22  the circumstances of the offense, and the history and

23  characteristics of the defendant, and arrive at a sentence that

24  is sufficient, but not greater than necessary, to satisfy the

25  statutory purposes of sentencing.  And that's the language that

 1    Congress uses:  Sufficient, but not greater than necessary, to

 2    reflect the seriousness of the offense; promote respect for the

 3    law; provide just punishment; afford adequate deterrence;

 4    protect the public from further crimes; to consider the need

 5    for treatment; and also to consider the need to avoid

 6    unwarranted sentence disparities amongst not just

 7    co-defendants, but other similar defendants.

 8              And so the guidelines for Mr. Templeman as calculated

 9    are 235 to 293 months, and as to Mrs. Templeman, 63 to

10    78 months.

11              So as I said, I'm supposed to start with the

12    guidelines and then consider the nature and the circumstances

13    of the offense and the history and characteristics of the

14    defendant.

15              The nature and circumstances of the offense are

16    amongst the worst that we see in this courthouse.  The selling

17    of a human being, helping a child offer her body to be abused

18    by adult men, strangers who we don't know much about, but we

19    know one thing about them:  They cannot possibly have had any

20    regard for the safety and well-being of the child.  And we can

21    make no mistake:  The victim here, the 15-year-old, or

22    16-year-old because of the time frame, was a child and is in no

23    way responsible for her own actions and is in no way

24    responsible for the acts of her parents.

25              She was a child.  And I am so sorry that I did not

1   get the opportunity to meet her and talk to her.  And I am so

2   sorry to Mr. and Mrs. Templeman for their loss.  It's an

3   unimaginable loss.  But she is a child whose body was sold to

4   feed drug addiction.  And as hard as it is for me to say to

5   you, you were the very people whose job it was to protect her

6   from drug addiction and to protect her from the types of

7   predators who would abuse her, and instead you facilitated the

8   abuse.  Not just facilitated it, participated in it by

9   literally delivering her to be abused.  It's really almost

10  impossible to comprehend any way that a parent could find any

11  rationalization for that conduct.

12          And I heard a repeated refrain this morning of "poor

13  decisions."  These weren't just poor decisions.  It's a poor

14  decision to run a traffic light because you're running late.

15  It's a poor decision to steal or sell drugs to earn money to

16  feed your family.  Sure, you get away with it for a little

17  while, but ultimately you're caught, now you're in prison, and

18  guess what, you can't feed or protect your family from prison.

19  That's a poor decision.

20          This can't euphemistically be ascribed or attributed

21  to a poor decision.  These were horrific,

22  unimaginably-wrong-on-every-level decisions with -- with tragic

23  consequences.  And I know that, sadly, no one is more aware of

24  how tragic those consequences are than Mr. and Mrs. Templeman.

25          Those are the circumstances of the offense, although

1   I think I need to briefly address one argument that was made

2   with respect to Mrs. Templeman.  It was argued that

3   Mrs. Templeman, while perhaps not equally as culpable as

4   Mr. Templeman, is more culpable than the guidelines suggest.

5   And I think the argument was that we're not really here about

6   the photos that were on her phone -- I'm looking for the

7   language; give me a minute.

8        That it's not really about the sexual abuse material

9   that was on her phone; that's not really what the case is

10   about.  And I understand that.  It is entirely true that that's

11   not really what the case is about, but that is what

12   Mrs. Templeman was permitted to plead guilty to.  And I think

13   that to the extent that I'm asked to view her sentencing

14   through the lens of having committed this sex trafficking

15   substantive offense and the conspiracy, then that really

16   somewhat deprives Mrs. Templeman of the benefit and the

17   intention of her plea agreement, a plea agreement which was

18   entered in part, as I understand it -- and I appreciate

19   Ms. Taylor's candor -- at the behest of the minor victim.

20        And so while I certainly understand the government

21   arguing that the Court should consider the totality of the

22   offense conduct -- and I think I have to consider the totality

23   of her offense conduct in arriving at an appropriate

24   sentence -- it is my intention to sentence Mrs. Templeman based

25   on the offense to which she pled guilty.  And I'm not inclined

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 96 of 113 PageID 653
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 212 of 231

96

1  to vary upward from the guidelines to hold her accountable for

2  the charges that are dismissed as part of her plea agreement.

3           And let me just say out loud:  I'm fully aware that I

4  can hold her accountable for dismissed conduct, it's just that

5  under the circumstances of this case, and given the

6  representations made regarding to the -- regarding the wishes

7  of the victim, that I think that the better course of action

8  here is not to do so.

9           I have to say I find it nearly impossible to

10  comprehend how Mrs. Templeman could have watched the

11  destruction and abuse of her child day to day.  But I can also

12  say that I cannot comprehend the pain and betrayal of the life

13  that Mrs. Templeman led that left her so totally and completely

14  ill-equipped to protect herself, to protect her child, or to

15  deal with the unsurmountable challenge of the drug addiction of

16  her husband and child; what truly appeared to have been her

17  whole world.

18           And so considering those -- the nature and

19  circumstances of the offense and those characteristics of

20  Mrs. Templeman, considering the charge to which she and the

21  government determined she would enter a plea, and considering

22  the intentions of the child victim, I am convinced that a

23  sentence within the guidelines is appropriate for

24  Mrs. Templeman.

25           Mr. Templeman presents an even more complicated

1  challenge to the Court in determining an appropriate sentence.

2  And I say that because Mr. Templeman's guidelines are quite

3  high:  just under 22 -- about 25 years.  And I've had to think

4  long and hard about whether -- whether a guideline sentence is

5  appropriate.  And I've had to talk about or think about whether

6  a different sentence would result in an unwarranted disparity

7  in sentence.

8           And one particular individual goes through my mind a

9  lot when I think about that, probably because he writes me

10  letters maybe every four to six months.  A gentleman named Ian

11  Sean Gordon, who I sentenced to life imprisonment for sex

12  trafficking of a 15-year old.

13          And when he writes me, sometimes he writes me to tell

14  me about progress he's made and good things that have happened.

15  Sometimes he writes me to tell me about sad things that have

16  happened in his life that he wasn't there for.  And when he

17  writes me those letters, I write him back.

18          Sometimes he writes to me to complain that he thinks

19  his sentence is unfair; that there are individuals in the

20  prison who committed crimes far more heinous than he, but their

21  sentences are only 10 or 15 years and he doesn't understand.

22  And I confess that when I got those particular letters from

23  him, I find the better course of action to be not to respond.

24          But I found myself thinking, here I'm contemplating

25  varying downward from 235 to 293, and what would Mr. Gordon

1   think about that.  And then I thought about the differences in

2   their offense conduct.  Mr. Gordon lured a child who was having

3   difficulties at home but was not anywhere -- was not -- she was

4   just acting out, shall we say, and not getting along with her

5   parents.  So he lured her from the facility where she had been

6   sent to get some counseling and go to school.  And he

7   introduced her largely to drugs; he introduced her to selling

8   her body; he caused her to become addicted to those drugs; and

9   then he preyed on that addiction.

10          And then when she realized that this was not safe and

11   she decided she wanted help, he threatened to harm her family

12   if she ran away.  And he beat her on more occasions than I

13   think she was able to count.

14          And then she did run away.  And when she ran away, he

15   found her and he literally dragged her back by her hair.  And

16   to prevent her from running away in the future, he locked her

17   in the hotel room without any clothes between Johns so that she

18   could not run away.

19          Of course, now Mr. Gordon regrets all of that, he

20   tells me in his letters, and I believe him.  But that's what he

21   did.  And that, combined with his terrible criminal history,

22   convinced me that a life sentence was the only sentence that

23   was appropriate to reflect the seriousness of his offense, to

24   accomplish just punishment and deterrence, and largely to

25   protect the public, because I was quite convinced that

1   Mr. Gordon, if released, would simply return to preying on the

2   next child he found.

3          And while Mr. Templeman's actions here are

4   inexplicable, deplorable, I have to say even despicable, he is

5   different than Ian Sean Gordon.  Markedly so.

6          And as I said with Mrs. Templeman, while I cannot

7   fathom how Mr. Templeman could convince himself on any level or

8   in any universe that any of this was remotely okay or remotely

9   just a poor decision, the fact that that is so inconceivable

10  somewhat ties into what Mr. Grant has argued, and that is that

11  Mr. Templeman's addiction and its control over his

12  decision-making and really his life left him really unable to

13  recognize the depravity of the conduct in which he was

14  engaging.

15         And while perpetuating the sexual abuse of your own

16  child is horrible, Mr. Templeman's actions are not akin to

17  those of Ian Sean Gordon.  And while I don't understand the

18  rationalizations that Mr. Templeman made, I am convinced that

19  he believed them.

20         I also think that unlike Ian Sean Gordon, who if

21  released would return to his prior offense conduct, I'm

22  confident that Mr. Templeman would never seek out a child to

23  sell for drugs or anything else again.

24         Even Ms. Taylor acknowledged that she had no reason

25  to believe Mr. Templeman ever set out to traffic his daughter

Case 3:21-cr-00019-MMH-PDB Document 119 Filed 07/12/22 Page 100 of 113 PageID 657
USCA11 Case: 22-11884 Document: 17 Date Filed: 09/06/2022 Page: 216 of 231

100

1   or had any intention to do that.

2          And unlike Ian Sean Gordon, Mr. Templeman's criminal

3   history suggests that but for the potential for the drug

4   relapse, he's not otherwise a danger to the public.  Now, the

5   danger of a drug relapse is a danger to the public, but

6   Mr. Templeman -- and this is true of both Mr. and Mrs.

7   Templeman, the offense conduct for which they are being

8   sentenced is about three and a half months of their entire

9   lives.  In Mrs. Templeman's case, no other criminal history.

10  In Mr. Templeman's case, no criminal history really to speak of

11  until almost 2019, at which point it's clear that his drug

12  addiction had taken him off the cliff.

13         And so I am convinced 235 to 293 months for an

14  individual before the Court to be sentenced for the first

15  serious criminal conduct of their life is just too high.  But

16  then once you decide that the guidelines are too high, you have

17  to figure out:  So what is -- what isn't too high and what

18  isn't too low.  And so I went to what I was told about the

19  minor victim's desire.

20         The minor victim's desire apparently was that her

21  father be permitted to plead to an offense that did not have a

22  minimum mandatory term of imprisonment because Count Two -- I

23  think it was, Ms. Taylor? -- Count Two carried a minimum

24  mandatory of ten years.

25         MS. TAYLOR:  I believe that the substantive offense

1   was Count Two, Your Honor, and yes, it was a 10-to-life.

2           THE COURT:  So that made me think:  Okay, is 10

3   years -- is that an appropriate sentence?  Or is something

4   under 10 years an appropriate sentence.  And it just isn't.

5   There's no amount of addiction, no amount of difficult

6   childhood or rationalization of keeping a family together that

7   would make a sentence of less than 10 years, or even 10 years,

8   just punishment for the selling of the body of a 15-year-old

9   child for sex.  It wouldn't reflect the seriousness of the

10  offense.  It would not promote respect for the law.  It would

11  not be just punishment.  It wouldn't be adequate deterrence.

12  The protection-of-the-public factor I think weighs less with

13  respect to Mr. Templeman than it does in others, but that just

14  would not -- would not be enough.

15          And to the extent that that truly was what the child

16  hoped for, I certainly take it into consideration.  But I also

17  have to consider that in expressing those desires, she

18  certainly loves her parents, that's to be understood, but to

19  the extent that she places the blame entirely on herself, I am

20  reminded that she is an untreated child victim who still

21  doesn't truly understand that she was the victim.

22          And so I've thought about all of these things, and I

23  have tried to determine what sentence is the right sentence

24  that would reflect the seriousness of the offense, that would

25  be a punishment appropriate to what was done to this child.

1    Her participation notwithstanding, she's a child.  She should

2    never have been in that situation.

3            So what's a sentence that reflects -- that

4    appropriately punishes that but still takes into consideration

5    Mr. Templeman's life and his circumstances?  And I settled on a

6    term of imprisonment of 160 months.  And I -- I think for an

7    individual who has served no -- essentially no time in prison

8    before this, and taking into consideration his life

9    circumstances, that the reality of his addiction, which no

10   doubt without that being in place he would not have committed

11   the offense, I think that's enough to accomplish just

12   punishment, to reflect the seriousness of the offense, to

13   promote respect for the law, and to accomplish deterrence.

14           As I said, I don't think longer than that is needed

15   to protect the public.  To the extent that the public needs any

16   protection from Mr. Templeman, it's for his drug abuse.  And

17   for that he needs treatment.  I am hopeful that he will get

18   treatment while in the Bureau of Prisons, and I'm going to

19   require him to continue that treatment upon release.  But I

20   certainly don't think that any greater sentence is necessary.

21           I also think that that sentence is significant enough

22   that any difference between it and the sentences that are

23   imposed against others who have committed similar conduct is

24   not an unwarranted sentencing disparity, and it's for those

25   reasons that I talked about Mr. Gordon.

1              It is a very significant sentence.  And I know that

2       Mr. Grant argued, as he always does quite eloquently, for a

3       lesser sentence.  But the offense conduct here is just really

4       significant.  And the Court has an obligation to impose a

5       sentence that accomplishes all of those purposes of sentencing.

6              And while I am -- while I recognize that there were

7       factors and demons that were more in control of Mr. Templeman's

8       life than he could ever imagine, the Court can't simply

9       disregard the seriousness of this offense and the tragic

10      circumstances of it because of that.

11             I'm also persuaded that in addition to the -- well, I

12      don't think "persuaded" is the right word.  I'm also very aware

13      of the fact that while the Court today imposes a sentence that

14      will be carried out by human beings, Mr. and Mrs. Templeman in

15      some ways have already been handed a far greater sentence, one

16      that can never be -- never be terminated and never be changed,

17      and that is the loss of their only child.  And when you combine

18      that with the sentences here, I think it's entirely adequate.

19             The circumstances of this case, I think all of the

20      lawyers have acknowledged, are horrible.  It's tragic for every

21      person that was involved in it.  And so I've done my best to

22      impose what Congress says:  A sufficient, but not greater than

23      necessary, sentence.

24             At this time, Mr. Grant and Mr. Templeman,

25      Mr. Bonderud and Mrs. Templeman, I'll ask you to come up to the

1    podium.

2              Give me one moment to get -- find what I'm looking

3    for here.

4              Well, heck.

5              Madam Deputy.

6         (The Court confers with the courtroom deputy.)

7              THE COURT:  I left one of my notes downstairs.  Let

8    me see if I can just pull it from upstairs.  Give me a moment.

9         (Pause in proceedings.)

10             THE COURT:  The Court has asked why judgment should

11   not be pronounced and has been given no cause.  I've heard from

12   counsel, I've heard from Mr. and Mrs. Templeman and their

13   witnesses, I've reviewed the presentence reports as well as the

14   sentencing memoranda and the letters from friends and loved

15   ones.

16             Pursuant to Title 18, United States Code, Sections

17   3551 and 3553, it is the judgment of the Court that the

18   defendant Samuel Christopher Templeman is hereby committed to

19   the custody of the Bureau of Prisons to be imprisoned for a

20   term of 160 months, and the defendant Deborah Lynn Templeman is

21   hereby committed to the custody of the Bureau of Prisons to be

22   imprisoned for a term of 72 months.

23             Upon release from imprisonment, each of these

24   individuals will have to serve a term of supervised release of

25   10 years.  While on supervised release you'll have to comply

1  with the standard conditions of release as well as certain

2  special conditions.

3          Mr. Templeman, I'm going to order that you

4  participate in substance abuse treatment and submit to random

5  drug testing.

6          I'm going to require both Mr. and Mrs. Templeman to

7  participate in a -- in mental health treatment and to

8  participate in sex offender treatment, including polygraph

9  testing.

10          Because of the offense of conviction, you are

11  required to register with the state sex offender registration

12  agency in any state where you reside, you're employed, carry on

13  a vocation, where you're a student, as directed by the

14  probation officer.  The probation officer will provide state

15  officials with all information required under Florida's sexual

16  predator laws as well as the federal Sex Offender Registration

17  and Notification Act and may direct each of you to report to

18  these agencies personally for required processing, such as

19  photographs and fingerprinting.

20          You will each be required to submit to a search of

21  your person, your residence, your place of business, and any

22  storage unit or computer or vehicle under your control by the

23  probation office at a reasonable time and manner based upon

24  reasonable suspicion that contraband or evidence of a violation

25  of supervised release is present.  And you'll have to inform

1    anyone with whom you share any of those items that you're

2    subject to that restriction.  And a refusal to submit to a

3    search would be a violation of the terms of your supervised

4    release.

5              Mrs. Templeman, because of the offense of conviction,

6    you are also prohibited from possessing, subscribing to, or

7    viewing any images, videos, magazines, literature or other

8    materials depicting children in the nude or in sexually

9    explicit conditions.

10             Give me a moment.  May I see you minute?

11        (The Court confers with the probation officer.)

12             THE COURT:  Having been convicted of a qualifying

13   felony offense, you'll each have to submit to the collection of

14   DNA.

15             You're each ordered to refrain from any unlawful use

16   of a controlled substance, and you'll have to submit to one

17   drug test within 15 days of beginning supervised release and

18   then periodic drug tests thereafter.

19             There is no restitution.

20             The Court waives the imposition of a fine based upon

21   the financial circumstances and indigence of the defendants.

22             There's a mandatory $100 special assessment, but the

23   Court, in light of the defendants' financial circumstances,

24   will not impose the 18 USC, third -- 30 -- 3014 assessment.

25             Ms. Taylor, there's a preliminary forfeiture already

1    entered.  Is there any other forfeiture the Court needs to

2    address at this time?

3            MS. TAYLOR:  No, Your Honor.

4            THE COURT:  So I have already explained the reasons

5    for my sentencing.  I'm not going to -- I'm not going to repeat

6    them now.

7            But I will repeat, and I am convinced that the

8    sentences imposed here today I think are sufficient sentences

9    for these particular individuals for the challenges they faced

10   and for the crimes that they've committed and that the

11   sentences are sufficient to satisfy the statutory purposes of

12   sentencing, but that greater sentences would be more than

13   necessary.  And so for those reasons, I have varied downward in

14   Mr. Templeman's case and imposed a mid-guidelines sentence in

15   Mrs. Templeman's case.

16           Each of you will be remanded to the marshal to await

17   sentencing.  Do you each want a recommendation that you be

18   designated to the facility closest to Jacksonville, Florida?

19           MR. GRANT:  The answer to that is yes, Your Honor.

20           Also, if I may suggest to the Court, I know you do it

21   sometimes, if after five years, if they -- if either one of

22   them or both of them -- specifically I'm talking for my client,

23   but I'm talking out loud for both -- if they are successful,

24   would you entertain a possibility of termination after five

25   years?

Case 3:21-cr-00019-MMH-PDB   Document 119   Filed 07/12/22   Page 108 of 113 PageID 665
USCA11 Case: 22-11884   Document: 17   Date Filed: 09/06/2022   Page: 224 of 231

108

```
 1          THE COURT:  I think if a client -- if an individual

 2   files such a motion, I have to entertain it.  And so I always

 3   will.  The government generally objects, and sometimes the

 4   circumstances are such that I find it warranted to grant and

 5   sometimes they aren't.  So certainly I would entertain it and

 6   then we'll just see what happens at that point.

 7          MR. GRANT:  Thank you.

 8          THE COURT:  And what Mr. Grant is talking about isn't

 9   a change in the sentence.  He's talking about the term of

10   supervised release to follow --

11          DEFENDANT DEBORAH TEMPLEMAN:  I understand.

12          THE COURT:  -- after the sentence.  The sentence,

13   once I impose it today, largely cannot be changed, at least not

14   by me.

15          So I've reviewed the plea agreements.  I'm satisfied

16   that the plea agreements adequately reflect the seriousness of

17   the actual offense conduct between -- or by these individuals,

18   and so the Court accepts the plea agreement.

19          Ms. Taylor, Mr. Templeman pled guilty to Count One

20   understanding that there would be a dismissal of Count Two, and

21   Mrs. Templeman pled guilty to Count Three understanding that

22   there would be a dismissal of Count One.

23          So moved at this time?

24          MS. TAYLOR:  Yes, Your Honor.

25          THE COURT:  All right.  So Count Two as to
```

 1  Mr. Templeman and Count One as to Mrs. Templeman are dismissed.

 2          You-all entered into plea agreements, which somewhat

 3  restrict your ability to appeal the Court's sentence.  I'm not

 4  going to get into that.  You'll talk to your lawyers about

 5  that, but I want to make sure you understand the process of

 6  appeal.

 7          If you wish to pursue an appeal, you have to file a

 8  Notice of Appeal within 14 days.  The government also has the

 9  right to appeal.  You are entitled to be represented by an

10  attorney in any appeal that's taken, and if you can't afford

11  one, the Court will appoint one to represent you at no cost to

12  you.

13          And if you wish to pursue an appeal but you can't

14  afford the filing fee, that's fine, you just submit your notice

15  and the Court will accept it without prepayment.

16          Do you understand those things, Mr. Templeman?

17          DEFENDANT SAMUEL TEMPLEMAN:  Uh-hmm, yes, ma'am.

18          THE COURT:  And you, Mrs. Templeman?

19          DEFENDANT DEBORAH TEMPLEMAN:  Yes, ma'am.

20          THE COURT:  I got off track.  So I'll recommend

21  designation to the facility closest to Jacksonville, Florida.

22          I'll recommend that each of these individuals be

23  evaluated for mental health treatment and be provided mental

24  health treatment at the facility of designation.

25          And with regard to Mr. Templeman, I'll recommend that

1   he be permitted to participate in the Residential Drug Abuse

2   Program as well as any other substance abuse programs available

3   at the facility of designation.

4           Any other requests you would ask me to include,

5   Mr. Grant?

6           MR. GRANT:  No, Your Honor.

7           THE COURT:  Any other recommendations you want me to

8   include, Mr. Bonderud?

9           MR. BONDERUD:  No, Your Honor.  Thank you.

10          THE COURT:  Mr. Grant, any objection to the sentence

11   or the manner in which it was imposed?

12          MR. GRANT:  No, Your Honor.

13          THE COURT:  Mr. Bonderud, any objection to the

14   sentence or the manner in which it was imposed as to

15   Mrs. Templeman?

16          MR. BONDERUD:  No, Your Honor.

17          THE COURT:  Ms. Taylor, I'm going to take these

18   separately.  As to Mr. Templeman, any objection to the sentence

19   or the manner in which it was imposed?

20          MS. TAYLOR:  The United States would object to the

21   below-guideline sentence, Your Honor.

22          THE COURT:  And as to Mrs. Templeman, any objection

23   to the sentence or the manner in which it was imposed?

24          MS. TAYLOR:  No, Your Honor.

25          THE COURT:  All right.  Mr. and Mrs. Templeman, we

1    likely won't see each other again, so good luck to you.

2          And to Ms. Taylor, I would ask you to reach out to

3    the agents and the JSO officers who worked on this case and

4    thank them for their good work.

5          MS. TAYLOR:  Yes, Your Honor.

6          And there was one other thing that I wanted to raise,

7    Your Honor.  In reviewing the sentencing memo that was

8    submitted on behalf of Mrs. Templeman, there's some information

9    on the first page of the memo which was very specific about

10   some childhood sexual abuse that she suffered, and I felt that

11   it should probably be placed under seal.  Not the entire memo,

12   but perhaps Mr. Bonderud could file a redacted version and the

13   original could be placed under seal just because that does

14   concern information about her as a child victim.

15         THE COURT:  Yeah.  You know, I should have thought of

16   that, Ms. Taylor.  Thank you.

17         Mr. Bonderud, can you file a redacted version of

18   that?

19         MR. BONDERUD:  Absolutely.

20         THE COURT:  And Madam Deputy, will you please have

21   the minutes direct the Clerk of the Court to place the original

22   sentencing memorandum under seal?

23         COURTROOM DEPUTY:  (Nods head.)

24         THE COURT:  The unredacted?

25         COURTROOM DEPUTY:  (Nods head.)

```
 1          MR. GRANT:  She's nodding her head.

 2          COURTROOM DEPUTY:  Sorry, I was writing.

 3          THE COURT:  I can't see.  I'm too short to see over

 4   the screen.

 5          All right.  I think that's everything.

 6          Good luck to you both.  And again, I am very sorry

 7   for your loss.

 8          DEFENDANT DEBORAH TEMPLEMAN:  Thank you.

 9          THE COURT:  We're in recess.

10          COURT SECURITY OFFICER:  All rise.

11       (The proceedings concluded at 4:21 p.m.)

12                                  -      -      -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3   UNITED STATES DISTRICT COURT)

 4   MIDDLE DISTRICT OF FLORIDA )

 5

 6        I hereby certify that the foregoing transcript is a true

 7   and correct computer-aided transcription of my stenotype notes

 8   taken at the time and place indicated herein.

 9

10        DATED this 12th day of July 2022.

11

12                         /s/ Katharine M. Healey
                           Katharine M. Healey, RMR, CRR, FPR-C
13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

## CERTIFICATE OF SERVICE

I hereby certify that on Tuesday, September 6, 2022, a true and correct copy of the foregoing *Appendix* was filed using CM/ECF that will automatically send a copy of this document to Assistant United States Attorney Dawn A. Tiffin, United States Attorney's Office, 400 North Tampa Street, Suite 3200, Tampa, Florida 33602; dawn.tiffin@usdoj.gov.

*/s/ Stephen J. Langs*
Stephen J. Langs
Counsel for Appellant Templeman